## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE UNDERWRITING MEMBERS OF LLOYD'S SYNDICATE 3500<br><br>Plaintiff,<br><br>       v.<br><br>THE KINGDOM OF SAUDI ARABIA, THE SAUDI HIGH COMMISSION FOR RELIEF OF BOSNIA & HERZEGOVINA, SAUDI JOINT RELIEF COMMITTEE FOR KOSOVO AND CHECHNYA, SAUDI RED CRESCENT SOCIETY, NATIONAL COMMERCIAL BANK, AL RAJHI BANKING AND INVESTMENT COMPANY, PRINCE SALMAN BIN ABDUL AZIZ AL SAUD, SULEIMAN ABDEL AZIZ AL RAJHI, YASSIN AL QADI<br><br>Defendants. | CIVIL ACTION NO.:<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## <u>THE PARTIES</u>

1.      Plaintiff Underwriting Members of Lloyd's Syndicate 3500, in its own right and as successor in interest to Lloyd's Syndicate 271, is a United Kingdom based insurance syndicate with a principal place of business located at 161-163 Preston Road, Brighton, England.

2.      Defendant Kingdom of Saudi Arabia is a foreign state within the meaning of 28 U.S.C. §1603(a).   Saudi Arabia maintains an Embassy within the United States at 601 New Hampshire Avenue, N.W., Washington, D.C. 20037.

3.      Defendant Saudi High Commission for Relief of Bosnia & Herzegovina ("Saudi High Commission" or "SHC") is a controlled agent and alter-ego of the government of Saudi Arabia.  Although the Saudi High Commission has its headquarters in the Kingdom, its operations are conducted primarily outside of Saudi Arabia.

4.      Defendant Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC") is a controlled agent and alter-ego of the government of Saudi Arabia.  Although the SJRC has its headquarters in the Kingdom, its operations are conducted primarily outside of Saudi Arabia.

5.      Defendant Saudi Red Crescent Society ("SRC") is a controlled agent and alter-ego of the government of Saudi Arabia.  Although the SRC has its headquarters in the Kingdom, its operations are conducted primarily outside of Saudi Arabia.

6.      Defendant National Commercial Bank ("NCB") is a Saudi-based international financial institution, with a principal place of business located at King Abdul Aziz Street, Jeddah, Saudi Arabia.  NCB maintains operations throughout the World, providing a broad range of financial services, including Shariah compliant finance products and services, to individual and institutional clients.

7.      Defendant al Rajhi Bank ("al Rajhi Bank"), formerly known as al Rajhi Banking and Investment Company, ("al Rajhi Bank") is a Saudi-based international financial institution, with a principal place of business located at Olaya Street, Riyadh, Saudi Arabia.  Al Rajhi Bank maintains operations throughout the World, providing a broad range of financial services, including Shariah compliant finance products and services, to individual and institutional clients.

8.      Defendant Prince Salman bin Abdul Aziz al Saud ("Prince Salman") is a resident of the Kingdom of Saudi Arabia, and at times material hereto headed the SHC.

9.      Defendant Suleiman Abdel Aziz al Rajhi is a citizen and resident of the Kingdom of Saudi Arabia, and at times material hereto was the CEO of al Rajhi Bank, founder of the Saar Foundation, and an officer of the International Islamic Relief Organization.

10.     Defendant Yassin al Qadi is a citizen and resident of the Kingdom of Saudi Arabia, and at times material hereto was an agent of National Commercial Bank, employee of al Rajhi Bank, and the founder of the Muwaffaq Foundation.

## A.     JURISDICTION

11.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1332(a)(2) (diversity), and 28 U.S.C. § 1350 (Alien Tort Claims Act).

12.     The jurisdiction of this Court over defendants Saudi Arabia, Saudi High Commission, Saudi Joint Relief Committee, Saudi Red Crescent, and National Commercial Bank is invoked pursuant to 28 U.S.C. § 1330, as the claims against those defendants fall within the exception to immunity set forth at 28 U.S.C. §1605(a)(5) (Foreign Sovereign Immunities Act).

13.     Venue in this district is proper pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(f)(1), as a substantial part of the events giving rise to the claims asserted herein occurred in this district.

## B.     FACTUAL BACKGROUND

14.     On September 11, 2001, nineteen members of the al Qaeda terrorist network, fifteen of whom were citizens of the Kingdom of Saudi Arabia, hijacked four commercial airliners, and used those planes as weapons in a coordinated terrorist attack upon the United States and its citizens (the "September 11th Attacks").

15.     The September 11th Attacks resulted in the tragic loss of several thousand lives, personal injuries to countless other persons, and property damage on a catastrophic scale, including the complete destruction of the World Trade Center Complex.

16.     Following the September 11th Attacks, various persons injured as a result of the Attacks, including families of individuals killed in the Attacks and parties who suffered economic losses as a result of the Attacks, brought civil claims against certain airlines, airport authorities, security companies, airplane manufacturers and other parties, generally alleging that those defendants were in some way responsible for their September 11 injuries under unintentional tort theories (the 9/11 Aviation cases).

17.     By Order dated July 24, 2002, as amended by an Order issued on November 1, 2002, all of the 9/11 Aviation cases were consolidated before the Honorable Alvin K. Hellerstein, under the consolidated caption *In Re September 11 Litigation, 21 MC 101* (the 9/11 Aviation Litigation).

18.     By Order dated November 1, 2002, Judge Hellerstein prohibited the defendants in the 9/11 Aviation Litigation from joining as additional defendants any alleged terrorist or terrorist supporter, thereby precluding the defendants from asserting third-party claims in that litigation against those intentional tortfeasors.

19.     After several years of pre-trial proceedings, the vast mority of the claims advanced in the 9/11 Litigation were resolved through a series of individual settlements.

20.     At all times material hereto, plaintiff herein provided liability insurance coverage to one or more of the parties named as defendants in the 9/11 Aviation cases.

21.     Pursuant to the terms of the applicable policies of insurance, plaintiff herein made payments on behalf of its liability insureds towards the settlements referenced above, in an amount in excess of $215,000,000.00.

22.     Through the instant action, plaintiff seeks recovery of amounts paid on behalf of its insureds in settlement of the 9/11 Aviation cases, and amounts expended in relation to the defense of its insureds in the 9/11 Aviation Litigation, from parties who knowingly provided material support and resources to al Qaeda in the years leading up to the September 11th Attacks, and who by virtue of their intentional conduct bear primary responsibility for the injuries resulting from the September 11th Attacks.

23.     As set forth above, the September 11th Attacks were carried out by the al Qaeda terrorist organization.  Althought the Attacks represented a tragedy of historic proportions to America and its allies, the Attacks were, to al Qaeda and its adherents, simply a targeted operational strike carried out as part of a broader mission to wage jihad against the United States.

24.     The success of al Qaeda's agenda, including the September 11th Attacks themselves, has been made possible by the lavish sponsorship al Qaeda has received from its material sponsors and supporters over more than a decade leading up to September 11, 2001.

25.     Each of the defendants named herein was a knowing and material participant in al Qaeda's conspiracy to wage jihad against the United States, its nationals and allies.

26.     The conspiracy among the defendants to wage jihad against the United States, its nationals and allies, included the provision of material support and resources to defendant al Qaeda and affiliated terrorist organizations, persons, and entities, as discussed herein.

27.     Absent the sponsorship of al Qaeda's material sponsors and supporters, including the defendants named herein, al Qaeda would not have possessed the capacity to conceive, plan and execute the September 11th Attacks.

## C.      THE ORIGINS OF AL QAEDA

28.     Al Qaeda has its origins in the jihad against the Soviet occupation of Afghanistan, although the ideological foundation for the al Qaeda movement long pre-dates that conflict.

29.     The Soviet invasion of Afghanistan served as a rallying point for Islamic extremists in the Middle East, who flocked to Afghanistan to wage jihad against the Soviet Union.

30.     Osama bin Laden travelled to Afghanistan in 1980 to participate in the jihad, and gained prominence during this period for his role in establishing the financial and logistical infrastructure that sustained the Arab-Afghan fighters, commonly referred to as the mujahideen. According to the Final Report of the National Commission on Terrorist Attacks Upon the United States (the 9/11 Commission):

> Bin Ladin understood better than most of the volunteers the extent to which the continuation and eventual success of the jihad in Afghanistan depended on an increasingly complex, almost world-wide organization.  This organization included a financial support network that came to be known as the "the Golden Chain," put together mainly by financiers in Saudi Arabia and Persian Gulf states.  Donations flowed through charities and other non-governmental organizations (NGOs).  Bin Ladin and the "Afghan Arabs" drew largely on funds raised by this network, whose agents roamed world markets to buy arms and supplies for the mujahideen or "holy warriors."

31.     Together with Abdullah Azaam, bin Laden founded the Maktab al Khidmat ("the Office of Services") to facilitate the provision of financial and logistical support to the mujahideen.

32.     Throughout the Afghan jihad, Maktab al Khidmat worked in concert with a network of purported charities and relief organizations (including among others the Muslim World League (MWL), International Islamic Relief Organization (IIRO), World Assembly of

Muslim Youth (WAMY), Rabita Trust, and Saudi Red Crescent Society) to provide travel documents, funds, transportation, training, facilities, arms, physical assets, and other support to the mujahideen.

33.     This network of ostensible charities and relief organizations established a vast financial and logistical infrastructure to support the mujahideen opposition to the Soviet occupation of Afghanistan.

34.     At the conclusion of the Afghan jihad, bin Laden determined that the network that supported the mujahideen in Afghanistan should not be abandoned, but rather adapted to serve as a foundation for waging a global jihad against all of the perceived enemies of Islam, and in particular, the United States.

> April 19, 1988 brought victory for the Afghan jihad.  Moscow declared it would pull its military forces out of Afghanistan within the next nine months.  As the Soviets began its withdraw, the jihad's leaders debated what to do next.
>
> Bin Ladin (and Abdullah Azzam) agreed that the organization successfully created for Afghanistan should not be allowed to dissolve.  They established what they called a base or foundation (al Qaida) as a potential general headquarters for future jihad.

9/11 Report at p. 56

## D.     AL QAEDA'S OBJECTIVES AND TACTICS

35.     In establishing al Qaeda in 1988, bin Laden sought to create a multi-national Islamic army to challenge the perceived domination of the democratic West, and to engage in armed combat wherever Muslim communities were perceived to be under duress, in furtherance of the ultimate objective of establishing a Pan-Islamic Caliphate.

36.     Al Qaeda employs a range of operational tactics and initiatives in the pursuit of its goals, which complement one another as part of a carefully conceived and coordinated global strategy.

37.     Although high profile terrorist attacks are an important aspect of that campaign, al Qaeda has historically devoted far greater resources to military campaigns in conflict regions, and to supporting and fostering regional jihadist organizations and Islamic separatist movements throughout the World.

38.     In this context, al Qaeda has been deeply involved in regional jihad campaigns, involving both traditional forms of combat and terrorist activities, in Bosnia, Chechnya, Kosovo, Sudan, Kashmir, Pakistan, Afghanistan, Iraq, Turkey, Indonesia, Malaysia, Algeria, the Philippines, Somalia, Palestine, Yemen, Kenya, Tanzania and Egypt.

39.     Al Qaeda's participation in these regional conflicts has taken many forms. Al Qaeda provides funding and logistical assistance to local extremist and terrorist organizations, in support of their military and terrorist activities.  In addition, al Qaeda deploys its own members to fight in these conflicts, train new volunteers, and assist in the planning and execution of terrorist attacks.

40.     Through its engagement in these regional jihad campaigns, al Qaeda aims to establish and support radical Islamic regimes and extend its sphere of influence, as critical components of its long-term objective to eradicate democratic societies and establish a pan-Islamic Caliphate.

41.     In describing the importance of these regional military campaigns within the

overall context of al Qaeda's jihad against the West, a 1998 Department of Defense Intelligence

Report states as follows:

> [al Qaeda] seeks to establish a worldwide Islamic state capable of
> directly challenging the US, China, Russia, and what it views as
> judeo-Christian and Confucian domination.
>
> The means by which the above goals are to be met are via terror,
> ethnic cleansing, "latent penetration" (NEI), and control over
> nuclear and biological weapons (Jikhad).  Further, radical Islamic
> (predominantly Sunni) regimes are to be established and supported
> everywhere possible, including Bosnia, Albania, Chechnya,
> Dagestan, the entire northern Caucasus "from Sea to Sea," central
> Asian Republics, Tatarstan, Bashkortostan, all of Russia,
> Afghanistan, Pakistan, Turkey, Indonesia, Malaysia, Algeria,
> Morocco, Egypt, Tunisia, Sudan, and the states of the Persian Gulf.

42.     In addition to the value its participation in regional military conflicts yields in

relation to its long-term strategic objectives, al Qaeda has derived significant immediate benefits

from its participation in these regional jihad campaigns.


43.     Al Qaeda's military operations bolster the organization's image among local

Muslims, thereby facilitating al Qaeda's ongoing recruiting and fundraising efforts.  These

campaigns also afford the organization an efficient vehicle to provide new members with battle

experience, in preparation for terrorist operations and the ongoing military conflict with the

United States.  In addition, al Qaeda's financial and operational support for local Islamist and

separatist movements has allowed al Qaeda to co-opt local conflicts and organizations to its own

ends.  As a result, many pre-existing terror and extremist organizations evolved into al Qaeda

proxies, thereby extending al Qaeda's operational capabilities, resources, and sphere of

influence.

44.     Al Qaeda's participation in such regional conflicts and jihad campaigns fueled al Qaeda's growth and development in the years leading up to the September 11th Attacks.  Indeed, according to the 9/11 Commission, al Qaeda's operational involvement in regional conflicts between 1988 and 1998 served to establish the organization as the vanguard of the global jihadist movement, and directly enhanced al Qaeda's operational capacity to carry out large scale terrorist attacks:

> By the time he issued his February 19, 1998 declaration of war, bin Ladin had nurtured (the al Qaeda) organization for nearly ten (10) years.  He could attract, train, and use recruits for ever more ambitious attacks, rallying new adherents with each demonstration that his was the movement of the future.

9/11 Report at p. 55.

45.     The findings of the 9/11 Commission further confirm that al Qaeda relied heavily on its global infrastructure in planning, coordinating and staging the September 11th Attacks, and that al Qaeda could not have successfully mounted those Attacks absent the impressive resources and assets amassed by the organization over the thirteen years preceeding the Attacks.

46.     In this regard, the 9/11 Commission found that the "9/11 attack was a complex international operation, the product of years of planning."  The 9/11 Report confirms that plans for the Attacks were carefully vetted through al Qaeda's most senior leadership over a period of nearly six years, while those leaders were safely ensconced in training camps and safe houses funded by al Qaeda's financial supporters; that the individuals selected to participate in the Attacks were chosen from an enormous pool of potential candidates, all of whom were recruited, trained, and indoctrinated with funds provided by the organization's supporters; and that details of the plans were revised up until the last minute, through a global communication network, the existence of which was also dependent on the financial sponsorship of al Qaeda's supporters.

47.     Based on the findings of its investigation concerning the relationship between al Qaeda's global infrastructure and the organization's operational capability to plan, coordinate and mount those Attacks, the 9/11 Commission reached the following conclusion regarding the basic organizational requirements for staging a sophisticated terrorist attack:

> A complex international terrorist operation aimed at launching a catastrophic attack cannot be mounted by just anyone in any place. Such operations appear to require
>
> Time, space, and ability to perform competent planning and staff work;
>
> A command structure able to make necessary decisions and possessing the authority and contacts to assemble needed people, money, and materials;
>
> Opportunity and space to recruit, train, and select operatives with the needed skills and dedication, providing the time and structure required to socialize them into the terrorist cause, judge their trustworthiness, and hone their skills;
>
> A logistics network able to securely manage the travel of operatives, move money, and transport resources (like explosives) where they need to go;
>
> Access, in the case of certain weapons, to the special materials needed for a nuclear, chemical, radiological, or biological attack;
>
> Reliable communications between coordinators and operatives; and
>
> Opportunity to test the workability of the plan.

48.     Consistent with the findings of the 9/11 Commission, U.S. counter-terrorism officials have repeatedly affirmed the critical importance of al Qaeda's broader infrastructure and resources to its capacity to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks, including the September 11th Attacks, as reflected by the following statements:

> There are some who question the effectiveness of our strategy to prevent terrorism by attacking the financing that supports it.  They

> note that terrorist attacks themselves cost very little money to carry out – the trivial cost of a suicide belt or similar device – and then leap to the conclusion that our efforts to combat terrorism by attacking terrorist resources are wasted or futile.

> The 9/11 Commission wisely rejected this point of view. In the first place, the cost of financing terrorist activity cannot be measured by the cost of a primitive destructive act. The maintenance of those terrorist networks, like al Qaeda, which threaten our national security, is expensive – even if a particular attack does not cost much to carry out. As the 9/11 Commission explained, groups like al Qaeda must spend money for many purposes – to recruit, train, plan operations, and bribe corrupt officials for example. If we can eliminate or even reduce their sources and conduits of money, we can degrade their ability to do all of these things, and thus can make them less dangerous.

Testimony of Stuart A. Leavey, Undersecretary of Terrorism and Financial Intelligence, August 23, 2004.

> As this Committee knows well, tracking and combating terrorist financing are critical facets of our overall efforts to protect our citizens and other innocents around the World from terrorist attacks…. While any single terrorist attack may be relatively inexpensive to carry out, terrorist groups continue to need real money. They depend on a regular cash flow to pay operatives and their families, arrange for travel, train new members, forge documents, pay bribes, acquire weapons and stage attacks. Disrupting money flows stresses terrorist networks and undermines their operations. In recent months, we have seen at least one instance of what we look for most – a terrorist organization indicating that it could not pursue sophisticated attacks because it lacks adequate funding.

Testimony of Stuart Levey, Undersecretary of Terrorism and Financial Intelligence before the House Financial Services Subcommittee on Oversight and Investigations, July 11, 2006.

> (T)errorist organizations require significant funding. Although individual terrorist attack may be inexpensive, terrorist organizations require far more than explosives to sustain themselves. They need money to train, recruit, pay operatives and their families, travel, bribe officials, procure cover and false documents, as well as purchase arms. If implemented effectively, targeted financial sanctions can put terrorist organizations in a financial box, effectively depriving them of the resources they need to conduct this range of activity.

Prepared remarks of Daniel L. Glaser, Acting Assistant Secretary for Terrorist Financing and Financial Crimes before the Annual Meetings Program of Seminars: The Importance of Expanding Targeted Financial Transactions Programs Around the Globe: Challenges and Opportunities, September 23, 2005.

> The primary reason why combating the financing of terrorism efforts are both necessary and important is that terrorist groups need money.  Although mounting an individual terrorist attack is relatively inexpensive, the cost to maintain the infrastructure to support terrorist activities is high.  Terrorist networks need cash to train, equip and pay operatives, to secure materials and to promote their cause.  To eliminate or reduce the cell's means of raising and transferring funds is to significantly degrade that cell's capabilities.

(*The Money Trail: Finding, Following and Freezing Terrorist Finances*), Michael Jacobsen and Matthew Levitt (Deputy Assistant Secretary for Intelligence and Analysis of the Treasury Department from 2005 – 2007), November 2008, at p. 3.

> Although manning a terrorist attack is relatively inexpensive, the cost to maintain a terrorist infrastructure is high.  Terrorist networks need cash to train, equip and pay operatives and their families and to promote their causes.  Recruiting, training, traveling, bribing corrupt officials and other such activities also cost money.  Limiting their ability to raise funds therefore limits their ability to function.

*Follow the Money – The Obama Administration Should Continue to Track How Terrorists get Their Money,* Michael J. Jacobsen and Matthew Levitt, December 23, 2008

49.     Given the financial needs of terrorist organizations, as documented above, Congress has concluded that money is the lifeblood of terrorism, and that any contribution to a terrorist organization furthers acts of terrorism.  The State Department has affirmed in proceedings before the United States Supreme Court that "[t]he experience and analysis of the U.S. government agencies charged with combating terrorism strongly suppor[t]" Congress's findings on those points.

E.     **THE MEANS THROUGH WHICH AL QAEDA BUILT AND SUSTAINS ITS GLOBAL INFRASTRUCTURE**

50.     Given the infrastructural requirements inherent in al Qaeda's mission to wage jihad globally, and its ambitious goal to stage spectacular international terrorist attacks against the United States as a component of that mission, the development and sustainment of the al Qaeda organization required massive funding on an ongoing basis over a period of many years, through secure and reliable channels.

51.     Indeed, in the wake of the September 11th Attacks, U.S. counter-terrorism officials estimated that al Qaeda required $35 million annually to sustain the infrastructure that supported the September 11th Attacks, a view that was endorsed by the 9/11 Commission as well.

52.     To realize these immense fundraising needs, al Qaeda simply and ingeniously adapted the network developed during the Afghan jihad, relying from its inception on Islamic da'awa organizations (frequently described inaccurately as "charities") to fuel its growth and development.

53.     As the United Nations Security Council Committee concerning al Qaeda and the Taliban succinctly explained:

> From its inception, al-Qaida has relied heavily on charities and donations from its sympathizers to finance its activities.  Charities provide al-Qaida with a very useful international channel for soliciting, collecting, transferring and distributing the funds it needs for indoctrination, recruitment, training, and logistical and operational support.  These funds are often merged with and hidden among funds used for other legitimate humanitarian or social programs.  Al-Qaida supporters and financiers have also established front charity networks whose main purpose is to raise and deliver funds to al-Qaida.  The roots of these charity networks stem from the anti-Soviet Jihad in Afghanistan during the last 1980s.  During that time, al-Qaida could draw on a number of state-assisted charities and other deep pocket donors that supported the anti-Soviet cause.

Today, al-Qaida continues to rely heavily on those charities to facilitate and mask the collection and movement of its funds.

54.     The 9/11 Commission's Staff Monograph on terrorist financing similarly concluded that "al Qaeda was funded, to the tune of approximately $30 million per year, by diversions of money from Islamic charities."

55.     Purported charities provide an attractive mechanism for al Qaeda to raise and launder funds for a variety of reasons.  Unlike for-profit organizations, charitable funds are meant to move in one direction only, meaning that large purported charitable transfers can move without any corresponding return of value.  In addition, charities are often cash intensive, and frequently have considerable access to funds.  Charities with global operations offer an infrastructure for international transactions, often within or near areas that present strategic opportunities for terrorist activity and recruitment.  Further, the legitimate relief work carried out by charities related to terrorist organizations allows terrorists to generate support for their causes and assists terrorists in propagating violent and extremist ideologies.

56.     Although al Qaeda has in limited instances established its own charities to serve as channels of support for particular initiatives, al Qaeda's development into a sophisticated global terrorist network was fueled primarily by the massive support it received from purported charities acting as agents and alter-egos of the government of the Kingdom of Saudi Arabia, many of which worked with the al Qaeda leadership during the Afghan jihad.  These governmental agents have served as the primary conduits for channeling financial, logistical, operational, and ideological support for al Qaeda's global jihad for more than twenty years.  To this day, many of these arms of the Saudi government remain dedicated to promoting al Qaeda's goals and operational objectives, and continue to play a singular role in propagating the violent

and virulently anti-Western ideology that provides religious legitimacy for al Qaeda's terrorist

activities and draws new adherents to al Qaeda's cause.

57.    Although representing themselves to the West as traditional "charities" or

"humanitarian organizations," these organizations are more accurately described as Islamic

da'awa organizations, created by the government of the Kingdom to propagate a radical strain of

Islam throughout the World, commonly referred to as Wahhabism.

58.    Under the direction of the Saudi government, these organizations have

aggressively pressed the view that Western society, under the leadership of the United States, is

conducting a coordinated "Western Cultural Attack" (Ghazu Fikari in Arabic) on Islam, designed

to destroy the fabric of Muslim society as a predicate for Western conquest of Muslim territories.

59.    These organizations fervently believe that this so-called "Western Cultural

Attack" (and other perceived or imagined threats to Islam) must be aggressively countered

through jihad and the indoctrination of Muslims throughout World into Wahhabi Islam, a

strategy the Kingdom has promoted and implemented through government agencies, state

controlled media, government sponsorsed publications, and a variety of other channels.

60.    Consistent with this view, the Saudi government controlled charities have

embraced al Qaeda and its affiliates as partners, and actively supported al Qaeda's global jihad at

every level, from the organization's inception.

61.    These so-called charities, including among others the IIRO, MWL, SHC, SJRC,

SRC, WAMY and al Haramain Islamic Foundation (al Haramain), have provided the vast

majority of the funding that allowed al Qaeda to build and sustain its massive global

infrastructure over the thirteen years leading up to the September 11th Attacks.  Beyond their

massive financial sponsorship of al Qaeda's global jihad, the Saudi charities have been

intimately involved in all aspects of al Qaeda's operations, and allowed al Qaeda to use their

infrastructures and resources as a platform for carrying out jihad.  As further detailed herein, the

Saudi government controlled charities have: (1) raised and laundered funds on behalf of Islamic

terrorist organizations and associated separatist movements, including al Qaeda; (2) channeled

donated funds to Islamic terrorist organizations, fighters and associated separatist movements,

including al Qaeda; (3) provided financial and logistical support and physical assets to Islamic

fighters and terrorists, including al Qaeda; (4) permitted Islamic fighters and terrorists to use

ostensible employment with their organizations as a vehicle for gaining access to conflict

regions, thereby allowing those individuals to carry out militant and terrorist activities in those

areas; (5) performed reconnaissance within conflict regions on behalf of Islamic terrorist

organizations and separatist movements, including al Qaeda; (6) served as liaisons to localized

terrorist organizations on behalf of al Qaeda, thereby assisting al Qaeda in expanding its

operational base and sphere of influence; (7) funded and facilitated shipments of arms and

supplies to Islamic terrorist organizations and associated separatist movements, including al

Qaeda; (8) funded camps used by al Qaeda and associated jihadist organizations to train soldiers

and terrorists; (9) actively recruited new members for Islamic terrorist organizations and

associated separatist movements, including al Qaeda; (10) worked throughout the World to

spread al Qaeda's jihadist ideology and draw new adherents to its cause; (11) served as channels

for distributing information and documentation within Islamic terrorist organizations and

associated separatist movements, including al Qaeda, and from Islamic terrorist organizations

and separatist movements to the media; (12) disseminated publications designed to advance al

Qaeda's radical Islamist ideology throughout the Muslim world and legitimize violent jihad against Christians and Jews on the grounds that they are "infidels" who do not deserve to live; and (13) openly advocated for young Muslims to take up arms against Western and democratic societies.

## F.     THE SAUDI ORIGINS OF THE GLOBAL JIHADIST MOVEMENT

62.     The emergence of al Qaeda and the global jihadist movement under the patronage and stewardship of these Saudi government charities is rooted in the origins of the Saudi state itself, and the unique relationship between the House of Saud and Wahhabi Islam.

63.     The modern Saudi state is a product of a pact forged in the 18th century between Muhammad Ibn al Saud, the head of the al Saud tribe in Arabia, and Muhammad Ibn Abd al Wahhab, a Muslim scholar from the Najd region of Arabia.

64.     Ibn Abd al Wahhab's ideas and teachings form the basis of the Islamic school of thought commonly known as Wahhabism, which forms the ideological foundation for the al Qaeda movement.  According to the National Commission on Terrorist Attacks Upon the United States, al Qaeda finds inspiration and religious justification for its actions "in a long tradition of intolerance" that flows "through the founders of Wahhabism."

65.     In the late 1730's, Ibn Abd al Wahhab began a campaign to impose a puritanical Islamic rule in the Najd region, zealously preaching and writing against Shia Islam as well as the "popular" practices of many Sunni Muslims.

66.     In furtherance of his goal to establish broad rule pursuant to Wahhabi doctrine, and to eradicate Islamic practices he deemed deviant or improper, Ibn Abd al Wahhab sought out an alliance with a political and military leader.

67.     In 1744 Ibn Abd al Wahhab achieved that goal, when he swore a traditional Muslim oath with Ibn al Saud, pursuant to which they promised to work together to establish a state run according to Islamic law (Shariah).

68.     The pact with Ibn Abd al Wahhab provided religious legitimacy and justification for Ibn al Saud's political authority, and offered Ibn Abd al Wahhab political and military resources to compel adherence to Wahhabi religious doctrine by force.

69.     In keeping with the pact forged with Ibn Abd al Wahhab, Ibn al Saud began leading his armies in a campaign to eradicate Islamic practices deemed deviant by Ibn Ab Wahhab, and to establish Wahhabi Islamic rule throughout the Najd region of Arabia.

70.     Over the ensuing century, the decedents of Ibn al Saud and Ibn Abd al Wahhab sustained and reinforced their politico-religious alliance, even as the political fortunes of the Saud clan waned.

71.     With the aid of a movement of fervent Wahhabi fundamentalists known as the Ikhwan, the House of Saud mounted a military offensive in the early 20th Century under the leadership of Abd al Aziz, which succeeded in uniting much of the Arabian Peninsula under Saudi rule, culminating in the establishment of the modern Saudi state.

72.     Upon taking control of Mecca and Medina, Abd al Aziz assumed the title Khadim al Haramain (servant of the Two Shrines), thus reaffirming the religious precondition and justification for the House of Saud's political authority.

73.     During the early years of the Saudi state, the Kingdom's affairs were governed pursuant to a generalized power-sharing agreement between the House of Saud and the Wahhabi Ulema (Islamic Religious Leaders), under which the Saudi kings and princes controlled political and financial decisions, while the Ulema governed religious and judicial affairs, including the issuance of fatwas (religious edicts that judged the compatability of temporal decisions with Islamic law).

74.     In the early period of the Saudi state, the balance of power tipped heavily in favor of the House of Saud, largely because the King appointed the Ulema to their positions, and retained largely unchecked authority to dismiss them from their posts.

75.     However, in the last three decades of the 20th Century, several developments occurred that fundamentally transformed Saudi society, and ultimately led to a massive investment by the Kingdom in the promotion of Islamic extremism as an accommodation to the Ulema.

76.     First, the oil boom of the 1970s thrust the Kingdom into the modern era, a development that created tension between the regime and Senior Ulema, given the latter's deep animosity and resistance to modernization and technological advancements.

77.     In order to gain the approval of the Ulema for modernization essential to the exploration and development of Saudi Arabia's oil reserves, and thereby maintain the Ulema's endorsement of the legitimacy of the regime's rule, the regime embedded the Ulema in the Kingdom's developing administrative and bureaucratic systems, thereby further integrating the Ulema into the power structure of the Saudi state.

78.     In addition, the regime channeled resources from its new-found oil wealth to support the religious goals and priorities of the Wahhabi Ulema.   In this setting, the Kingdom

increased the funding of existing organizations like the Muslim World League, and created a host of new da'awa organizations, to promote the propogation of Wahhabi Islam and the establishment of states governed pursuant to Shariah outside of Saudi Arabia.

79.     Although these accommodations succeeded in appeasing certain segments of the Ulema, an emerging group of scholars, largely influenced by prominent members of the Muslim Brotherhood who fled Egypt and were welcomed by Saudi Arabia and given prominent positions in the Kingdom's state controlled Islamic universities and mosques, became increasingly wary of the modernization of Saudi society.  These religious scholars were especially discontented by the perceived failure of the Saudi state to adequately apply its new-found wealth to the service of Wahhabi Islam, the failure of the Saudi government to support Islamist movements throughout the world, the absence of a banking system adhering to principles of Shariah, and the un-Islamic excesses of the Saudi royals themselves.

80.     In the face of modernization, these Sheikhs increasingly advocated that the Ummah (the Muslim community throughout the globe) were under a sophisticated cultural and intellectual attack organized by the West, the objective of which was to destroy the fabric of Muslim society as a precursor to a Western re-conquest of the Middle East, and the subordination of Muslims to western faiths and values.  In this context, the Saudi Ulema did not differentiate between the United States and Communist Russia, advocating that the two "super-powers" were but opposite sides of the same coin, and that both were enemies of Islam.

81.     In 1979, three events occurred that empowered these members of Ulema, and served to endorse their worldview, both within Saudi society and the broader Muslim world.

82.     In January of 1979, the Shah of Iran fled his country in response to popular protests, leading to the establishment shortly therafter of a Shia'h Islamic regime in Iran, a direct threat to the Saudi state's then perceived hegemony as the preeminent "Islamic" nation in the world.  To the Saudi Ulema, who viewed as heretical the version of Islam espoused by the Iranian clergy, the Iranian Revolution presented a threat to Islam itself, to be countered at all costs.

83.     Shorlty thereafter, on November 20, 1979, a group of armed insurgents stormed and took control of the Grand Mosque in Mecca, the holiest site of Islam.  The isurgents were led by Juhaiman ibn Muhhamed ibn Saif al Utaibi, a member of a powerful Saudi family and student of Sheikh Abdel Aziz bin Baz, a revered member of the Ulema who would later become the Grand Mufti of Saudi Arabia, the Kingdom's supreme religious leader.

84.     Broadcasting throughout Mecca over the Grand Mosque's speakers during a siege that lasted for several weeks, the jihadists asserted that the House of Saud had lost its legitimacy through corruption and imitation of the West, and called for a purification of Islam and the absolute repudiation of modernizing influences.

85.     Because any violence within the Grand Mosque is strictly forbidden by Islamic law, the Saudi regime was paralyzed from taking action to oust the jihadists from the Grand Mosque without a formal fatwa from the senior Ulema authorizing force, a reality that underscored the increasing influence of the Ulema within the modernizing Kingdom.

86.     After the senior Ulema issued a fatwa authorizing the use of deadly force to retake the Grand Mosque, Saudi forces under the command of senior members of the Royal family mounted several offensives to oust the jihadists, but were repelled and suffered massive

casualties in a series of embarrassing clashes.  In the end, the regime had to turn the entire mission over to the Pakistani military, which then carried out a successful operation to reclaim the Grand Mosque.

87.     The regime's inability to protect and recapture the Grand Mosque on its own further undermined the legitimacy of its rule, requiring greater reliance by the House of Saud on the continuing support of the Ulema, and compelling the regime to find new ways to bolster its Islamic credentials within the Muslim world.

88.     On the heels of the Grand Mosque siege, the Soviet army invaded Afghanistan on December 27, 1979.  For the Ulema who had been cautioning against the Western Cultural Attack, the invasion validated their thesis, and offered a compelling platform for promoting their Islamic agenda.

89.     In response to the invasion, Abdullah Azzam, an Egyptian member of the Muslim Brotherhood who fled to Saudi Arabia and was appointed by the government of the Kingdom to a prominent lecturing position at the King Abdul Aziz University in Jeddah, issued a fatwa entitled *Defense of the Muslim Land*, in which he declared it the personal obligation of all Muslims to wage jihad against the Russians in Afghanistan and the the Israelis in Palestine.

90.     Azzam's fatwa was endorsed by Sheikh bin Baz and the senior Saudi Ulema, which endorsement necessarily required the approval of the Saudi regime.

91.     In response to the Ulema's call for jihad, the most radical young Saudis – many of whom were graduates of the Kingdom's new religious universities – flocked to Afghanistan to join the mujahideen.

92.     As discussed above, Osama bin Laden was among the Saudis who went to Afghanistan to wage jihad during this time period, and worked closely with Abdullah Azzam in organizing the infrastructure to support the mujahideen fighters.

93.     For the Saudi government, the Afghan jihad presented an opportunity to restore the Kingdom's Islamic credentials.  By supporting the jihad, the regime could portray itself to the Muslim world as a leading force in the defense of the Ummah against the Western Attack, without requiring that the Kingdom directly intervene in the conflict.  At the same time, the jihad drew the most radicalized young Saudis away from the Kingdom, thus limiting the ideological and security threat they posed to the regime.

94.     The Kingdom seized on the opportunity, mobilizing and deploying its vast da'awa infrastructure to support the jihad.  Under the guise of performing humanitarian work, Saudi government controlled organizations, including the Muslim World League, International Islamic Relief Organization, World Assembly of Muslim Youth, Saudi Red Crescent Society and Rabita Trust, established an efficient network to channel support to the mujahideen fighters.  Among other activities, these organizations recruited new volunteers for the conflict, established safe houses for new recruits arriving in the region, provided false documentation to the fighters and otherwise assisted them in gaining entry to the conflict zone, supported training camps for the fighters, purchased and delivered weapons and equipment to the mujahideen, raised funds to support the jihad, performed reconnaissance for military initiatives, and evacuated wounded jihadists.

95.     In connection with its support of the Afghan jihad, the government of the Kingdom appointed a young Saudi jihadist named Wa'el Jelaidan to serve as the Director of the

Muslim World League/International Islamic Relief Organization offices in Peshawar, Pakistan in 1985.  Prior to that appointment, Jelaidan had served for several years as the Director of the Islamic Center of Tucson, the de facto office of Makhtab al Khidmat in the United States. Jelaidan developed close ties to bin Laden during the Afghan jihad, and as detailed below would go on to become a founding member of al Qaeda.

96.     Bin Laden and Jelaidan were joined in their organizing efforts by another young Saudi named Mohammed Jamal Khalifa, who would later become bin Laden's brother-in-law. Khalifa and bin Laden had become close friends while studying together at King Abdulaziz University, where they became further radicalized by government paid religious scholars.  The two joined the Afghan jihad together, and Khalifa excelled at recruiting volunteers from throughout the world to the cause, including over 100 Philippino Muslims, among them Abdulrak Janjalani.  Following the Afghan jihad, Janjalani was selected by Khalifa and al Qaeda to head abu Sayyaf Group, a Philippine proxy for al Qaeda established by Khalifa using funds and resources of the International Islamic Relief Organization.

97.     After nine years of combat, the Soviet army began withdrawing from Afghanistan in 1988, delivering the young jihadists a stunning victory.

98.     To the leaders of the Afghan jihad, the defeat of the Soviets demonstrated the divine supremacy of their Islamist movement, and reinforced their belief that the United States could be defeated by guerilla warfare and terrorism.  By virtue of their unwavering belief in the Western Cultural Attack narrative, this group viewed waging jihad against the United States as an absolute religious duty and imperative, and established al Qaeda in 1988 for that purpose.

99.     Around this same time, bin Laden returned to Saudi Arabia, where he went back to work for the bin Laden family construction empire, the Saudi Bin Laden Group, and began organizing al Qaeda and planning for the next phase of the global jihad.

100.    From the outset, the Saudi regime was aware of bin Laden's ongoing efforts to organize a mujahideen army to conduct jihad throughout the world, and in particular bin Laden's desire to wage jihad against the United States.

101.    Indeed, during a February 13, 2006 speech at the Council on Foreign Relations, Prince Turki al Faisal al Saud, the Saudi Intelligence Chief from 1977 through September 1, 2001, stated that "we [the Saudi regime] were pretty much aware of bin Laden from the very beginning, if you like." Turki confirmed that he personally met with bin Laden after the conclusion of the Afghan jihad, and that bin Laden presented himself at that time as the leader of a jihad army, recounting as follows:

> I met Osama bin Laden five times in my life as intelligence director. Mid-'80s to end of 1989 or beginning of 1990 was the last time I saw him. And when the withdrawal of Soviet troops in Afghanistan occurred, bin Laden and his supporters within Afghanistan—and by the way, that's where al Qaeda was born. As I like to—prefer to say, the al Qaeda was born in the hills of Afghanistan rather than in the deserts of Saudi Arabia. And they decided that they were going to form a group that will, in their view, protect Muslim interests throughout the world as they identified themselves as being the primary claimants to the credit of driving the Soviets out of Afghanistan.
>
> And so, by 1990 when I last saw him at the beginning of that year, he had come to me with a proposition that he wants to bring his Mujaheddin as he called them, to liberate the then-Marxist regime in south Yemen.

102.    Moreover, bin Laden made no effort to conceal his jihadist ambitions in public speeches within the Kingdom during this period. Upon returning from Afghanistan, bin Laden

was greeted as a hero by the Saudi populace, who were astonished that a wealthy member of the

Saudi elite had risked his life to carry out jihad.  Bin Laden was in great demand to give speeches

and interviews, and made clear in his statements his continuing dedication to jihad against the

perceived enemies of Islam.

103.     Speaking in 1988, bin Laden expressly affirmed what he believed to be the

personal obligation of all Muslims to wage jihad against the enemies of Islam, stating as follows:

> the blessing of jihad in the cause of God – the peak of true Islam,
> which people in this age have forgotten is a religious duty….Priase
> be to God for allowing us to perform jihad in Afghanistan as he did
> for the best of men, our Prophet, may God's peace and prayers be
> upon him…I would like to advise my brother Muslims in all parts
> of the East and West to take the initiative and leave what they are
> doing to assist in raising the banner of jihad for the cause of God.
> This banner is the best banner and the mujahidin are the best
> people…May God accept our and your prayers and our urging of
> believers to perform jihad in order to deter the infidel forces and be
> truthful.

104.     Speaking in 1990 to an audience of hundreds in the Bin Laden family mosque in

Jeddah, bin Laden singled out the United States as the primary target of this global jihad,

asserting that "[t]he Americans won't stop their support of Jews in Palestine until we give them a

lot of blows.  They won't stop until we do jihad against them."

105.     In that same year, bin Laden organized and funded the travel of an estimated

4,000 mujahideen fighters to Afghanistan for training, as part of his ongoing efforts to build his

jihadist army.

106.     To the regime, neither bin Laden's status as an organizational leader of a jihad

movement nor his ambition to target America were at all surprising.  The Saudi government was

intimately familiar with bin Laden' role as a logistical, financial and operational organizer of the

Afghan jihad, and the Saudi regime knew well that the young radicals who had travelled to Afghanistan to wage jihad had no intention of abandoning the cause.  Through its security apparatus, the government of the Kingdom closely monitored the activities of the returning mujahideen, chief among them bin Laden, to ensure that their jihadist fervor remained focused on targets outside of the Kingdom.  The Kingdom also knew that several of the chief organizers of the Afghan jihad network (including Jelaidan and Khalifa) remained embedded in senior positions within the Saudi government da'awa infrastructure, and therefore had access to that infrastructure in relation to their ongoing jihadist efforts.  More fundamentally, the jihadist worldview bin Laden was promoting was firmly grounded in Wahhabi ideology and the Western Cultural Attack narrative, as promoted by the Saudi regime itself over a period of many years.  In simple terms, the Saudi regime had unique access to information concerning bin Laden's jihadist agenda and organizational efforts from the earliest date.  Moreover, the House of Saud understood implicitly the ideological foundation for bin Laden's global jihadist movement, and was well aware that members of that movement firmly believed that they owed a religious duty to wage jihad against the United States.

107.    On August 2, 1990, bin Laden's ongoing efforts to build support for the global jihad received a transformative boost, when Iraq invaded Kuwait.  The invasion by the region's most sophisticated army of Kuwait posed an imminent threat to the security of the Kingdom.

108.    At the height of the security crisis, bin Laden again used his prominence and family's close ties to the House of Saud to secure a meeting with a senior member of the Saudi royal family, in this case Prince Sultan, the Saudi Minister of Defense.

109.     Accompanied by several mujahideen commanders and veterans of the Afghan jihad, bin Laden laid out a detailed plan of attack, indicating where trenches and protective measures would be constructed along the border using the Saudi bin Laden Group's earthmoving equipment.  Again making clear his continuing role as an organizer of a jihadist army, bin Laden assured Sultan that he could amass 100,000 mujahideen quickly to defend the Kingdom, drawing primarily on the Arab veterans of the Afghan jihad.

110.     Prince Sultan rejected bin Laden's plan out of hand, as did Prince Turki, with whom bin Laden also met.  Instead, the House of Saud invited the United States army to Saudi Arabia to protect the Kingdom.

111.     The presence of an infidel crusader army on Saudi soil reinforced and energized the Western Cultural Attack narrative, and prompted outrage among many prominent Ulema (and bin Laden), who again questioned the legitimacy of the House of Saud's rule given its inability to protect Islam without foreign assistance.

112.     Recognizing the gravity of the threat to its rule, the Saudi regime prevailed upon the Senior Ulema to issue a fatwa authorizing the presence of U.S. troops on Saudi soil.

113.     The issuance of that fatwa did not, however, appease the younger Ulema or their followers, but rather merely convinced them that many members of the senior religious establishment had been co-opted by the regime, and that decisive action was needed to restore the primacy of Islam within the Kingdom and counter the Western Cultural Attack.

114.    A vibrant movement rapidly spread at mosques and universtities within the Kingdom, demanding the removal of the "crusader" U.S. forces from Muslim soil and advocating for extensive reforms in accordance with Shariah.

115.    The leaders of this emerging reformist movement were known as the Awakening Sheiks and included Salman al Awda, a professor of Islamic law at Imam Muhammad bin Saud University in Riyadh, and Safar al-Hawali, the head of the Department of Theology at Umm al-Quarra University in Mecca.  Al Awda and al Hawali were, not coincidentally, spiritual mentors to bin Laden, and many of bin Laden's ideas about jihad were derived directly from the teachings of these Saudi government paid scholars.

116.    In the view of these members of the Ulema, the Iraqi occupation of Kuwait was itself organized by the United States as a predicate for its occupation of the Muslim world. Hawali in particular theorized that Washington engineered the rift between Iraq and Kuwait, and then encouraged Sadaam Hussein to invade.  At that point, Hawali argued that Washington used the pretext of defending Arab states from Iraqi aggression as a predicate for occupying sacred Muslim soil.  According to Hawali, the United States was motivated to this course of action by its recognition that Islam was the only threat to America's world domination, and that the United States consequently determined that it must subordinate Muslims to its rule.

117.    When the war ended with the defeat of Hussein's armies, many of the Ulema demanded a complete U.S. withdraw from Saudi soil, but the House of Saud declined to accede to that demand, effectively acknowledging that the regime was incapable of defending Saudi Arabia on its own.

118.    The decision to allow American forces to remain on Saudi soil, and the implications that followed from that decision, prompted an even more acute crisis of legitimacy for the Saudi Royal Family.  To many prominent and influential members of the Ulema, the House of Saud's self-evident inability to protect Saudi Arabia was a product of its own corruption under Western influences, and its failure to govern and rule in strict accordance with Shariah.  To the extent the regime would not embrace and fulfill its duty to rule in accordance with the requirements of Islam, these Ulema concluded that they should exercise greater authority relative to the governance of the Kingdom.

119.    In March of 1991, a group of prominent Ulema drafted a "Letter of Demands" detailing their principal criticisms with the House of Saud's rule, and reforms they deemed imperative to restoring Saudi Arabia's Islamic character, and by extension, the regime's legitimacy.  Broadly speaking, the document demanded a greater role for the Ulema in the conduct of Saudi domestic and foreign affairs; the abolition of any laws and regulations that did not adhere with Shariah; a ban against the collection of interest by financial institutions; the establishment of a strong and sophisticated military; the repudiation of any alliances which in their view contradicted Shariah, to include Riyadh's alliance with Washington; and a drastic increase in the funding of Saudi Arabia's da'awa institutions, in order to spread Islam and foster the establishment of Shariah based states outside of the Kingdom.  In particular, the Letter of Demands insisted on the following reforms:

> The formation of a consultative council to decide internal and external issues on the basis of the Shari'a.  Its members must be honest, straightforward and representing all fields of expertise. They must be totally independent and not be subject to any pressure that may affect the authority of the council.

All laws and regulations of political, economic, administrative or other nature must be reconciled with the principles of the Shari'a. Trusted committed with expertise in Shari'a should be authorized to repeal legislation not conforming to Shari'a principles.

In addition to possessing specialized expertise, dedication and honesty, government official and their overseas representatives must be unswervingly moral.  Failing any one the requirements for any reasons is an abuse of public trust and a fundamental cause of injury to the national interest and reputation.

Justice must be applied, rights granted and duties assigned in full equality among all citizens, not favoring the nobles or begrudging the weak.  Abuse of authority by anyone whether by shirking obligations or denying people what is their right is a cause for breakup and annihilation of society.

All government officials, especially those occupying the highest positions, must be diligently scrutinized and must all be made accountable with no exceptions.  Government agencies must be cleansed of anyone whose corruption or dereliction is proven, regardless of any other consideration.

Public wealth must be distributed fairly among all classes and groups.  Taxes must be eliminated and fees that have overburdened citizens must be reduced.  Government revenues must be protected from exploitation and abuse; priority in expenditure must be given to the most urgent necessities.  All forms of monopoly or illegitimate ownership must be eliminated.  Restrictions imposed on Islamic banks must be lifted.  Public and private banking institutions must be cleansed of usury, which is an affront to God and His Prophet, and a cause for stunting the growth of wealth.

A strong and fully-integrated army must be built and fully equipped with weapons of all kinds, from any source.  Attention must be given to manufacturing and developing arms.  The goal of the army must be to protect the country and the Holy Sites.

Information media must be remodeled according to the adopted media policy of the Kingdom.  The goals must be to educate, serve Islam and express the morals of society.  The media must be purged of anything conflicting with these objectives.  Its freedom to spread awareness through truthful reporting and constructive criticism must be safeguarded within the confines of Islam.

Foreign policy must be based on national interest without relying on alliances not sanctioned by the Shari'a.  It must also embrace

Muslim causes.  The Kingdom's embassies must be reformed to enable them to reflect the Islamic nature of the country.

Religious and proselytizing institutions must be developed and strengthened with financial and human resources.  All obstacles preventing them from fully carrying out their objectives must be removed.

Judicial institutions must be unified and granted full and effective independence.  Juridical authority must apply to all.  It is necessary to establish an independent body whose function is to ensure carrying out judicial orders.

The rights of individuals and society must be guaranteed.  Every restriction on people's rights and their will must be removed, to ensure the enjoyment of human dignity, within the acceptable religious safeguards.

120.    The Letter of Demands was broadly supported among the Ulema, and was in fact signed by approximately 400 clerics, judges and scholars, and endorsed by Sheik bin Baz.  In addition, thousands of copies of the Letter of Demands were distributed throughout the country, in a rare public denunciation of the practices and policies of the Saudi regime.  The rebuke was especially problematic in that the criticisms and demands set forth therein were grounded in well established beliefs and principles of Wahabbi Islam, the ultimate source of all law in the Kingdom and of the authority of the Saudi regime.

121.    Approximately one year later, in March 1992, a smaller group of Ulema submitted a second petition to the regime, entitled the Memorandum of Advice, which expanded upon and refined the arguments presented in the Letter of Demands.  In the Memorandum of Advice, the Ulema offered particularly harsh criticisms of the Saudi government's conduct of foreign affairs, its perceived failure to provide adequate funding to Saudi *dawa* institutions and support Islamic resistance and separatists movements outside of the Kingdom, and the

government's failure to maintain an adequate and competent army "motivated by the spirit of jihad and sacrifice."

122.    Together, the Letter of Demands and Memorandum of Advice presented a withering criticism of the Saudi regime, and a direct challenge to its legitimacy of a far more serious nature than any the House of Saud had previously faced.

123.    In response to the renewed crisis of legitimacy, the regime sought to diminish the Ulema's challenge by positioning itself as a leading force in combating the Western Cultural Attack and in advancing the global Islamist movement, much as it had done in response to the Soviet invasion of Afghanistan.

124.    Rhetorically, the regime enthusiastically embraced the concept of the Western Cultural Attack as its own, promoting through official speeches and the state-run media the idea of a clash of civilizations between the infidel west and a spiritual Muslim civilization led by Saudi Arabia.  The regime fully endorsed the view, advocating by the Ulema, that Saudi Arabia must launch a counter attack against Western civilization, in defense of the Ummah.

125.    To demonstrate its commitment to these ideas, and simultaneously appease its critics within the Saudi religious establishment, the House of Saud used the Letter of Demands and Memorandum of Advice as a roadmap for its course of action, subject to limitations necessary to protect the regime's own power and self interest.  Generally speaking, the regime rejected, or adopted in a neutered way, those demands that implicated the House of Saud's core authority to manage the political affairs of the Kingdom.  However, the regime enthusiastically embraced the external religious priorities of the Ulema concerning the propogation of Wahhabi Islam and support for Islamist movements abroad.  In addition to appeasing the Ulema, the

regime calculated that this approach would serve to focus the energy of the most radical elements of the Saudi religious establishment and society on activities carried out abroad, a strategy that had served the regime effectively in the context of the Afghan jihad.  In adopting and implementing this plan, the regime was of course fully aware that many of the Ulema charged with directing the activities of the *dawa* institutions (as employees of the Saudi government) firmly believed that the conduct of jihad against the United States was a religious duty in response to the Western Cultural Attack.

126.     Pursuant to this strategy, the regime dramatically increased the budget and resources of the State controlled *dawa* institutions, dedicating incomprehensible sums to support the priorities and objectives of the Ulema and propagation of Wahabbi Islam outside of the Kingdom.  Indeed, according to recent estimates, the Kingdom has expended between $2-3 billion dollars annually to further the religious priorities of the Ulema outside of Saudi Arabia.

127.     To support this global initiative, the regime established offices of the Saudi *dawa* organizations throughout the world, and directed the Saudi embassies to support their work.  As part of this effort, Saudi Arabia embedded religious scholars from the Ministry of Islamic Affairs within the embassies, to supervise, assist and support the *dawa* organizations in the propagation of Wahabbi Islam.  The Kingdom deployed thousands of Saudi trained clerics to teach at Saudi government funded mosques and Islamic centers throughout the globe, many of which were themselves established under the auspices of the Saudi government controlled *dawa* organizations.  In addition, consistent with the Ulema's demand that the regime support Islamic movements seeking to establish Sharia based states outside of the Kingdom, the regime embraced the role of primary benefactor of Islamic extremist movements throughout the world. The movements and organizations that benefited from the regime's Islamist largesse included

(among others)  Abu Sayyef Group, Moro Islamic Liberation Front, Hamas, Palestine Islamic

Jihad, Jemaah Islamiyya, Egyptian Islamic Jihad, Asbat al-Ansar, Salafist group for Call and

Combat, Al Gama'a al Islamiyya, Lashkar-Tayyiba, Lashkar I Janghvi, and Algerian Islamic

Group.   That many of these organizations used terrorism as a tool to achieve their religious and

political goals was not an impediment to the Kingdom's support of their causes.

128.    As the regime's campaign to restore its legitimacy by supporting the Islamic

agenda of the Ulema outside of Saudi Arabia was unfolding, a war broke out in Bosnia-

Herzegovina, primarily between Bosnian Muslims and Bosnian Serbs.

129.    For the Saudi regime, the outbreak of the Bosnian war presented a timely

opportunity for the House of Saud to demonstrate its dedication to the defense of the Ummah,

one of the duties the Ulema had called on the Kingdom to fulfill in the Letter of Demands and

Memorandum of Advice.

130.    The Bosnian war presented a timely opportunity for al Qaeda as well.  As

discussed above, al Qaeda was formed to carry out jihad throughout the globe, and participation

in military conflicts involving Mulsim communities (as the mujahideen had done in Afghanistan)

was a central pillar of its strategy to establish Islamic regimes throughout the World.  Waging

jihad in Bosnia also offered al Qaeda an opportunity to establish a base of operations in Europe,

from which it could launch future terrorist attacks against the West.  At the same time, the Arab

veterans of the Afghan jihad were being expelled from Pakistan.  For many of these jihadists,

return to their home countries was impossible, as they were viewed as extremists and faced

potential imprisonment.  Finding a new jihad front for these fighters was therefore essential to

maintaining the nascent al Qaeda army.   Beyond these strategic considerations, as an Islamist

organization deriving its ideological foundation from the teachings of Wahhabi Islam and the

Western Cultural Attack theory, al Qaeda believed Muslims owed a personal obligation to carry

out jihad in defense of the Bosnian Muslims, a view that was shared by the Saudi Ulema.

131.    In 1992, bin Laden, who was by then residing in Sudan under the protection of the

National Islamic Front, sent a delegation of senior al Qaeda members to Bosnia to assess the

situation and evaluate the logistical needs for waging jihad in the region.  The delegation was led

by Abu Abdel Aziz, a Saudi veteran of the Afghan jihad and senior al Qaeda member.  Abu

Adbel Aziz, also known by the aliases Barabarossa (Red Beard), Abdelrahman al-Dosari, and

Hown (for his proficiency during the Afghan jihad with Russian made "Hound" artillery),

succinctly explained in an interview the circumstances under which al Qaeda sent him to Bosnia

following the conclusion of the Afghan jihad, as part of al Qaeda's broader efforts to find new

regions for waging jihad:

> Then the conquest of Kabul came, and we thanked Allah, praised
> be He. The joy of Jihad overwhelmed our hearts. The Prophet,
> peace be upon him, said, "The highest peak of Islam is Jihad."  We
> were looking for Jihad (after Afghanistan). We found it in the
> Philippines, and in Kashmir. Only fifteen days lapsed (after the
> conquest of Kabul) and the crisis of Bosnia begun. This confirmed
> the saying of the Prophet (of Islam), peace and blessings be upon
> him, who said, "Indeed Jihad will continue till the day of
> Judgment." A new Jihad started in Bosnia, (we moved there), and
> we are with it, if Allah wills.
>
> [W]hen Jihad in Afghanistan was over, with the conquest of Kabul,
> I went with four of those who participated in Afghanistan to
> Bosnia to check out the landscape.

132.    In that same interview Abu Abdel Aziz confirmed the converegence of interests

between al Qaeda and the Saudi Ulema in relation to the Bosnian War, and the importance as a

religious matter of the latter's specific authorization for al Qaeda's proposed jihad in Bosnia:

Interviewer: We heard, and many brothers heard, that you met with prominent Ulema and scholars in the Muslim World and discussed with them the question of Jihad in Bosnia. Can you tell us some of their views and the issues you discussed?

Abu Abdel Aziz: First, we consider our scholars the light and guidance of Islam. They are the heirs of prophets (as the Hadith says, "warathat al-Anbiya"). Our duty is to seek knowledge from them and guidance from their scholarly light (sic). I - alhamdulillah - met several prominent Ulema. Among them Sheikh Nasir ad-Din al-Albani, Sheikh Abdel Aziz Bin Baz and Sheikh Muhammad Bin Otheimin and others in the Gulf area. Alhamdulillah, all grace be to Allah, they all support the religious dictum that "the fighting in Bosnia is a fight to make the word of Allah supreme and protect the chastity of Muslims." It is because Allah said (in his holy book), "Yet, if they ask you for succor against religious persecution, it is your duty to give [them] this succor." (Lit. "to succor them in religion", Qur'an, al-Anfal, 8:72). It is then our (religious) duty to defend our Muslim brethren wherever they are, as long as they are persecuted because they are Muslims and not for any other reason.

133.     At the time he endorsed al Qaeda's jihad in Bosnia, Sheikh bin Baz was Saudi Arabia's Grand Mufti, a governmental position to which he was appointed by King Fahd. Thus, Abu Abdel Aziz's statements confirm that al Qaeda's jihad in Bosnia was formally sanctioned by the Saudi government.

134.     Bin baz used his governmental post as the Kingdom's highest religious authority to encourage public support for al Qaeda's Bosnian jihad as well, issuing a fatwa calling on Muslims to support that jihad by any means available to them, including by way of "money, arms and prayers."

135.     In accordance with the fatwas issued by its senior religious leaders, the Kingdom aggressively deployed its da'awa infrastructure to support the Bosnian jihad. Existing Saudi da'awa organizations such as the IIRO, WAMY, al Haramain Islamic Foundation, and al Haramain al Masjil al Aqsa Foundation promptly established physical operations in Bosnia and

the surrounding region to support the jihad.  In addition, the Kingdom established a new da'awa organization under the leadership of Prince Salman bin Abdul Aziz al Saud, called the Saudi High Commission for Relief to Bosnia and Herzegovina (SHC), to steward and centralize the Kingdom's Bosnian efforts.

136.    From the inception of the conflict, these organizations sponsored the entry into the region of hundreds of jihadists eager to join the fighting.  Many of these jihadists were Saudi veterans of the Afghan jihad, known to the Kingdom by virtue of its intimate participation in that earlier conflict and subsequent monitoring of their activities to be associates of bin Laden, and members of his nascent jihad organization.

137.    Throughout the course of the Bosnian war, the Saudi government controlled da'awa organizations, including the SHC, al Haramain, IIRO and WAMY, provided money, food, shelter and supplies to al Qaeda fighters.  In many cases, this support was coordinated by senior al Qaeda members who were embedded in the da'awa organizations themselves as directors, managers and officials.  These organizations also transported al Qaeda members throughout the region in their vehicles bearing UNHCR plates, thereby allowing al Qaeda to circumvent UN checkpoints.  After the conclusion of the war, the Saudi da'awa organizations provided ostensible employment to many al Qaeda members, so that they could remain in Bosnia in furtherance of al Qaeda's operational goals.  Several of those al Qaeda members planned and carried out terrorist attacks from offices of the SHC, while ostensibly employed by that organization.

138.    The methodology employed by the Kingdom to support the Bosnian jihad was implemented in regions throughout the world to advance al Qaeda's global agenda, but ably adapted to suit the particular objectives and conditions presented by the local context.

139.    For example, at the time of its founding, al Qaeda identified the Philippines as a potential fertile ground for jihad.  Muslims in the southern Philippines had been engaged in a long-running but unsuccessful campaign to establish an independent Muslim state, which had taken on an increasingly militant and Islamist character under the banner of the Moro Islamic Liberation Front, following a failed peace agreement in 1976.  Al Qaeda had strong relationships with members of MILF and Philippine jihadists, as a result of Mohammed Jamal Khalifa's successful campaign to recruit Philippine Muslims to join the Afghan jihad.    The opportunity presented by these circumstances fit perfectly into al Qaeda's global strategy, and in particular its plans to exploit regional conflicts to expand its global reach and promote the establishment of Shariah based states.

140.    The Saudi Ulema had likewise long identified with the Philippine Islamic movement, and advocated that the Saudi state support the effort of Philippine Islamists to establish an independent Shariah state.  From at least the 1980's, the Muslim World League was actively engaged in da'awa and political activities aimed at supporting the Philippine Islamist independence movement.

141.    To both al Qaeda and the Saudi Ulema, the inability of Muslims in the Philippines to achieve their goal of establishing an independent state was largely attributable to a lack of understanding and application of the true (Wahhabi) Islam.  In addition, based on their joint activities in Afghanistan, the al Qaeda leadership and Saudi da'awa organizations believed that

the goals of the Philippine Islamist movement could be achieved only through jihad by trained, indoctrinated, dedicated, highly ideologized, and organized mujahid.

142.     Based on this understanding of the circumstances and challenges facing the Philippine Islamist movement, al Qaeda implemented a comprehensive strategic plan for promoting the jihadist movement in the Philippines, to be carried out under the cover of humanitarian activities of the MWL, IIRO and AHIF.

143.     In furtherance of that plan, the MWL and IIRO established offices in the Philippines and Indonesia in approximately 1989.  The Kingdom appointed Mohammed Jamal Khalifa to serve as Director of those offices.  At the time of his appointment, the Kingdom was aware that Khalifa was a prominent veteran of the Afghan jihad and close associate of bin Laden. Khalifa has affirmed that all of his activities as Director of the IIRO in the Philippines and Indonesia were carried out under the supervision and direction of the Saudi Embassy in the Philippines.

144.     Using IIRO funds and resources, Khalifa established an Islamic "school" called Dar al Imam al Sahfi'e, and personally selected and invited the most promising young Philippine jihadists to become students.  The curriculum of Dar al Imaam al Shafi'e was designed to indoctrinate the students in the most intolerant conceptualization of Wahhabi Islam, and prepare them to carry out jihad and terrorist activities as members of a covert organization.

145.     Simultaneously, Khalifa entered into negotiations with Abdulrack Janjalani, a local Islamist leader whom Khalifa had recruited to the Afghan jihad, regarding the establishment of an al Qaeda proxy in the Far East.  In basic terms, Khalifa offered to provide funding through the IIRO for a jihad organization to be headed by Janjalani, subject to

Janjalani's agreement that the organization would take direction from al Qaeda. The negotiations ultimately led to the establishment of Abu Sayyaf Group. Khalifa filled the ranks of Abu Sayyaf with graduates of Dar ul Imaam al Sahfi'e, and using IIRO funds arranged for them to be trained in terrorist techniques at camps operated by MILF. Khalifa gave certain Abu Sayyaf members ghost positions with the IIRO, typicall as "da'awa instructors," to provide an income to support them while they carried out jihad.

146.    Since its formation through the patronage of the MWL/IIRO, the Abu Sayyaf Group has systematically targeted U.S. citizens in a series of kidnappings, bombings and brutal killings. These include the beheading of an American citizen in 2001, the 2002 bombing of a bar across the street from a United States military camp, and a 2009 bombing which killed two U.S. soldiers on a humanitarian mission.

147.    Beyond its role in establishing and supporting Abu Sayyaf, the IIRO used its Philippine and Indonesian offices to support the terrorist activities of 1993 World Trade Center Bomber Ramzi Youssef and 9/11 mastermind Khalid Sheikh Mohammed. The plots developed by Youssef and Mohammed in conjunction with Khalifa and the IIRO included a plan to assassinate of Pope John Paul II during a January 1995 trip to the Philippines and a plot to simultaneously bomb multiple U.S. airliners as they flew from Asia to the United States, dubbed Operation Bojinka. The Operation Bojinka plot served as inspiration for the September 11th Attacks.

148.    In Kosovo and Albania, the partnership between al Qaeda and the Saudi da'awa organizations more closely tracked the program implemented in Bosnia, owing to the similarity of the of the conflicts that drew al Qaeda to those regions.

149.    The conflict in Kosovo erupted in 1998, when ethnic Albanians in Kosovo demanded their independence from Serbia and the Kosovo Liberation Army came out in open rebellion against Serbian rule.

150.    As was the case in Bosnia, al Qaeda saw in the Kosovo conflict an opportunity to extend the global jihad and advance its strategic interests.

151.    Consistent with the model which had been applied in Afghanistan and Bosnia, the Saudi da'awa institutions quickly established physical operations in the region to support al Qaeda's intervention in the Kosovo conflict.  The Kingdom again established an umbrella organization, called the Saudi Joint Relief Committee for Kosovo and Albania, to coordinate Saudi Arabia's activities in the region.  In a move that plainly demonstrated the SJRC's true mission in the region, the Kingdom appointed Wa'el Jelaidan to serve as Director of the Pristina offices of the SJRC, thereby embedding a founding al Qaeda member in a powerful and pivotal role in the organization.  Contemporaneous to Jelaidan's appointment to his position in the SJRC by the government of the Kingdom, bin Laden described Jelaidan as a close associate in a widely disseminated interview with al Jazeera.  Not surprisingly, Jelaidan promptly began using the SJRC as a front for planning terrorist attacks against Western interests and moving men and weapons into the region for bin Laden, according to the U.S. government.

152.    Within Africa, al Qaeda's charity partners worked closely with bin Laden to build al Qaeda's infrastructure, and directly supported al Qaeda's military and terrorist operations throughout the continent.  In this context, the SHC facilitated arms shipments to General Mohammad Farah Hassan Aideed, the al Qaeda affiliated Somali warlord responsible for the massacre of American troops during the Battle of Mogadishu, according to a Defense

Intelligence Agecny Report.  The IIRO and al Haramain were, in turn, directly implicated in the 1998 African embassy bombings.

153.    In Europe and the United States, the Saudi da'awa organizations have focused primarily on spreading al Qaeda's jihadist ideology, encouraging Muslim communities to reject Western culture and values, recruiting Western Muslims to al Qaeda's cause, raising funds to support al Qaeda's global jihad, and providing cover for the planning and execution of terrorist attacks.  In explaininig the role of the da'awa organizations in promoting the jihadist agenda in Europe, the Dutch Intelligence Service explained as follows:

> The groups focusing on Dawa follow a long-term strategy of continuous influencing based on extreme puritanical, intolerant and anti-Western ideas.  They want Muslims in the West to reject Western values and standards, propagating extreme isolation from western society and often intolerance towards other groups in society.  They also encourage these Muslims to (covertly) develop parallel structures in society and to take the law into their own hands.

154.    As a complement to their financial, ideological and operational support for these regional objectives and activities, the Saudi da'awa organizations provided a robust, secure and consistent source of funding for al Qaeda's global infrastructure.  For example, a 1996 CIA Report concerning the involvement of purported charities in the sponsorship of terrorism indicates that the IIRO provided the funding for six al Qaeda training camps in Afghanistan.   Al Haramain has separately been described by the U.S. government as a "principal" source of funding for al Qaeda.

155.    The pervasive involvement of the government of Saudi Arabia in sponsorsing al Qaeda's global jihad through its state controlled da'awa organizations is further demonstrated by the facts and evidence set forth below as to each of those organizations.  By virtue of their status

as agents and alter-egos of the Saudi government, the terror sponsorship activities of these organizations, as described herein, are properly viewed as activities of the Saudi government itself.

## THE MUSLIM WORLD LEAGUE

156.     Founded in 1962 by the Kingdom of Saudi Arabia, the Muslim World League ("MWL") is among the world's largest Islamic charitable organizations, with offices in more than thirty (30) countries.  The MWL serves as an umbrella organization for a number of other Islamic charities, commonly referred to as bodies or members of the League, including the International Islamic Relief Organization ("IIRO"), World Assembly of Muslim Youth ("WAMY"), al Haramain & al Aqsa Mosque Foundation, and Rabita Trust, among others.

157.     The MWL is a controlled agent and alter-ego of the Kingdom of Saudi Arabia. The Kingdom controls and directs MWL operations, appoints and terminates MWL personnel, provides the MWL with virtually all of its funding, determines how funds will be distributed throughout the world, and otherwise stringently controls the MWL's operations.  In many countries, MWL conducts operations from the local Saudi embassy, under the supervision of the embassy's Islamic Affairs Division.

158.     Senior officials of the MWL have expressly acknowledged that the MWL and its subsidiary bodies are agents and alter-egos of the Saudi government.

159.     According to the affidavit testimony of Ali Mohammed al Kamal, Manager for Financial Affairs of the MWL, "the MWL's policies are established by its Constitutive Council, which is chaired by the Grand Mufti of Saudi Arabia.  The MWL's daily operations are conducted and supervised by its General Secretariat, which is headed by a Secretary General

appointed by the Constitutive Council based on a nomination by the Saudi Government.  The MWL's annual budget is $80 million Saudi Riyals, which is funded by an annual grant from the Saudi Government."

160.     Abdulaziz H. al Fahd, a member of the Saudi Council of Ministers, confirmed in a separate affidavit that organizations such as the MWL and World Assembly of Muslim Youth are headed by Saudi officials, and that the Saudi government uses its da'awa organizations as tools to spread Wahabbi Islam outside of Saudi Arabia.

161.     Abdullah bin Saleh al Obaid, Secretary-General of the Muslim World League from 1995 through 2000, has similarly affirmed the intimate relationship between the government of Saudi Arabia and MWL, explaining in an affidavit that the MWL is "sponsored and financially supported by the Saudi Government," and that he was appointed to his position as the Secretary General of the MWL by Royal Decree.

162.     In a 1984 edition of the *Muslim World League Journal*, then MWL Secretary General, Dr. Abdullah Omar Nasseef, briefly discussed the relationship between the MWL and Government of Saudi Arabia, noting that the Kingdom founded the League "in order to serve" the Ummah throughout the World and that the MWL receives an annual budget from the Kingdom.

163.     Arafat El Asahi, the Director of IIRO in Canada and a full-time employee of the Muslim World League, was even more explicit concerning the Kingdom's absolute domination of the MWL and IIRO during testimony in a Canadian immigration proceeding captioned *Minister of Citizenship and Immigration v. Mahmoud Jaballah*, Federal Court of Canada, Docket DES-6-99, stating under oath as follows:

Q:  During those eight years that you have been with the IIRO here in Canada, have you ever heard anything to the effect that the Canadian government has any concern whatsoever with respect to your office?

A:  Let me tell you one thing, the Muslim World League, which is the mother of IIRO, is a fully government funded organization.  In other words, I work for the government of Saudi Arabia.  I am an employee of that government.  Second, the IIRO is the relief branch of that organization which means that we are controlled in all of our activities and plans by the government of Saudi Arabia.  Keep that in mind, please. . .I am paid by my organization which is funded by the [Saudi] government . . . The [IIRO] office, like any other office in the world, here or in the Muslim World League, has to abide by the policy of the Government of Saudi Arabia.  If anybody deviates from that, he would be fired; he would not work at all with IIRO or with the Muslim World League.

164.    Consistent with the statements of its senior officials, the MWL has asserted in pleadings filed in American court proceedings that it is an "instrumentality" of the government of Saudi Arabia.

165.    The MWL's close affiliation with Osama bin Laden and other high ranking al Qaeda officials dates to the 1980's.  During the war against the Soviet occupation of Afghanistan, Abdullah Azzam, bin Laden's spiritual mentor and partner in Makhtab al Kidhmat, headed the office of the MWL in Peshawar, Pakistan, which served as the rear base for mujihadeen operations.  That office was thereafter led by Wa'el Jelaidan, who also served as Director General and a member of the Board of Trustees of Rabita Trust, a financial arm of the MWL.  Wa'el Julaidan is a founding member of al Qaeda.  On September 6, 2002, the United States Department of Treasury designated Jelaidan as a Specially Designated Global Terrorist pursuant to Executive Order 13224.  The Treasury Department statement regarding the designation provided as follows:

Wa'el Hamza Julaidan, a Saudi citizen, is an associate of Osama bin Laden.  Julaidan fought with bin Laden in Afghanistan in the 1980s.  Julaidan is also associated with several individuals and entities linked to al Qaida, including bin Laden's lieutenants, Ayman al Zawahri, Abu Zubaida, and Mohammed Atef; and the organizations: Maktab al Khidmat, the Rabita Trust, and al-Gamma al Islamiya.  These individuals and entities have been previously designated under President Bush's Executive Order and by the United Nations.

Bin Laden himself acknowledged close ties to Julaidan during a 1999 interview with al-Jazeera TV.  When referring to the assassination of al Qaida co-founder Abdullah Azzam, bin Laden stated that  "we were all in one boat, as is known to you, including our brother, Wa'el Julaidan."  Julaidan has established contacts with several known Islamic extremists, including bin Laden's principal lieutenant, Ayman al-Zawahri.  Another bin Laden lieutenant, Abu Zubaida, claimed that he had accompanied Julaidan from Pakistan to Kandahar, Afghanistan during the summer of 2000.  Zubaida said that Julaidan met with bin Laden and senior bin Laden lieutenant Mohammed Atef soon after arriving in Kandahar.

In February 2000, Julaidan was appointed to the Board of Trustees of the Rabita Trust and served as its director general.   The Rabita Trust is an NGO designated under President Bush's Executive Order as an organization that provided logistical and financial support to al-Qa'ida.

### BASIS FOR DESIGNATION

The United States has credible information that Wa'el Hamza Julaidan is an associate of Osama bin Laden and several of bin Laden's top lieutenants.  Julaidan has directed organizations that have provided financial and logistical support to al-Qa'ida.  Accordingly, the United States is designating Julaidan under Executive Order 13224 as a person who supports terror.

166.    Consistent with bin Laden's plan to adapt the network established for the Afghan resistance to support al Qaeda's global jihad, al Qaeda has from its establishment used the MWL as a front to conceal the terrorist organization's existence and true purpose, as confirmed by documents seized throughout the world in conjunction with investigations into al Qaeda's global support infrastructure.

167.    Internal al Qaeda documents chronicling the formation of the organization, seized during a 2002 raid of the Sarajevo office of an al Qaeda front, the Benevolence International Foundation ("BIF"), confirm that al Qaeda planned from its inception to use the MWL and its subsidiary bodies, to include the IIRO, to provide support and cover for al Qaeda's operations. A BIF computer file named "Tareekh Osama" (or "Osama's History") contained numerous documents regarding al Qaeda's formation and the participation of purported Islamic charities in al Qaeda's support infrastructure, including the MWL and IIRO.  For instance, the files include a document on MWL/IIRO letterhead stating that attacks would be launched from MWL offices: "And if he is being subjected to any pressures, let it be a secret (*agreement*), in a way that [Muslim World] League offices will be opened as (*illegible*) for the Pakistanis, and the attacks will be launched from the (*these offices*) …").

168.    During the 2002 searches, investigators also recovered a list of orders from Osama bin Laden regarding the management of Islamic charities.  On point 10 of his list, bin Laden urges the creation of a committee to receive and distribute donations to al Qaeda, and suggests the participation of the MWL, SRC and IIRO.

169.    Another al Qaeda document seized during the March 2002 raids, written on the joint letterhead of the MWL and IIRO, suggests using the name of the "League" as "an umbrella which you can stay under."

170.    Consistent with this plan, al Qaeda founding member Mohammed Jamal Khalifa, opened a joint MWL/IIRO branch office in the Philippines contemporaneous with the formation of al Qaeda.  The office was used to support al Qaeda's efforts to export the jihad to the Far East.

171.    Khalifa was tried in absentia by a Jordanian court for his involvement in a 1994 attack on a movie theater in Amman, Jordan by a local terrorist cell.  One of Khalifa's co-defendants in that case, Abdul al Hasheikeh, testified at length concerning the impressive terrorist platform Khalifa established iin the Far East through the MWL and IIRO.  Al Hasheikh explained that he traveled from Jordan to the Philippines in July 1993 to meet with Khalifa and request his support for the Jordanian terrorist cell.  According to al Hasheikeh:  "The principal of the League's office in the Philippines is the named Mohammed Gamal Khalifa, a Saudi citizen, who is the in-law of Osama Ben Laden, a wealthy Saudi, who supports extremist Islamic organizations around the world and has training camps in Yemen."

172.    Al Hasheikeh testified that Khalifa established a terrorist training academy in the Philippines under the auspices of the IIRO called Dar ul Imam al Shafi'e, and that Khalifa recruited al Hasheikh to work as a teacher at the school.

173.    Khalifa was detained by U.S. law enforcement officials on December 16, 1994 by U.S. law enforcement officials as he was returning to the Philippines from San Francisco, California.  Documents found in Khalifa's possession at the time of his arrest confirm al Hasheikheh's testimony, detailing that students at the Dar al Imam al Shafi'e received training in assassination, kidnapping, bombing churches, martyrdom operations, methods of torture, explosives and weapons.

174.    As al Qaeda developed and expanded its operations into new geographical regions over the years, the MWL extended its infrastructural support accordingly.  In Bosnia, for instance, the MWL was instrumental in transferring hundreds of millions of dollars to al Qaeda and the Arab mujihadeen in that region, including military equipment and weapons.

175.     As a "beacon" of Wahhabi ideology and propogation, the MWL took a leading

role in rallying Muslims throughout the World to support al Qaeda's Bosnian jihad as well.  In

the April 20, 1992 edition of the *Al Alam Al Islami*, the Arabic edition of the MWL Journal, the

MWL published an article by Isma'il Fath Alh Salamah calling for the Islamic world to prepare

an army for jihad for Allah.  In the article, Salamah incites readers to fight all infidels, calls on

them to gather weapons, and quotes militant verses praising jihad and terrorizing the enemies of

Islam.  In the August 10, 1992 edition of the *Al Alam Al Islami*, the MWL published a fatwa

issued by Sheikh Muhmmad al Ghazali in reference to Bosnia.  Al Ghazali's fatwa warns that

any Muslim ignoring the plight of the Muslims in Bosnia is an infidel, and further asserts that the

duty to help Muslims in Bosnia is a religious one akin to jihad.  An article in the April 19, 1993

edition of *Al Alam Al Islami* similarly advocates that the first step to saving Bosnia is to equip the

jihad fighters in Bosnia with everything necessary for jihad for Allah.

176.     MWL officials, including then Secretary General of the MWL, Dr. Abdullah

Omar Naseef, have similarly issued statements calling for Muslims to support jihad in Bosnia

and other regions of strategic importance to al Qaeda.  For instance, in the April 17, 1992 edition

of *Al Alam Al Islami*, Secretary General Naseef issued an announcement relating to the state of

Muslim affairs in countries such as Bosnia-Herzegovina, the Philippines, Kashmir, Somalia, and

Burma, stating that Muslims can have a role in caring for their Muslim brothers in these

countries by carrying out jihad with their money and lives.  At the time of that statement, al

Qaeda was engaged in ongoing efforts to promote jihad in each of those countries.

177.     Intent on spreading the message that Muslims have a duty to carry out jihad in

support of their Muslim brothers, Dr. Naseef sent a letter to the Saudi Arabian Minister of

Religious Affairs in October 1992 advising of the recent recommendation from the "Conference

of the Mosque's Message" that Friday sermons in the mosques should be used to spread belief in Allah and the study of the Islamic religion.  Dr. Naseef recommended in his letters that Friday sermons should be used to revive the spirit of jihad.

178.     At an April 1993 press conference in Cairo, Dr. Naseef again stressed the importance of providing money and weapons to Muslims in Bosnia.  According to Naseef:  "We cannot solve the problem of Bosnia with talks and not with action.  We must act in all manners possible to equip the Muslims in Bosnia with financial support and military equipment."

179.     In May 1993, Dr. Naseef released a statement thanking Saudi Arabia's King Fahd for his contribution of $20 million which would be used for immediate relief of Muslims in Bosnia so that they may continue their jihad against the Serbs.

180.     Dr. Naseef similarly called on Muslims to support the Palestinian Intifada against Israel.  In the March 23, 1992 edition of the *Al Alam Al Islami*, the MWL published a manifesto issued by Dr. Naseef urging Muslims to support jihad and the Palestinian Intifada, and further directing donations be deposited into a MWL bank account to support the Intifada.  The bank account was identified as being at the National Commercial Bank, Account No. 01/14807000107.

181.     Ahmad Muhammad Ali, the MWL's Secretary General following Dr. Nassef, also called on Muslims to help the Bosnian people with funds and weapons.

182.     The MWL also played a role in supporting the 1998 U.S. Embassy bombings in Kenya and Tanzania.  While working for the MWL in Kenya, Ihab Ali relayed messages between Osama bin Laden and Wadi El Hage in connection with the coordination of the

bombings of the U.S. embassies.  El Hage, who was convicted for his role in the embassy

bombings, was himself at one time an employee of the MWL.

183.    The MWL also provided direct financial assistance to al Qaeda members involved

in the attempted assassination of Egyptian President Hasni Mubarak in 1995.

184.    The MWL further sponsored al Qaeda through its participation in the Saudi Joint

Relief Committee for Kosovo and Chechnya ("SJRC"), a body established by the Kingdom of

Saudi Arabia to coordinate ostensible relief efforts among several charitable organizations under

its control and direction in Kosovo and Chechnya.  The other purported charities compromising

the SJRC include the International Islamic Relief Organization, Saudi Red Crescent Society,

World Assembly of Muslim Youth, al Haramain Foundation, Islamic Endowments and Makk

Establishment, among others.

185.    The United Nations' mission in Kosovo declared that the SJRC in Pristina,

Kosovo served as a cover for several al Qaeda operatives, including Adel Muhammad Sadi bin

Kazam and Wa'el Hamza Julaidan, both of whom served as directors of the SJRC.

186.    Between 1998 and 2000, the Kingdom of Saudi Arabia, through the SJRC,

diverted more than $74 million to al Qaeda members and loyalists affiliated with SJRC bureaus.

Throughout this time, the Committee was under the supervision and control of Saudi Interior

Minister Prince Naif bin Abdul Aziz.

187.    MWL officials have publicly acknowledged the organization's funds were being

funneled to terrorist organizations.  In an interview with Dr. Abdullah bin Saleh al Obaid,

Secretary General of the MWL, published in *The Muslim World* magazine on July 21-27, 1997,

al Obaid was asked about reports that the MWL's funds were being funneled to extremist groups. Al Obaid responded: "This is a closed chapter …. It has already been proven that there were people who exploited the situation and misused some funds …."

188.     As further detailed herein, the MWL has also provided substantial material support and resources to al Qaeda through its subsidiary bodies, including the IIRO, WAMY, and Rabita Trust.

## INTERNATIONAL ISLAMIC RELIEF ORGANIZATION

189.     The International Islamic Relief Organization ("IIRO") is a subsidiary body of the Muslim World League ("MWL"), with offices throughout the globe.

190.     Like the MWL, the IIRO is a controlled agent and alter-ego of the Kingdom of Saudi Arabia. The Kingdom controls and directs IIRO operations, appoints and terminates IIRO personnel, provides the IIRO with virtually all of its funding, determines how funds will be distributed throughout the world, and otherwise stringently controls the IIRO's operations. In many countries, IIRO conducts operations from the local Saudi embassy, under the supervision of the embassy's Islamic Affairs Division.

191.     Senior officials of the IIRO have expressly acknowledged that the IIRO and the other subsidiary bodies of the MWL are agencies, instrumentalities and organs of the Kingdom of Saudi Arabia. According to the affidavit testimony of the Manager of Financial Administration of the IIRO, Saleh Abdullah al Saykan, himself a Saudi government official, the IIRO was "established by the Muslim World League in 1978," and "is governed by a 15-member Board of Directors chaired by the Secretary General of the Muslim World League, who is nominated by the Saudi Arabia Government."

192.     The IIRO's Annual Reports further document the direct involvement of senior

Saudi Government officials in the "supervision," and "direction" of the IIRO offices within

Saudi Arabia, which in turn supervise and direct the activities of the IIRO branch offices abroad.

193.     As referenced above, IIRO's relationship with al Qaeda also grew out of IIRO's

participation in the Afghan jihad in the 1980s, during which the IIRO worked within the network

of ostensible charities to support the mujihadeen.  During the conflict Wa'el Hamza Jelaidan ran

the IIRO offices in Peshawar, Pakistan, and was a leading supporter of jihad through the relief

organization network.  As a member of al Qaeda, Jelaidan remained in the Saudi da'awa

infrastructure, serving as the director of the IIRO's Peshawar, Pakistan offices, an officer of the

MWL, and later as a director of the SJRC.

194.     With the formation of al Qaeda, Jelaidan and the al Qaeda leadership continued to

draw on the IIRO to support al Qaeda's global jihad, as documented by the previously discussed

documents chronicling al Qaeda's formation.

195.     According to Jamal al Fadl, a former al Qaeda official who became a cooperating

witness for the United States and testified at length in the African Embassy bombing trials, the

IIRO provided false identification cards to al Qaeda members to enable them to cross the

Pakistan-Afghanistan border for training at al Qaeda camps.  Additionally, a June 2, 2004 FBI

report summarizing an interview with al Fadl states that the IIRO office in Peshawar, under

Jelaidan's leadership, facilitated the purchase of weapons for al Qaeda.  According to the FBI

report, "Julidan was one of Bin Laden's closest friends at the time."

196.     Other representatives of the IIRO in Pakistan provided funds for salary, travel and

health benefits for al Qaeda members.  For instance, the IIRO's branch office in Pakistan was

managed by Abu Hamam al Saudi, who was also Osama bin Laden's cousin.  Al Saudi would

transfer IIRO funds to Madani al Tayyib, who would then distribute the amounts to individuals

who were in charge of salary, travel, and health benefits for al Qaeda.

197.    The IIRO also played a critical role in supporting al Qaeda's expansion into the

Far East, as discussed previously.

198.    Using IIRO funds and resources, Mohammed Jamal Khalifa Khalifa established a

network of charities, businesses, and Islamic institutions in the Philippines to support

international terrorism.  To assist Khalifa, Ramzi Yousef, a bomber of the World Trade Center in

1993, and Wali Khan Amin Shaw, also an IIRO employee in Pakistan, came to the Philippines.

Yousef began training Philippine terrorist groups in bomb-making, while also conducting further

research and refining his bomb-making technique.  While working as the Director of the IIRO's

Philippines branch, Khalifa maintained close connections with al Qaeda and employed members

of the Abu Sayyaf Group, the al Qaeda proxy organization established by Khalifa using IIRO

funds.

199.    According to the U.S. government, one of the plots devised by Ramzi Yousef in

conjunction with Khalifa and the IIRO office was to assassinate Pope John Paul II during a

planned January 1995 visit to the Philippines and to simultaneously attack multiple U.S. airliners

as they flew over the Pacific Ocean from Asia to the United States (the "Operation Bojinka"

plot).  According to a 1996 Central Intelligence Agency report regarding the involvement of

Islamic charities in the sponsorship of terrorism, the "former head of the IIRO office in the

Philippines, Mohammed Jamal Khalifa, has been linked to Manila-based plots to target the Pope

and U.S. airlines; his brother-in-law is Usama Bin Ladin."  The CIA report further states that

another high-ranking IIRO official in the Philippines leads Hamas meetings and that the majority of Hamas members in the Philippines are employed by the IIRO.  Moreover, the "IIRO helps fund six militant training camps in Afghanistan," including camps from which al Qaeda planned, approved and coordinated the September 11th Attack, and at which some or all of the September 11 hijackers received indoctrination and training.

200.    As mentioned above, American law enforcement officials detained Khalifa on December 16, 1994, as he was returning to the Philippines from San Francisco, California.  FBI documentation relating to his arrest identifies Khalifa as a "Known Terrorist."  Traveling with Khalifa at the time of his detention was Mohamed Loay Bayazid, an al Qaeda founding member and top official who had tried to purchase uranium on behalf of al Qaeda.

201.    At the time of his arrest, the FBI discovered a trove of information in Khalifa's possession including documents referring to the plot to kill Pope John Paul II, as well as documentation identifying the curriculum for the Dar al Imam al Shafi'e in the Philippines. These documents confirmed that students at the school received training in assassination, kidnapping, bombing churches, martyrdom operations, methods of torture, explosives and weapons.

202.    Jamal al Fadl identified Khalifa as a close associate to Osama bin Laden.  During testimony as a cooperating witness for the United States, al Fadl stated that he knew Khalifa by his alias ("Abu Bara"), "who was close to bin Laden."  According to al Fadl:  "Hammam [IIRO's branch manager in Pakistan], Bara, and bin Laden are part of the group that has been around a long time."

203.    In coonection with immigration proceedings following Khalifa's arrest, Philip C. Wilcox, Jr., the Department of State's Coordinator for Counterterrorism, submitted several letters to the immigration judge urging for Khalifa's continued detention.  In a December 16, 1994 letter, Wilcox advised the Court that Khalifa financed a 1994 attack on a Jordanian movie theater, and that "the United Stated Government has evidence that Muhammad Jamal Khalifa, who has lived in the Philippines for a number of years, has provided financial support to the Philippine terrorist group Abu Sayyaf.  We also have information that while in the Philippines he has been involved in organizations closely linked to Hamas…."

204.    In a December 23, 1994 letter the Court, Wilcox asserted that (i) Khalifa has provided support to terrorist groups in the Philippines; (ii) Khalifa has helped organize efforts by former fighters in Afghanistan to provide training and assistance to terrorists in the Philippines; (iii) Khalifa has extensive ties to Hamas; and (iv) Khalifa has ties to the terrorist organization Gama't Islamiya.

205.    Department of State cables following Khalifa's detention in the United States further detail Khalifa's and the IIRO's support for terrorist organizations and their activities in the Philippines and Afghanistan.  For instance, a July 1994 cable from the American Embassy in Amman, Jordan concerning the Jordanian cinema bombing trial states that one of the defendants in the case worked "in the Imam al-Shafi center led by Muhammad Jamal Khalifa, another defendant who is an in-law of Saudi financier Usama Bin-Ladin."

206.    A December 1994 cable from the Secretary of State Warren Christopher's office states: "Khalifa is an officer of an Islamic NGO in the Philippines that is a known Hamas front and has financed terrorist operations.  Khalifa is reported to be the brother in law of Usama Bin

Laden, the Sudan-based financier of Islamic extremists.  Khalifa is believed to have provided support to the Philippine terrorist group Abu Sayyaf."  An additional December 1994 cable from the Secretary of State's office states that Khalifa is a "known financier of terrorist operations and an officer of an Islamic NGO in the Philippines that is a known Hamas front."

207.    An April 1995 cable from the American Embassy in Amman, Jordan to Secretary of State Warren Christopher discusses an attack by Abu Sayyaf Group, with possible assistance from Moro Islamic Liberation Front and Moro National Liberation Front, which left 53 people dead.  According to the cable:  "President Ramos said that Prime Minister Bhutto had disclosed to him the existence of training camps in Afghanistan where international terrorists, including ASG, are being trained …. Mohammed Jamal Khalifa, the former head of the International Islamic Relief Organization in Manila, [i]s a principal financier of Abu Sayyaf."

208.    In an August 1993 interview concerning the Moro Islamic Liberation Front's call for jihad against the Philippine government, Sheikh Savila Salih, who was in charge of MILF's religious rulings, confirmed that MILF also received support from the IIRO:  "The IIRO and other Islamic bodies who deal with the da'awa and aid, are the leaders of those who give the Front considerable support and are deserving of their gratitude."

209.    An October 2001 cable from the Secretary of State Colin Powell's office states that "Philippine authorities reported that Saudi national Muhammad Jamal Khalifa who ran two Islamic nongovernmental organizations in Manila was the major financier of the terrorists arrested there.  Khalifa who has also been implicated in terrorist activities in Jordan is Bin Ladin's brother-in-law."

210.    An April 2004 cable from Secretary of State Colin Powell states that the IIRO is "tied to al-Qaida and other terrorist organizations.  For example, IIRO has been cited as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime.  IIRO has also been cited as the conduit for funds from Usama Bin Laden to terrorist organizations, specifically that the Abu Sayyaf cell in Manila was founded with money sent by Bin Laden to Mohamed Jamal Khalifa through IIRO."

211.    A June 2004 cable from the Secretary of State's office similarly details the IIRO's support for al Qaeda and the Abu Sayyaf terrorist group.  According to the cable:  "The USG believes that some elements of the International Islamic Relief Organization (IIRO) have been exploited by terrorists and their financiers as a means of transferring assets, providing organizational cover, or otherwise supporting extremist, violent operations."  The cable further states the "IIRO has been cited as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime.  IIRO has also been cited as the conduit for funds from Usama Bin Laden to terrorist organizations, specifically that the Abu Sayyaf cell in Manila was founded with money sent by Bin Laden to Mohamed Jamal Khalifa through IIRO."

212.    Prior to his death in January 2007, Khalifa confirmed in writing that all of his activities as Director of the IIRO in the Philippines were conducted under the direct supervision of the Saudi embassy.

213.    On August 3, 2006, the U.S. Department of the Treasury designated the IIRO's Philippine and Indonesian branch offices and a senior IIRO official in Saudi Arabia, Abd al Hamid Sulaiman al Mujil, "for facilitating fundraising for al Qaida and affiliated terrorist groups."  According to U.S. Treasury officials, "Abd Al Hamid Sulaiman Al-Mujil, a high-

ranking IIRO official in Saudi Arabia, has used his position to bankroll the al Qaida network in Southeast Asia.  Al Mujil has a long record of supporting Islamic militant groups, and he has maintained a cell of regular financial donors in the Middle East who support extremist causes." Often referred to as the "Million Dollar Man" for supporting Islamic militant groups, al Mujil provided donor funds directly to al Qaeda and is identified as a major fundraiser for the Abu Sayyaf Group and Jemaah Islamiyah.

214.    The August 3rd designation details al Mujil's long record of supporting terrorist organizations such as al Qaeda, Abu Sayyaf and Jemaah Islamiyah through the IIRO:

> Abd Al Hamid Sulaiman Al-Mujil (Al-Mujil) is the Executive Director of the IIRO Eastern Province (IIRO-EP) branch office in the Kingdom of Saudi Arabia.  Al-Mujil has been called the "million dollar man" for supporting Islamic militant groups.
>
> Al-Mujil provided donor funds directly to al Qaida and is identified as a major fundraiser for the Abu Sayyaf Group (ASG) and Jemaah Islamiyah (JI).  Both ASG and JI are al Qaida-associated terrorist groups in Southeast Asia designated pursuant to the authorities of E.O. 13224.  These terrorist groups are also on the United Nations 1267 Committee's consolidated list of individuals and entities associated with the Taliban, al Qaida and/or Usama Bin Ladin.
>
> In 2004, Al-Mujil invited a Philippines-based JI supporter to Saudi Arabia under the cover of traveling for the hajj (the Muslim pilgrimage), and planned to provide him with cash to carry back to the Philippines to support organizations including JI.
>
> Al-Mujil was also present in Afghanistan in the late 1990s and personally knew Usama Bin Ladin and deceased al Qaida co-founder Abdallah Azzam.  Al-Mujil traveled continuously to meet with members of Bin Ladin's organization in Arab countries.  In the 1990s, Al-Mujil established a relationship with senior al Qaida operational planner Khalid Shaykh Muhammad.
>
> Al-Mujil has a long history of providing support to terrorist organizations.  He has contributed direct financial assistance to ASG leaders, including Abdurajak Janjalani (deceased).

> The Indonesian and Philippines branches of IIRO have received
> support from IIRO-EP, which in turn is controlled by Al-Mujil.
> Indeed, he is often responsible for authorizing payment transfers
> for IIRO Philippines (IIRO-PHL) and IIRO Indonesia (IIRO-IDN).

The Treasury Department's findings regarding the IIRO's branch offices in the

Philippines and Indonesia are just as damaging.  According to the August 3rd designation:

> The IIRO-PHL is a source of funding for the al Qaida-affiliated
> ASG.  IIRO-PHL has served as a liaison for the ASG with other
> Islamic extremist groups.  A former ASG member in the
> Philippines familiar with IIRO operations in the country reported
> that a limited amount of foreign IIRO funding goes to legitimate
> projects and the rest is directed to terrorist operations.
>
> ***
>
> The IIRO Indonesia director has channeled money to two
> Indonesia-based, JI-affiliated foundations.  Information from 2006
> shows that IIRO-IDN supports JI by providing assistance with
> recruitment, transportation, logistics, and safe-havens.  As of late
> 2002, IIRO-IDN allegedly financed the establishment of training
> facilities for use by al Qaida associates.

215.    The IIRO was also instrumental in supporting al Qaeda's operations in Bosnia, as

one of the first da'awa organizations to enter the Balkans foolowing the outbreak of the war.

According to Dr. Farid Qurashi, former Secretary General of the IIRO:  "From the very

beginning of the Bosnia war, we were there to help."

216.    Former American mujahideen recruit Randall Todd Royer (a/k/a Ismail Royer),

who participated in the Bosnian jihad, acknowledged that the IIRO's reputation as a front for

jihad was well known in the Balkans:  "It was well known that they helped get 'people' into

Bosnia."  Royer explained that another mujahideen fighter in Zenica had openly discussed his

efforts to use the IIRO in order to obtain identity cards for fellow jihadists.

217.    In September 1992, Balkan press agencies published photos depicting the severed heads of Serb soldiers killed by foreign mujahideen collected in boxes.  The photos were seized from the belongings of fallen Saudi Arabian jihadists, which also included an IIRO humanitarian worker identification card.  The recovered card was labeled with the name and photo of "Khalil Abdel Aziz," a teacher from Saudi Arabia, and indicated that it had been printed by the Peshawar, Pakistan office of the IIRO.

218.    By mid-1993, the operations of the IIRO in Bosnia-Herzegovina were under the primary oversight of a Palestinian national known as Abdelaziz Zaher (a/k/a Abu Anas; Abu Enes) and his deputy, an Algerian national, Djamel Lamrani (a/k/a Abu Musab al Djazairi).  Zaher was expelled from his former residence in Belgrade in early 1993 after Serbian officials tied him to various organizations suspected of aiding armed fundamentalist militant groups, including the IIRO.  .

219.    Zaher's top lieutenant at the IIRO, Jamal Al-Jibouri, was personally responsible for oversight of a massive logistical operation to provide al Qaeda and al Qaeda affiliated Islamic militants in the Balkans with weapons and ammunition.

220.    Whle working for the IIRO, Zaher participated in the 1994 murder of British aid worker Paul Goodall near Zenica.  Two days following the murder, Bosnian police arrested Saudi national Abdul Hadi al Qahtani, Abdu Khulud al Yemeni and Abu Enes (a/k/a IIRO chief Abdelaziz Zaher).  At the time of his arrest, al Qahtani was carrying an identification card issued by the Zenica office of the Saudi High Commission.

221.    Following the arrest of the three men, Dr. Abdul Harith al Liby, deputy commander of the mujahideen, sent a letter to "authorized individuals" in the Bosnia-

Herzegovina Military Police and security services requesting the release of the two "mujahideen" arrested alongside al Qahtani.  Al Liby's letter identified both "Abu Enes" (Zaher) and al Qahtani interchangeably as "mujahideen" and as "employees" of "IGASE" (IIRO), who were detained by authorities while traveling in an IIRO employee-owned vehicle.

222.    Following the end of the war in Bosnia-Herzegovina in late 1995, Zaher and the IIRO continued their operations in the Balkans.  The same year, "with the financial help of Selim Ben Mafuz, the executive director of 'Igasa' in Vienna," Zaher and other local IIRO organizers founded two commercial enterprises, "Sahara" and "Isra-Trade" which allegedly were the recipient of suspicious financial transfers from "residential accounts of the H.O. 'Igasa.'"

223.    International law enforcement and intelligence investigations targeted the IIRO's mission in the Balkans as well.  According to a guidebook on Islamic charitable organizations printed by NATO in April 1995, "the regional financial accountant for the IIRO, an Egyptian named Hossam Meawad Mohammad Ali, was detained by Croatian authorities in a raid in Zagreb" for his involvement in alleged criminal activity.

224.    In 1993, officials linked members of the Zagreb office of the IIRO to an Islamic extremist group headed by Muhammad Sa'd Darwish al Shazy, which was planning to conduct anti-Jewish bombings in Croatia.  In addition to representatives of IIRO, al Shazy's organization included the heads of the Zagreb offices of the Saudi High Commission and the Kuwaiti Joint Relief Committee, representatives of the Human Relief International, and members of the Qatar Charitable Society.

225.    Through its offices in Kenya, the IIRO provided direct financial and logistical support to al Qaeda terrorists involved in the 1998 bombings of the United States Embassies in

Dar Es Salam, Tanzania and Nairobi, Kenya.  As a result of an investigation into the involvement of the IIRO in the bombings, Kenyan officials deregistered the IIRO's Nairobi office.

226.    In October 2001, Pakistani officials identified and expelled some two dozen al Qaeda members who had been working for the IIRO in Pakistan.

227.    According to the Indian government, IIRO officials were behind the 1999 al Qaeda plot to attack the U.S. consulates in Madras and Calcutta, in response to the American military retaliation for the 1998 bombings of the United States Embassies in Dar Es Salaam, Tanzania and Nairobi, Kenya.  The operational cell designated to carry out the planned attacks on the U.S. consulates was led by Sayed Abu Nesir, a Bangladeshi national who was directed to launch the attacks by Shaykh Ahmed al-Gamdin, Director of IIRO operations in Asia.

228.    During his subsequent interrogation, Abu Nesir declared that 40 to 50% of IIRO's charitable funds were being diverted to finance terrorist training camps in Afghanistan and Kashmir.  Among other duties, Abu Nesir visited the training camps on behalf of IIRO to assess their funding needs.  At the direction of al-Gamdin, Nesir himself attended one of the al Qaeda camps to receive training, where he met Osama bin Laden.

229.    Mahmoud Jaballah, head of IIRO's Canadian office, was arrested and jailed by Canadian officials based on his links to al Qaeda and Egyptian al Jihad.  Jaballah was accused of having contact with al Qaeda operatives and had spent three years working for the IIRO in Pakistan.

230.    In 1991, the IIRO established a U.S. branch in Virginia, under the name
International Relief Organization, Inc. ("IRO").  The IRO operated from offices at 360 South
Washington Street, Washington, D.C., where it shared office space with the MWL.  The
Washington, D.C. offices of the IIRO and MWL were part of a complicated web of for-profit
and ostensible charitable organizations within the United States, referred to by the U.S.
government as the Safa Group or SAAR Network, the majority of which maintained offices at
555 Gross Street, Herndon, VA.  The SAAR Network of businesses and charities was created to
provide funding, money laundering and other material support to terrorist organizations,
including al Qaeda.  In March of 2003, federal authorities executed search warrants at the offices
of IIRO in Washington, DC, in connection with an ongoing federal investigation of the illegal
activities of the Northern Virginia and Washington based charities and for-profit enterprises
within the SAAR Network.  Through that investigation, federal authorities determined that the
IIRO and MWL offices in Washington, DC provided funding and material support to al Qaeda
and Hamas.

231.    The IIRO further sponsored al Qaeda through its participation in the Saudi Joint
Relief Committee for Kosovo and Chechnya ("SJRC").  As set forth herein, the SJRC offices in
Pristine, Kosovo served as a cover for al Qaeda operatives.  Furthermore, between 1998 and
2000, the Kingdom of Saudi Arabia, through SJRC, diverted more than $74 million to al Qaeda
members and loyalists affiliated with SJRC bureaus.

232.    Not surprisingly, given the breadth of the IIRO's ties to al Qaeda, the United
States has detained several IIRO officials and employees as "enemy combatants."  In support of
the continued detention of those individuals, the U.S. Government has cited their affiliations with

IIRO as a "primary factor" favoring detention, and expressly labeled the IIRO as an al Qaeda front.

233.    Detainee Samir N. Al Hasan (ISN No. 043) traveled to Afghanistan from Yemen in 1999 or 2000, attended the training camp at al Farouq, and became a bodyguard in August 2001.  Al Hasan told U.S. authorities that he was in Afghanistan as a relief worker for the IIRO and that he received the position from the head of the IIRO.  The United States government's unclassified evidentiary summaries relating to al Hasan assert:  "The International Islamic Relief Organization was identified as an Islamic humanitarian organization with headquarters in Mecca, Saudi Arabia, and is financed by Usama bin Laden."

234.    Detainee Rashed Awad Khalaf Balkhair (ISN No. 186) traveled from Saudi Arabia to Pakistan and Afghanistan in early 2001 and worked for "Al-Ighatha Al-Islamiya, International Islamic Relief Organization (IIRO)."  Balkhair was associated with the Taliban and al Qaeda, and stayed approximately 3 months in a Taliban guesthouse in Jalalabad, Afghanistan. Moreover, Balkhair's name was listed on a computer hard drive associated with a known terrorist and was further discovered on a list of al Qaeda mujahedin who were in Afghanistan. The unclassified evidentiary summaries filed in support of Balkhair's continued detention at Guantanamo Bay state that "the International Islamic Relief Organization is a non-governmental organization, which has ties to Usama Bin Laden and the Abu Sayyaf Group."

235.    Detainee Said Muhammad Husayn Qahtani (Detainee No. 200) traveled multiple times from Saudi Arabia to Afghanistan between 2000 and 2001.  In May 2000, Qahtani met and stayed with Abu Zubaydah in a safehouse while waiting to travel to Afghanistan.  Moreover, during a trip in June 2000, Qahtani joined the Taliban against the Northern Alliance and spent a

considerable amount of time on the front lines.  Qahtani joined al Qaeda after giving an oath of allegiance ("al bay'ah") to Osama bin Laden, and further met 2 of the 9-11 hijackers – Saeed al Ghamdi and Ahmed Alnami.  According to Department of Defense documentation, Qahtani contacted relief organizations such as the IIRO and al Haramain with the intention "to join a relief organization because those entities would offer him a way to get into Chechnya, whose borders were closed at that time.  Once there, the detainee would be free to leave the relief organization and join the fighting."

236.    Detainee Abdallah Ibrahim al Rushaydan (ISN No. 343) was captured on December 10, 2001 on the border of Pakistan and Afghanistan.  According to the U.S. government:  "The International Islamic Relief Organization (IIRO) is also known as Al Hayat Al Igatha Al Islamiya Al Aalamiya.  According to the media in Asia, the Islamic Non-government Organization known as the International Islamic Relief Organization (IIRO), which is managed by Osama Bin Laden's brother-in-law, has maintained links with the Abu Sayyaf group (ASG) in the Philippines.  Executive Order 13224, which blocks property and prohibits transactions with persons who commit, threaten to commit, or support terrorism, designates the Abu Sayyaf Group as a global terrorist entity."

237.    Significantly, in response to the U.S. government's assertion that the IIRO is a front for terrorism, al Rushaydan testified that the IIRO "is a government organization managed by Dr. Adnan Basha who holds the rank of Minister.  [IIRO] is a government organization under the Islamic World League and all charity organizations are under the Senior Director for charity organizations, Ameer Nayef (King Nayef), who is the Saudi Minister of Interior."

238.    Detainee Rashid Abd al Muslih Qaid al Qaid (ISN No. 344) traveled from his home in Saudi Arabia to Afghanistan in October 2001 with an individual who was identified as a member of the al Qaeda mujahideen.  Al Qaid himself was also designated by the Saudi government as a high priority target.  The United States government's unclassified evidentiary summaries relating to al Qaid state:  "The detainee and both of his traveling companions, Al Nur and Wasim, traveled to carry out charity work in conjunction with a Saudi charity, al-ighatha al-khairia."  "Al Ighatha is a large Saudi NGO with field offices worldwide, many of which are staffed by or support terrorists or mujahidin.  The NGO is linked to al Qaida and other extremist NGOs."

239.    Detainee Ghanim Abd al Rahman Ghanim al Huwaymadi al Harbi (ISN No. 516) was working in the IIRO finance department in Jeddah during the summer of 2000.  Al Harbi responded to a fatwa that requires all Muslims to train and be prepared to defend Islam at any time.  Although he was prohibited from traveling outside of Saudi Arabia, al Harbi traveled to Afghanistan during the summer of 2001 via Bahrain and Pakistan.  Al Harbi testified that he was a "governmental employee of a charitable organization" known as the International Islamic Relief Organization.  In addition, al Harbi acknowledged during his testimony that he received training at the al Farouq camp in Afghanistan, a known al Qaeda facility, which he understood to be a "charity funded camp."

240.    Detainee Tariq Mahmoud Ahmed al Sawah (ISN No. 535) is a former relief worker for the IIRO in Bosnia and Croatia.  Al Sawah testified that he chose to go to the Balkans region after watching videos depicting the atrocities committed by Serbs against Bosnians, and eventually joined the Bosnian Third Army, whose members were predominantly Arab Mujahideen fighters.  Al Sawah admitted to being a member of the mujihadeen since 1992.

According to the U.S. government:  "The International Islamic Relief Organization, also known as the World Islamic Relief Organization, is the largest Islamic charity organization in Saudi Arabia.  International investigations have disclosed the organization has connections to terrorist financing activities and its field offices throughout the world have supported terrorist activity."

241.    Al Sawah was expelled from Bosnia in 2000 and traveled to Afghanistan where he attended the al Farouq training camp and further served as an advanced explosives trainer at the Tarnak Farm training camp.  In 2002, he met Ayman al Zawahiri and also attended a banquet dinner with Osama bin Laden and a senior al Qaeda lieutenant.  Moreover, al Sawah authored a 400 page manuscript containing bomb-making techniques and provided it to al Qaeda members.  His design for a shoe bomb technically matched the design of the failed explosive device used by shoe bomber Richard Reid.

242.    Detainee Ahmed Hassan Jamil Suleyman (ISN No. 662), who performed volunteer work for the IIRO, was identified as a senior al Qaeda commander and trainer with contacts to Osama bin Laden, Sheikh al Liby and Abu Zubayda.  Suleyman was also a member of Makthab al Khidmat and associated with Makhtab al Khidmat (the "Office of Services").  According to Department of Defense documentation:  "The detainee occasionally would perform volunteer work with the International Islamic Relief Organization (IIRO).  The IIRO has connections to terrorist organizations and has channeled funds to Islamic extremists from Afghanistan."

243.    Detainee Abdul Latif Elbanna (ISN No. 905) worked for the IIRO.  The unclassified evidentiary summaries filed in support of Elbanna's continued detention at Guantanamo Bay state:  "In 1990 the detainee worked at an Islamic Relief organization (IRO)

called Haiat Ali Ghatha Al Islami Al Alamia. He lived for free at a guesthouse owned by the

charity in the Hayat Abad district of Peshawar. Fighters from Afghanistan stayed at the

guesthouse. The International Islamic Relief Organization/Hay-at al-Igathat al-Islamiyya al-

Alamiyah of Saudi Arabia is designated a Tier 1 Non-Governmental Organization having

demonstrated sustained and active support for terrorist organizations willing to attack U.S.

persons or interests."

## WORLD ASSEMBLY OF MUSLIM YOUTH

244. The World Assembly of Muslim Youth ("WAMY") is also a subsidiary of the

MWL. Founded in 1972 and headquartered in Riyadh, Saudi Arabia, WAMY has a physical and

operational presence in at least 56 countries worldwide. In addition, WAMY conducts activities

in many countries in which it does not maintain a formal physical presence, through its

association and membership in other Islamic organizations and committees, including its

membership in the Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC").

245. Like the MWL and IIRO, WAMY is a controlled agent and alter-ego of the

Kingdom of Saudi Arabia. WAMY was established by MWL, itself an alter-ego of the

Kingdom, with the formal approval of high ranking officials of the Kingdom. The vast majority

of WAMY's funding is provided by the Kingdom. In addition, WAMY's leadership is

dominated by high ranking officials of the Kingdom. For example, Dr. Maneh el Johani

simultaneously served as both the Secretary General of WAMY and a member of the Kingdom's

Shura Council. While head of the Ministry of Islamic Affairs, Saleh bin Abdul Aziz al Sheikh

also served as a chairman of WAMY and al Haramain Islamic Foundation.

246.    Mutaz Saleh Abu Unuq, Financial Director of WAMY, has confirmed in affidavit testimony that WAMY was established by Royal Decree in 1972, and that "WAMY is governed principally by its General Assembly and President who was appointed by the Saudi Government. The current President of WAMY is the Minister of Islamic Affairs in Saudi Arabia.  The daily operations of WAMY are supervised by its Secretary General. The Government of Saudi Arabia funds a large portion of WAMY's budget."

247.    Outside of Saudi Arabia, the operations of WAMY's branch offices are directed and closely supervised by local Saudi embassies.  According to Dr. Abdullah Wahab Noorwali, Assistant Secretary General of WAMY, the Kingdom "provides us with protection abroad through Saudi embassies and consulates, in addition to financial support."  As Arafat el Asahi's previously cited Candaian court testimony confirms, the Saudi embassies do not tolerate any deviation by the Saudi da'awa organizations under their supervision from Saudi government policy.

248.    The operations of WAMY's branch offices are closely supervised and directed by WAMY's central leadership in Saudi Arabia as well, and functionally operate as agents of the central organization.  WAMY's central authority in Saudi Arabia uses a variety of mechanisms to rigidly control the branch offices.  WAMY's General Assembly and Board of Trustees in Saudi Arabia set policies and procedures for all WAMY branch offices, and hand-pick the officials who run those branch offices.  WAMY headquarters also selects the projects and causes for which funds are to be raised by the WAMY offices throughout the world.  Funds raised by the branch offices are transferred back to the organization's headquarters, which then redistributes those funds to the regional offices, to be applied to projects and causes selected by WAMY's central leadership.  WAMY's branch offices are required to submit detailed reports of

their activities and finances to the central leadership in Saudi Arabia, for review and approval. High ranking WAMY officials from Saudi Arabia also conduct periodic inspections of the branch offices.  In addition, by virtue of its close relationship with the Kingdom's government, WAMY is able to use the Kingdom's governmental apparatus throughout the world, including the embassies, to monitor the day to day activities of the branches.

249.     For more than a decade, WAMY has knowingly and intentionally used its international infrastructure as a tool for supporting the al Qaeda movement, on both the ideological and military fronts.  As a result of the Kingdom of Saudi Arabia's extensive patronage, WAMY possesses a multi-million dollar annual budget.  WAMY dedicates a significant portion of that budget to the publication and worldwide dissemination of literature calculated to promote the global jihadist agenda, convince young Muslims to reject the United States and democratic ideas as evil and non-Muslim, demonize Christians, Jews and non-Wahhabi Muslims, and convince young Muslims to engage in violent jihad against the West and Israel.

250.     Virulently anti-American, anti-Semitic and pro-jihadist propaganda pervade WAMY's "educational" publications.  For example, under the heading "The Prophet asks for Jihad," the WAMY book *Islamic Views* says, "The Prophet Mohammad fought against the infidels and the Jews till he triumphed over them and conducted himself about twenty invasions and he sent tens of regiments led by his companions for Jihad…Damn from Allah to the Jews who made graves of their prophets as Masjid."   Later, *Islamic Views* says Islam "is a religion of Jihad*"* and that jihad "was an answer for the Jews, the liars."  "[T]each our children to love taking revenge on the Jews and the oppressors, and teach them that our youngsters will liberate Palestine and al-Quds when they go back to Islam and make Jihad for the sake of Allah."

*Islamic Views* further exhorts Muslims to wage "Jihad against the Satan," and that "You should

not back the Jews and the Christians and the Communists against the Muslims; the Communists,

the Infidels, the Jews, and the Christians, those who do not believe in Mohammed.  You should

say they are infidels."

251.    The jihad WAMY advocates in its publications is intensely violent.  According to

a WAMY policy statement, "[a] Christian should be asked to repent.  If he does not he must be

killed." *See Written Statement of James B. Jacobsen, President of Christian Solidarity

International,* submitted to the Sub-Committee of International Relations and Human Rights,

Hearing on Persecution of Christians Worldwide, February 15, 1996.  The book *Islamic Camps:

Objectives, Program Outlines and Preparatory Steps*, prepared by WAMY's Camps and

Conferences Unit and intended to serve as a manual for Islamic youth camps, suggests that

youths attending WAMY camps be led in the following refrain:

> Hail! Hail! O Sacrificing Soldiers! To Us! To Us!
>
> So we may defend the flag on this Day of Jihad, are you miserly
> with your blood?!
>
> And has life become dearer to you? And staying behind sweeter?
>
> Is staying in this world of torment more pleasing to us?
>
> You are amongst those called upon by Destiny.
>
> Come! So we may revive the times the times of our predecessors!

252.    Through these and other WAMY publications, as well as the madrassas, camps,

Islamic Centers, mosques, conferences and other events it sponsors,  WAMY has provided the

ideological foundation for the al Qaeda movement, and actively advocated young Muslims to

take up arms and engage in violent jihad against the United States.  In this regard, WAMY has

played a critical role in al Qaeda's cultural assault on the United States and democratic institutions throughout the world.

253.   Consistent with the extremist agenda it advocates, WAMY has immersed itself deeply in the militant endeavors of the global jihadist movement as well, actively supporting the militant and terrorist activities of al Qaeda and associated organizations in Bosnia, Chechnya, Kosovo, Kashmir, Pakistan, South East Asia, the United States and elsewhere.

254.   WAMY's pervasive involvement in supporting al Qaeda fighters and associated local jihadist groups in regional conflicts was well documented prior to September 11, 2001.  On December 5, 1992, the *New York Times* identified WAMY as a front for armed Islamic jihad in Bosnia.  According to the article, *Muslims From Afar Joining "Holy War" in Bosnia*:

> The conflict between Serbs and Muslims in Bosnia and Herzegovina… has been adopted by Islamic fundamentalists as the newest holy war against Christian infidels bent on the destruction of Islam.
>
> In the last few weeks, the conflict has lured several hundred militants, many of them veterans of the war in Afghanistan, to volunteer for the Bosnian forces….
>
> The volunteers are sponsored by a variety of militant religious organizations and often have their expenses and plane fare covered….  Despite formal denials from the relief organizations, Saudi officials say an increasing amount of the charity on behalf of the Bosnians is now used to provide arms and logistical support for Arab volunteers.
>
> "Since August, most of the money raised for relief has been turned over to the Bosnians for weapons," a Saudi official….  The World Assembly of Muslim Youth, which organized relief operations in Afghanistan and is now deeply involved in the conflict in the Balkans, flies back wounded Saudi fighters and provides free medical care in the Saudi German hospital.

255.     Within the same article, Adel Batterjee, the then chairman of WAMY,

acknowledged the organization's role in supporting armed Islamic jihad in Bosnia: "if a relief

worker decides that he wants to join the fighting forces, we would not stop him…." Following

the September 11, 2001 attack, Adel Batterjee was formally designated as a terrorist sponsor and

supporter pursuant to Executive Order 13224.

256.     In May of 2000, Russian officials similarly accused the SJRC, the committee

through which WAMY conducted activities in Chechnya, of financing and otherwise supporting

Islamic terrorists and separatists in that region.  According to a May 19, 2000 article in the

Russian newspaper *ITAR-TASS*, *Chechen Separatists Said Funded by Several Foreign Sources*:

> The aid to Chechens fighting against Russia, is delivered from the
> organization of humanitarian assistance to Muslims of Kosovo and
> Chechnya (the SJRC)….
>
> Officially, the money is sent to Chechnya to be used for religious
> events and Islamic feasts, but is actually used to finance rebel
> troops [a representative of the Russian Federal Security Service
> (FSB)].
>
> According to available information, part of the money is
> transferred to banking accounts of some warlords, including
> Shamil Basayev and Khattab…
>
> Russia's security services are aware that these people are financing
> rebel forces, overseeing arms, food and medicine deliveries, as
> well as arranging treatment for the wounded and paying
> allowances to guerillas.

257.     Significantly, Amir Khattab, one of the individuals who received financing

directly from WAMY and the SJRC, is a senior al Qaeda member who was deployed to

Chechnya by Osama bin Laden to organize al Qaeda's operations in that area.  According to the

1998 Department of Defense Intelligence Report:

> In 1995, Khattab appeared in Chechnya to carry out a special
> mission assigned to him by Usama ben Laden to organize training
> camps for international terrorists…. He was a colonel, fought as a
> field commander, and was wounded in the hand. Khattab
> organized three training camps in the Vedeno and Nojai-Urt areas
> of the forested mountain zone. Graduation is held at the three
> camps every two months. They are very equipped, with firing
> range facilities and capabilities to create models of "sites of
> diversion," as well as classes for sappers and snipers.

258. By no later than 1999, the details of bin Laden's direct links to Khattab and the

Chechen mujihadeen were the subject of widespread reporting in the mainstream media. For

instance, in August of 1999, NBC News published a report, *U.S. Links bin Laden to Chechnya*,

stating that "Osama bin Laden is financing the Chechen operation in Dagestan…" The article,

which was based on information provided by senior U.S. intelligence officials, explained that the

"key bin Laden connection" to the Chechen jihadists was Amir Khattab, and that their

relationship was so close that bin Laden was considering relocating from Afghanistan to areas of

Chechnya under Khattab's control.

259. Prior to the September 11th Attack, WAMY officials made little effort to conceal

their involvement in sponsoring armed jihad in Chechnya. To the contrary, at least within the

Arabic press, WAMY officials openly acknowledged that the organization was deeply involved

in sponsoring militant activities in Chechnya. For example, in a January 15, 2000 article

published in *Al Jazeera* newspaper, *The Chechen Tragedy – The Reality and the Required Role*,

Dr. Maneh al Johani, the Secretary General of WAMY, wrote as follows:

> [I] want to stress that these heroic Moslems, the Mujihadeen who
> are standing strong, deserve to receive our support and we must
> invest all of our energy in aiding them when they are being fed the
> taste of defeat once again. … It should be pointed out that WAMY
> has doubled its efforts and has placed all of its branches inside and
> outside of the Kingdom on alert to serve the Chechen issue and to
> implement the aid program for the Chechen refugees.

1.  The question that must be asked is: What do the Chechen Muslims need from us today?

2.  ***They need money to buy arms and ammunition. (emphasis supplied)***

The Islamic awakening, which is growing, praise be to Allah, is that which worries the Communist East and Heretic West, and they are afraid they will awaken one day and the Muslims will demand payment of a poll tax.

Triumph is coming and Islam will remain and Allah will rise and be victorious.  I request Allah for our brothers Mujihadeen in Chechnya and Dagestan, stability, reinforcements and victory.

260.    Significantly, al Jahari published his call for Muslims to donate funds to WAMY to buy "arms and ammunition" for the "mujihadeen" in Chechnya and Dagestan well after the direct and close relationship between those militants and al Qaeda had been widely detailed in the media and elsewhere.

261.    Philippine officials also publicly implicated WAMY in the financing of terrorist activities in Southeast Asia in the years prior to the September 11th Attacks.  According to a January 15, 1999 article in the *Australian General News*, *Phillipines Suspect Australian Group of Helping Rebels*, the government of the Philippines accused WAMY's Australian branch of financing the Moro Islamic Liberation Front ("MILF").  MILF was responsible for several bombings and attacks on remote villages in the Philippines that forced 400 civilians to flee in January of 1999.  In February of 1999, MILF Chief Hashim Salamat publicly confirmed that MILF had received funds from Osama bin Laden.

262.    Statements by government officials and press reports in the years preceding the September 11th attack also reveal WAMY's extensive role in supporting al Qaeda activities in Kashmir.  According to a December 8, 1995 article in the periodical *Money Clips*, *Kashmiri*

*Leader Thanks WAMY for Help*, a Kashmiri leader publicly thanked WAMY during a press conference for "helping the Mujihadeen in their struggle for independence from India." Separate articles published prior to September 11, 2001 reveal that WAMY funneled support to the Students' Islamic Movement of India (SIMI), Lashkar-e-Taibah and Hizb ul Mujahideen, three violent jihadist groups operating under the broader al Qaeda umbrella. *See SIMI:  Nursery of Hate, India Today*, April 2, 2001; *ISI Twin Plan – Attack Christians, Defame Hindu Outfits, The Economic Times of India*, July 15, 2000; *Kashmir: Hizb-Ul-Mojahedin Chief Explains Reasons Behind Cease Fire, BBC Worldwide Monitoring*, August 23, 2000; *Pakistani Behind Chruch Blast Say Police, The Statesmen (India)*, July 14, 2000.  In an interview contained in one of the articles, SIMI head Safdar Nagori publicly confirmed his organization's allegiance to al Qaeda:

> Q:     In your conferences, you have openly eulogized Osama bin Laden.
>
> A:     Not once, but dozens of times.  We believe he has shown great character in standing up the Americans, the biggest terrorists in the World.

263.    In March of 2003, al Qaeda military chief Abu Zubaydah was arrested at a Lahkar-e-Taibah safehouse in Islamabad, confirming the depth of collaboration and reciprocal support between those two terrorist organizations.

264.    WAMY Secretary General, Dr. Maneh al Johani, said that Muslims should come forward to wage jihad to liberate Kashmir.  Speaking at a Muslim World League auditorium in 1991, al Johani stated that jihad could be performed in many forms, asserting that  Muslims can go to the battlefield to wage a war against the enemies of Islam or they can give their moral, physical and financial support to the cause of jihad.

265.     WAMY's sponsorship of jihadist activity in Kashmir was channeled through its offices in Pakistan, which sponsored al Qaeda activity in that country as well.  In connection with a crackdown on terrorist activity prompted by the September 11th Attack, Pakistani authorities deported 89 employees of ostensible NGOs in October of 2001, based on their suspected ties to terrorism.  WAMY was among the organizations whose "employees" were specifically targeted by the measure.  Pakistani intelligence officials, operating in conjunction with agents of the Federal Bureau of Investigations of the United States, raided WAMY's Pakistani offices approximately one year later, as part of ongoing counter-terrorism efforts.  WAMY's close ties to senior al Qaeda cells in Afghanistan and Pakistan were revealed just one week after the raid, when an employee of WAMY hand delivered a recorded message from Osama bin Laden to an Arab television network in Islamabad.

266.     That incident did not represent the first occasion on which WAMY was involved in transferring information on behalf of al Qaeda.  During the investigation into the 1993 World Trade Center bombing, U.S. officials discovered an al Qaeda  training manual in the possession of Ahmed Ajaj, who was later convicted for his role in that attack.  The manual, entitled "*Military Lessons In The Jihad Against The Tyrants,*" was distributed to Ajaj by WAMY and detailed how to establish and maintain clandestine operational sales.  The same manual was subsequently recovered from the London apartment of African embassy bomber Khalid al-Fawwaz in 1998.

267.     Until shortly after the September 11th Attack, WAMY also maintained a physical presence in the United States, from which the organization channeled material support and resources to al Qaeda.  WAMY's U.S. offices were established in Falls Church, VA in 1992 by Abdullah bin Laden and Omar bin Laden, blood nephews of al Qaeda leader Osama bin Laden.

Under Abdullah bin Laden's leadership, WAMY's U.S. branch was deeply involved in the terrorist activities of the SAAR Network of businesses and charities. Federal authorities raided WAMY's U.S. offices in 2002, in connection with an ongoing investigation of the SAAR Network's role in sponsoring al Qaeda.

268. Despite the increased scrutiny of WAMY's operations following the September 11th Attack, the organization continues to sponsor al Qaeda and associated terrorist organizations and separatist movements to this day, demonstrating the organization's deep and longstanding commitment to al Qaeda's global jihad.

269. In June of 2002, Indian authorities arrested two men under the Prevention of Terrorism Act, after determining that they had transferred funds to Sayed Ali Shah Geelani, the leader of the Fundamentalist Jamaat-e-Islami party. According to sources within India's government, the two men, Farooq Ahmed and Mohammed Maqbool, were given funds by Nazir Qureshi, a senior WAMY official, to be covertly delivered to Geelani. Geelani previously had been arrested under the Prevention of Terrorism Act based on his involvement in transferring money to militant organizations in Kashmir.

270. In September of 2003, Romanian intelligence officials implicated WAMY in an al Qaeda plot to hijack a plane departing from Romania and crash it into Heathrow Airport in London. According to an article published by the *Global New Wire* on September 5, 2003, *Intelligence Service "Alert" Watches Egypt's "Muslim Brothers" in Romania*, the plot was being coordinated by al Qaeda affiliated members of the Muslim Brotherhood in Romania. Quoting information obtained from Romanian intelligence officials, the article asserts that the

Romanian wing of the Muslim Brotherhood acts under the cover of various humanitarian organizations, and receives most of its funds from WAMY.

271.     Statements by Treasury Department officials, testifying before Congress, further confirm that WAMY continues to serve as a front for al Qaeda and other terrorist organizations. During a July 13, 2005 Hearing on Money Laundering and Terror Financing Issues in the Middle East before the U.S. Senate Committee on Banking, Housing, and Urban Affairs, Treasury Under Secretary Stuart Levey asserted that "wealthy Saudi financiers and charities have funded terrorist organizations and causes that support terrorism and the ideology that fuels the terrorists' agenda… Even today, we believe that Saudi donors may still be a significant source of terrorist financing, including for the insurgency in Iraq."  Levey expressed particular concern about the continued involvement of WAMY, the IIRO and MWL in the financing of terrorist activities throughout the globe

272.     As is the case with the MWL and IIRO, the United States has detained a number of WAMY employees as enemy combatants, and the unclassified evidentiary summaries prepared by the Department of Defense for thos detainees specifically detail WAMY's support for al Qaeda and other terrorist organizations.

273.     For instance, the United States government's unclassified evidentiary summaries relating to detainee Mammar Ameur (ISN No. 939) state the following regarding WAMY:  "In 1996, the detainee resigned from the EHRO [Egyptian Human Relief Organization] and remained unemployed afterward.  The detainee was arrested with an individual, who worked for several years for a Saudi organization called WAMY.  The World Assembly of Muslim Youth

(WAMY) is an NGO operating in Afghanistan and may be associated with Usama Bin Laden and/or al Qaeda."

274.    Detainee Adel Hassan Hamed (ISN No. 940) was employed by Lajnat al Daawa al Islamiya ("LDI") in Afghanistan and Pakistan from 1986-1999.  LDI is a non-governmental organization that operates in Afghanistan and is affiliated with Osama bin Laden and al Qaeda operations.  When Hamed was laid off from the LDI in 1999, he was hired as the Director of the WAMY hospital in Afghanistan.  "WAMY is a non-government organization operating in Afghanistan that may be affiliated with Usama Bin Ladin and al Qaeda operations.  According to top WAMY officials, both the United States and Israel must be destroyed.  WAMY provides financial support to the Palestinians fighting against Israel.  In addition, WAMY has put forward a proposal that the Palestinians should declare open war on Israel."

## AL HARAMAIN ISLAMIC FOUNDATION

275.    Defendant al Haramain Islamic Foundation ("al Haramain") is a Saudi Arabia-based ostensible charity, with branch offices in approximately 50 countries.

276.    Al Haramain is an agent and alter-ego of the Kingdom of Saudi Arabia.  The Kingdom controls and directs al Haramain operations, appoints and terminates al Haramain personnel, provides al Haramain with virtually all of its funding, determines how funds will be distributed throughout the world, and otherwise stringently controls al Haramain's operations.  In many countries, al Haramain conducts operations from the local Saudi embassy, under the supervision of the embassy's Islamic Affairs Division.

277.    Al Haramain officials have acknowledged that their operations are under the control and direction of the Kingdom of Saudi Arabia.  According to the affidavit testimony of

the Financial and Administrative Manager of al Haramain, Khalid bin Obaid Azzahri, "al Haramain operates under the supervision of the Saudi Minister of Islamic Affairs, who appoints its Board of Directors and senior management personnel."  Moreover, al Haramain's general director, Sheik Aqeel Abdulaziz al Aqil, stated that "we work under the supervision of Saudi government."  Al Aqil has also acknowledged that more than 95% of al Haramain's funding comes directly from the Kingdom of Saudi Arabia.  In an August 25, 2002 report posted on al Haramain's website, the Chairman of the Africa Committee of al Haramain, al Sheikh Muhmad al Tujri, declared that al Haramain's activities in Kenya were under the "direct supervision" of the Saudi embassy in that country.  A separate report on al Haramain's website that month indicated that the Saudi Interior Minister had directed the organization to provide assistance to Afghani refugees.

278.     The 9-11 Commission Staff Monograph on terrorism financing further indicates that at least two government ministers held supervisory roles over al Haramain.

279.     International investigations have confirmed al Haramain's direct and pervasive complicity in al Qaeda's operations and attacks throughout the world.

280.     In 2002, an intelligence report from the Bosnian Intelligence Services (Agency for Investigation and Documentation or "AID") revealed the active role of Vakufska Banka D.D. in terrorism funding.  Indeed, AID described Vakufska Banka D.D. and the merged Depozitna Banka D.D., as a financial platform assisting al Haramain Islamic Foundation and al Qaeda activities:

> The HO (al Haramain) spent around 13 KM ($7,647,000) between
> its foundation in 1997 and the end of last year 2000. Financial
> transactions were through accounts at the Depozit[na] Bank, now

the Vakufska Bank, whose major shareholders have been linked
with PIS operating illegal money laundering.

The Bosnian Intelligence memo regarding the activities of al Haramain states the
following:

Given all the above security factors, we believe that the clear lack
of any concrete humanitarian projects indicates that the existence
of this HO [Humanitarian Organization] was a fictitious cover (…)

The report establishes al Haramain's role in financing and assisting Osama bin Laden
operations:

Saudi HO [Humanitarian Organization] Al Haramain, (…) has
acted as a channel for financing the activities of terrorist
organizations. (…) According to available intelligence, the
Sarajevo office assisted the terrorist organization Gama Al
Islamija, while members of Bin Laden's El Itihad al Islamija
(AIAI) terrorist groups were employed at the Somalia offices,
which also financed their operations.

281.    The charity allegedly wired $1 million to Chechen rebels in 1999 and arranged to

buy 500 heavy weapons for them from Taliban units.  The Russian security service, FSB, has

publicly alleged that Al Baraka Bank was used by al Haramain to funnel money to Islamic

resistance fighters in Chechnya.

282.    On March 11, 2002, the United States designated the Bosnia-Herzegovina and

Somalia branches of al Haramain, based on their extensive and pervasive involvement in the

funding of al Qaeda's activities in those two countries.  According to the designation:

The Bosnia office of Al Haramain is linked to Al-Gama'at al-
Islamiyya, an Egyptian terrorist group (designated under Executive
Order 13224 on October 31, 2001) that was a signatory to UBL's
February 23, 1998 fatwa against the United States.

U.S. Treasury Department officials further noted the Somalia branch's support for the al
Qaeda network and a Somali terrorist organization:

The Somalia office … is linked to Usama bin Laden's al Qaida
network and Al-Itihaad al-Islamiyya (AIAI), a Somali terrorist
group (designated under Executive Order 13224 on September 23,

2001). Al Haramain Somalia employed AIAI members and provided them with salaries through al Barakaat Bank (designated under Executive Order 13224 on November 7, 2001), which was a primary source of terrorist funding. Al Haramain Somalia continued to provide material and financial support for AIAI even after the group's designation under E.O. 13224 and UNSCR 1333. Money was funneled to AIAI by disguising funds as if they were intended for orphanage projects or Islamic schools.

283.     On January 22, 2004, the United States designated the al Haramain branches in Indonesia, Kenya, Tanzania and Pakistan for providing "financial, material and logistical support to Usama bin Laen's (UBL's) al-Qaida network and other terrorist organizations."

284.     The Indonesian Office of al Haramain had diverted funds to al Qaeda affiliated terrorists for weapons procurement, and directly funded the deadly October 12, 2002 Bali nightclub bombing.  In addition to providing financial support to al Qaeda operatives in the country and to the Jemmah Islamiyah terrorist group, a senior al Qaeda official apprehended in Southeast Asia, Omar al Faruq, told authorities that al Haramain served as a primary source of al Qaeda funding throughout Southeast Asia.

285.     In the press release issued in conjunction with the designation of the Kenyan and Tanzanian offices of al Haramain, the U.S. Treasury Department described al Haramain's extensive involvement in terrorist activity within Africa as follows:

As early as 1997, U.S. and other friendly authorities were informed that the Kenyan branch of AHF was involved in plotting terrorist attacks against Americans.  As a result, a number of individuals connected to AHF in Kenya were arrested and later deported by Kenyan authorities.

In August 1997, an AHF employee indicated that the planned attack against the U.S. Embassy in Nairobi would be a suicide bombing carried out by crashing a vehicle into the gate of the Embassy.  A wealthy AHF official outside East Africa agreed to provide the necessary funds.  Information available to the U.S.

shows that AHF was used as a cover for another organization whose priorities include dislike for the U.S. government's alleged anti-Muslim stance and purposed [sic] U.S. support for Christian movements fighting Islamic countries.

Also in 1997, AHF senior activities in Nairobi decided to alter their (then) previous plans to bomb the U.S. Embassy in Nairobi and instead sought to attempt the assassination of U.S. citizens. During this time period, an AHF official indicated he had obtained five hand grenades and seven "bazookas" from a source in Somalia. According to the information available to the U.S., these weapons were to be used in a possible assassination attempt against a U.S. official.

Information available to the U.S. shows that a former Tanzania AHF director was believed to be associated with UBL [Usama Bin Laden] and was responsible for making preparations for the advance party that planned the August 7, 1998 bombings of the U.S. Embassies in Dar Es Salaam, Tanzania, and Nairobi, Kenya. As a result of these attacks, 224 people were killed.

Shortly before the dual-Embassy bombing attacks in Kenya and Tanzania, a former AHF official in Tanzania met with another conspirator to the attacks and cautioned the individual against disclosing knowledge of preparations for the attacks. Around the same time, four individuals led by an AHF official were arrested in Europe. At that time, they admitted maintaining close ties with EIJ and Gamma Islamiyah.

Wadih-El-Hage, a leader of the East African al Qaida cell and personal secretary to UBL [Osama Bin Laden], visited the Kenya offices of AHF before the 1998 dual Embassy attacks. Searches conducted by authorities revealed that El-Hage possessed contact information for a senior AHF official who was head of AHF's Africa Committee, then overseeing authority for AHF's offices in Kenya and Tanzania.

In early 2003, individuals affiliated with AHF in Tanzania discussed the status of plans for an attack against several hotels in Zanzibar. The scheduled attacks did not take place due to increased security by local authorities, but planning for the attacks remained active.

Information made available to the U.S. shows that AHF offices in Kenya and Tanzania provided support, or act for or on behalf of al Qaida and AIM.

286.    The Pakistan office of al Haramain provided funding and logistical support for the

acquisition and delivery of Zenit missiles, Sting anti-aircraft missiles, and hand-held anti-tank

weapons to al Qaeda and al Qaeda affiliated militants.  In addition:

> Before the removal of the Taliban from power in Afghanistan, the
> AHF in Pakistan supported the Taliban and other groups.  It was
> linked to the UBL-financed and designated terrorist organization,
> Makhtab al-Khidemat (MK).  In one instance, some time in 2000,
> the MK director instructed funds to be deposited in AHF accounts
> in Pakistan and from there transferred to other accounts.
>
> At least two former AHF employees who worked in Pakistan are
> suspected of having al-Qaida ties.  One AHF employee in Pakistan
> is detained at Guantanamo Bay on suspicion of financing al-Qaida
> operations.  Another former AHF employee in Islamabad was
> identified as an alleged al-Qaida member who reportedly planned
> to carry out several devastating terrorist operations in the United
> States.  In January 2001, extremists with ties to individuals
> associated with a fugitive UBL lieutenant were indirectly involved
> with a Pakistani branch of the AHF.
>
> As of late 2002, a senior member of AHF in Pakistan, who has also
> been identified as a "bin Laden facilitator," reportedly operated a
> human smuggling ring to facilitate travel of al-Qaida members and
> their families out of Afghanistan to various other countries.
>
> AHF in Pakistan also supports the designated terrorist
> organization, Lashkar E-Taibah (LET).

287.    On June 22, 2004, the United States designated the al Haramain branches in

Afghanistan, Albania, Bangladesh, Ethiopia and the Netherlands "for the financial, material and

logistical support they provided to the al-Qaida network and other terrorist organizations."  The

designation stated the following regarding the al Haramain branch in Afghanistan:

> In Afghanistan, prior to the removal of the Taliban from power,
> AHF supported the cause of Jihad and was linked to the UBL
> financed Makhtab al-Khidemat (MK), a pre-cursor organization of
> al Qaeda and a Specially Designated Global Terrorist pursuant to
> the authorities of E.O. 13224.

Following the September 11, 2001 terrorist attacks, activities supporting terrorism in Afghanistan continued. In 2002, activities included involvement with a group of persons trained to attack foreigners in Afghanistan. A journalist suspected of meeting with al Qaida and Taliban members in Afghanistan was reportedly transferring funds on behalf of the al Qaida-affiliated AHF and forwarding videotapes from al Qaida leaders to an Arabic language TV network for broadcast.

The Albanian branch of al Haramain was closely linked to Osama bin Laden according to U.S. Treasury officials:

The U.S. has information that indicates UBL may have financed the establishment of AHF in Albania, which has been used as cover for terrorist activity in Albania and in Europe. In late 2000, a close associate of a UBL operative moved to Albania and was running an unnamed AHF subsidiary. In 1998, the head of Egyptian Islamic Jihad in Albania was reportedly also a financial official for AHF in Albania. This individual, Ahmed Ibrahim al-Nagar, was reportedly extradited from Albania to Egypt in 1998. At his trial in Egypt, al-Nager reportedly voiced his support for UBL and al Qaida's August 1998 terrorist attacks against the U.S. embassies in Kenya and Tanzania.

The al Haramain office in Bangladesh conducted surveillance for potential al Qaida attacks on U.S. targets in India:

Information available to the U.S. shows that a senior AHF official deployed a Bangladeshi national to conduct surveillance on U.S. consulates in India for potential terrorist attacks. The Bangladeshi national was arrested in early 1999 in India, reportedly carrying four pounds of explosives and five detonators. The terrorist suspect told police that he intended to attack U.S. diplomatic missions in India. The suspect reportedly confessed to training in al Qaida terrorist camps in Afghanistan, where he met personally with Usama bin Laden in 1994. The suspect first heard of plans for these attacks at the AHF office in Bangladesh.

288.    In Ethiopia, the al Haramain branch provided support to Al Itihaad al Islamiyya

("AIAI"). AIAI has engaged in attacks against Ethiopian defense forces and has been designated

both by the United States and the U.N. 1267 Sanctions Committee. Dutch officials confirmed

that the al Haramain Humanitarian Aid Foundation located in Amsterdam is part of the larger al

Haramain network which has supported terrorism.

289.    Additionally, on June 22, 2004, the United States designated, "the founder and long-time leader of AHF [al Haramain Islamic Foundation] and a suspected al Qaida supporter," Aqeel Abdulaziz al Aqil.  Al Aqil has been identified as al Haramain's Chairman, Director General and President.  As al Haramain's founder and leader, al Aqil controlled the organization and was responsible for all of its activities, including its support for al Qaeda and other terrorist organizations.  According to U.S. Treasury officials:

> When viewed as a single entity, AHF is one of the principal Islamic NGOs providing support for the al Qaida network and promoting militant Islamic doctrine worldwide.  Under Al Aqil's leadership of AHF, numerous AHF field offices and representatives operating throughout Africa, Asia, Europe and North America appeared to be providing financial and material support to the al Qaida network.  Terrorist organizations designated by the U.S. including Jemmah Islammiya, Al-Ittihad Al-Islamiya, Egyptian Islamic Jihad, HAMAS and Lashkar E-Taibah received funding from AHF and used AHF as a front for fundraising and operational activities.
>
> Under Al-Aqil's leadership, AHF implemented its tasks through its offices and representatives, which span more than 50 countries around the world.  AHF maintained nine general committees and several other "active committees" that included the "Continuous Charity Committee, African Committee, Asian Committee, Da'wah and Sponsorship Committee, Masjid Committee, Seasonal Projects Committee, Doctor's Committee, European Committee, Internet and the American Committee, the Domestic Committee, Zakaat Committee and the Worldwide Revenue Promotion Committee."

290.    According to the U.S. Treasury Department evidentiary memorandum detailing al Aqil's designation pursuant to Executive Order 13224, Mansour Al-Kadi, a Saudi and deputy director general of the al Haramain headquartered in Saudi Arabia, issued an Internet posting which identified al Aqil as the "only individual with final decision making on spending … and the one with authority to hire employees, even if it is just a janitor …."  Al Kadi is also "head" of al Haramain's Africa Committee, and vice president of the United States al Haramain branch.

291.    On September 9, 2004, the United States designated the United States branch of al Haramain, along with one of its directors, Soliman al Buthe.  In support of the designation, Stuart Levey, U.S. Treasury's Under-Secretary for Terrorism and Financial Intelligence, said this:  "We continue to use all relevant powers of the U.S. government to pursue and identify the channels of terrorist financing, such as corrupted charities, at home and abroad.  Al Haramain has been used around the world to underwrite terror, therefore we have taken this action to excommunicate these two branches and Suliman Al-Buthe from the worldwide financial community."

292.    The United States branch of al Haramain was formally established in 1997.  On the United States branch's tax Form 990 for 2001 filed with the Internal Revenue Service ("IRS"), al Aqil is identified as the President, al Kadi as the Vice-President, al Buthe as the Treasurer, and Perouz Sedaghaty as the Secretary.  The U.S. branch's Article of Incorporation and application to the IRS for tax-exempt status also list al Aqil and al Kadi as members of the board of directors.  Additional documents naming al Buthe as the organization's attorney and providing him with broad legal authority were signed by al Aqil.

293.    The assets of the al Haramain branch, which is headquartered in Ashland, Oregon, were blocked as a result of an investigation involving agents from the Internal Revenue Service – Criminal Investigations ("IRS-CI"), the Federal Bureau of Investigation ("FBI"), and the Department of Homeland Security's Immigration and Customs Enforcement ("ICE").

294.    In February 2004, the United States Attorney's Office for the District of Oregon announced the execution of a federal search warrant against the Ashland, Oregon property which has been purchased on behalf of the Al Haramain Islamic Foundation, Inc.  The search was conducted pursuant to a criminal investigation into violations of the Internal Revenue Code,

Money Laundering Control Act and Bank Secrecy Act.  The accompanying affidavit by IRS Special Agent Colleen Anderson alleges al Haramain and its officers attempted to conceal the transfer of $130,000 in American Express traveler's checks and a $21,000 cashier's check intended for aid to Muslims in Chechnya in mid-March of 2000.  The affidavit also states that on several occasions from 1997 to 2001, Soliman H. al Buthe, co-founder of the U.S. branch of Al Haramain, brought significant sums of traveler's checks into the United States, according to declarations he made when entering the country.  In 13 trips, he reported bringing in $777,845, of which $206,000 was used to buy the Ashland headquarters in 1997.  But there is no explanation for the balance, Anderson wrote.

295.    In early 2000, an Egyptian doctor wired a $150,000 donation from his London bank account to al Haramain's Ashland bank, according to the affidavit.  An e-mail from the doctor said the money was meant "to participate in your noble support to our Muslim brothers in Chechnya."  At the time, Russian forces were battling Chechen rebels for control of the region.  The fight was considered a jihad, or holy war, by some Muslim factions.

296.    The affidavit said that eleven (11) days after the doctor's donation showed up in Oregon, al Buthe traveled to Ashland from Saudi Arabia.  He joined Perouz Sedaghaty (a/k/a "Pete Seda"), co-founder of the U.S. branch of al Haramain, at an Ashland bank and the two took out $130,000 – buying 130 traveler's checks in $1,000 denominations, the affidavit said.  A bank clerk suggested it would be easier to issue a cashier's check, the affidavit said.

297.    "Seda said he could not take a cashier's check because the money was to help people and a lot of times these people may not be able to negotiate a cashier's check," the affidavit said.  Seda took an additional $21,000 in a cashier's check, giving that to al Buthe, the

affidavit said.  The check had the notation: "Donations for Chichania [sic] Refugees," the affidavit said.  The affidavit said Seda – using the name Abu Yunus – signed an agreement with al Buthe saying he was relinquishing the money for "brothers and sisters in Chechnya."

298.     Within days, al Buthe returned to Saudi Arabia, failing to declare to Customs, as required, that he was taking the traveler's checks out of the United States, the affidavit said. Once back in Saudi Arabia, al Buthe cashed the traveler's checks in for Saudi riyals at the Al Rajhi Bank.  The money then disappeared, presumably to be smuggled into Chechnya.  Al Buthe deposited the remainder into his bank account.

299.     Al Haramain's 2000 tax return underreported income by $21,000, underreported grants by $150,000, and overstated the price of a second prayer house that al Haramain bought in Missouri.  The tax return shows that Sedaghaty, or one of his associates, improperly listed the $131,300 disbursement to al Buthe as funds used to purchase the Springfield prayer house.

300.     On September 9, 2010, a grand jury in Eugene, Oregon convicted Sedaghaty of two felonies related to the organization's efforts to send nearly $150,000 to support religious extremist militants in Chechnya.  He was convicted of all charges, which included a charge that he filed a false tax return and conspired to file a false tax return as part of al Haramain's efforts to hide the trail of money. [Sentencing is scheduled for Nov. 23, 2010 – may want to add in here when sentenced]

301.     The United States also further designated the al Haramain branch located in the Union of the Comoros on September 9, 2004 based on information that two associates of that branch were linked to al Qaeda.  According to the transcript from *U.S. v. Osama Bin Laden*, the Union of the Comoros was used as a staging area and exfiltration route for the perpetrators of the

1998 bombings of the U.S. embassies in Kenya and Tanzania.  The al Haramain branches in

Kenya and Tanzania were previously designated for providing financial and other operational

support to these terrorist attacks.

302.    Finally, on June 19, 2008, the U.S. Treasury Department designated the Saudi-

based headquarters of the al Haramain Islamic Foundation "for having provided financial and

material support to al Qaida, as well as a wide range of designated terrorists and terrorist

organizations."  According to the designation:

> Today's action targets the entirety of the AHF organization,
> including its headquarters in Saudi Arabia.  Evidence demonstrates
> that the AHF organization was involved in providing financial and
> logistical support to the al Qaida network and other terrorist
> organizations designated by the United States and the United
> Nations.

303.    Al Haramain has also sponsored al Qaeda activity within Europe, through the al

Nur Mosque.  According to German officials, the al Nur Mosque served as a meeting place,

recruitment center and base of operations for al Qaeda within Germany.  At the direction of the

Kingdom of Saudi Arabia, al Haramain contributed in excess of $1 million dollars to the

Mosque, funding the purchase of the land for the Mosque as well as its construction.

304.    Al Haramain also sponsored al Qaeda operations in Chechnya and Kosovo

through its participation in the Saudi Joint Relief Committee for Kosovo and Chechnya

("SJRC").  As set forth previously, the SJRC offices in Pristine, Kosovo served as a cover for al

Qaeda operatives.  Furthermore, between 1998 and 2000, the Kingdom of Saudi Arabia, through

the SJRC, diverted more than $74 million to al Qaeda members and loyalists affiliated with

SJRC bureaus.

305.    Al Haramain has advertised its connection to al Qaeda.  Al Haramain's website used to have a direct link to the al Qaeda site about the Chechnyian operations (qoqaz.com).  The website is part of the al Qaeda propaganda organization, Azzam Publications group of websites, including qoqaz.com, qoqaz.net, and azzam.com (among others).

306.    According to the 1996 Central Intelligence Agency Report, al Haramain directly funded and supported a mujahideen battalion in Zenica, was involved in illegal smuggling activities, and has further been linked to illegal funding through drugs and prostitution.

307.    Predictably, al Haramain employees and associates feature prominently among the persons detained as enemy combatants at Guantanamo Bay, Cuba following the September 11, 2001 attacks.

308.    Detainee Zaid Muhamamd Sa'ad al Husayn (ISN No. 050) left Saudi Arabia for Afghanistan in July 2001 after being inspired by flyers posted by al Haramain.  According to the U.S. government:  "The al Haramayn Foundation (aka Al Haramayn Islamic Foundation (HIF)) is designated as a Tier 1 Non-Governmental Organization (NGO).  Tier 1 targets are defined as terrorist groups, especially those with state support, that have demonstrated the intention and the capability to attack United States Persons or interests."

309.    Detainee Abdel Hadi Mohammed Badan al Sebaii Sebaii (ISN No. 064) worked as a volunteer for al Haramain.  Department of Defense documentation states that al Haramain "is an NGO with known ties to al Qaida and Usama Bin Laden" and further asserts: "Al Haramain has been connected with violent Islamic groups and possible financial support of militant groups.  They're known to support Islamic extremist elements in 17 countries or regions."

310.    Detainee Abdul Rahman Owaid Mohammad al Juaid (Detainee No. 179) provided monetary support to al Haramain, traveled from Saudi Arabia to Afghanistan in 2001, and was identified on a jihadist website on a list of mujahideen captured by the U.S. military in Afghanistan.  According to the unclassified evidentiary summaries submitted in support of his continued detention:  "The Al Haramain Islamic Foundation is on a terrorism blacklist because of 'financial, material and logistical support' they provided to the al Qaida network and other terrorist organization."  "Foreign Government Services officials believe that Al Haramain might be a cover organization for Osama Bin Laden's al Qaida network.  Saudi mujahedin are known to work in Al Haramain regional offices around the world."

311.    Detainee Said Muhammad Husayn Qahtani (Detainee No. 200) traveled multiple times from Saudi Arabia to Afghanistan between 2000 and 2001.  In May 2000, Qahtani met and stayed with Abu Zubaydah in a safehouse while waiting to travel to Afghanistan.  Moreover, during a trip in June 2000, Qahtani joined the Taliban against the Northern Alliance and spent a considerable amount of time on the front lines.  Qahtani joined al Qaeda after giving an oath of allegiance ("al bay'ah") to Osama bin Laden, and further met 2 of the 9-11 hijackers – Saeed al Ghamdi and Ahmed Alnami.  According to Department of Defense documentation, Qahtani contacted relief organizations such as the IIRO and al Haramain with the intention "to join a relief organization because those entities would offer him a way to get into Chechnya, whose borders were closed at that time.  Once there, the detainee would be free to leave the relief organization and join the fighting."

312.    Detainee Fahd Muhammed Abdullah al Fouzan (Detainee No. 218), an al Haramain employee, traveled to Afghanistan after September 11, 2001 and was identified as having attended the Abu Nasir military camp in Afghanistan.  Al Fouzan fought in Tora Bora

and was a fundraiser and recruiter for both al Qaeda and the Taliban in Saudi Arabia.  According to the U.S. government:  "The detainee was identified as an employee of the al Haramayn Charitable Institute.  Al Haramayn was added on 11 March 2002 to the list of organizations identified under Executive Order 13224 blocking property and prohibiting transactions with persons who commit, threaten to commit, or support terrorism."

313.    Detainee Wasm Awwad Umar Wasim (Detainee No. 338), traveled from Saudi Arabia to Afghanistan in late 2001 with another member of al Qaeda.  According to the unclassified evidentiary summaries submitted in support of his continued detention:  "The detainee volunteered to work with the Al Haramain charity/non-governmental organization (NGO) from time to time.  Executive Order 13224, which blocks property and prohibits transactions with persons who commit, threaten to commit, or support terrorism, designated Al-Haramain as a global terrorist entity.  The detainee stated he was a colleague of the Al-Haramain Director."  In response to allegations concerning his association with al Haramain, Wasim testified that "al Haramain is an official governmental organization, registered under the administration of the government and the Kingdom of Saudi Arabia.  It is officially registered and included in the Humanitarian Aid Association, and under the administration of Internal Affairs, led by the Minister of Internal Affairs."  Wasim further stated that al Haramain is "not a secret organization; it's a governmental organization."

314.    Detainee Sami al Haj (Detainee No. 345), a senior al Qaeda operative and logistics expert, traveled to Azerbaijan at least 8 times to courier money to al Haramain, particularly between 1997-1999.  The United States government's unclassified evidentiary summaries relating to al Haj assert:  "A source stated the al Haramain Saudi Arabian Foundation's main mission is to implement and teach true Wahhabism religious doctrine

worldwide.  Al Haramain has connections with al Qaida.  A former head of the al Haramain has

been accused of controlling the financial, material and logistical support to al Qaida and other

terrorist organizations.  Al Haramain is suspected of involvement in weapons smuggling to

Algeria and the transfer of radical fundamentalists to Bosnia during the war in the former

Yugoslavia."

315.    Detainee Jamal Muhammad Alawi Mari (Detainee No. 577), began working with

al Haramain as a student in 1995 and was later hired in 1997 to work at the al Haramain office in

Baku, Azerbaijan.  In August 1998, Mari was appointed as director of the al Haramain office in

Baku.  A foreign government agency has stated that Mari took part in high-level illegal activity,

and further reported that the al Haramain office disseminated propaganda of an extremist and

separatist nature in the guise of providing humanitarian assistance.

316.    The unclassified evidentiary summaries filed in support of Mari's continued

detention at Guantanamo Bay detail al Haramain's long-standing support for Islamic extremist

groups, families of Islamic suicide attackers, the al Qaeda network, and mujahideen fighters in

Chechnya:

> Al Haramayn was founded in 1992 to disseminate the Saudi
> Arabian version of the Sunni Islamic religion with Wahabistic
> influences/teachings.  In addition to providing legitimate
> humanitarian aid to promote Islamic teachings, this organization
> has provided support to families of Islamic suicide attackers, freed
> activists from prisons, procured fraudulent travel documents,
> provided medical care for wounded Mujahedin, smuggled weapons
> into Algeria and transferred radical fundamentalists into Bosnia.
>
> Al Haramayn has provided logistical support to the Mujahedin
> fighting in Afghanistan since the 1980's.  Their annual budget was
> between 50 to 60 million United States Dollars.  Al Haramayn
> provides support to Islamic extremist elements in seventeen
> countries or regions that includes freeing of activists from prisons,

procurement of fraudulent travel documents and weapons smuggling to Algeria.  Forty bank accounts connect to terrorist activities have been linked to offices and sub-departments of al Haramayn.

A source stated al Haramayn worked closely with members of al Wafa.  A former al Qaida member stated organizations such as al Haramayn and al Wafa allowed easier access to funds which financed al Qaida.  These organizations provided a legitimate cover for al Qaida members to travel world-wide under the guise of humanitarian operations.  These groups would build mosques for the purpose of recruiting future al Qaida members.

Al Haramayn established an office in Azerbaijan to provide a legitimate organization, which was also providing money and materials to Mujahedin, military leaders throughout Chechnya.  Authorities accused Al Haramayn of supporting activities not in alignment with the humanitarian aims of the organization in January 2000 and the office was subsequently closed.

317.    Detainee Khalid Mahomoud Abdul Wahab al Asmr (Detainee No. 589), identified as an Afghan jihad veteran who had connections with Islamic extremists worldwide, told U.S. military investigators that he had been providing aid to al Qaeda and other extremists since 1996. According to the U.S. government, Al Asmr met with Muhamed Krimi, the director of the al Haramain office in Zenica, Bosnia in July 1999 to discuss a plan to attack the British and American embassies:  "HIF [al Haramain] has been sanctioned under Executive Order 13224 for supporting terrorism.  HIF has been linked to the Mujahedin Brigade in Bosnia and the Islamic Cultural Institute (ICI) in Milan.  HIF uses links to the ICI to remain active in support of the former mujahiden in Bosnia."  In response to the Tribunal's contention that al Haramain is associated with al Qaeda, Al Asmr stated:  "If you consider al Haramayn as a terrorist organization, you should [be] talking to Saudi Arabia, because Saudi Arabia was the country that established al-Haramayn.  Its president is the Royal Prince there.  Why don't you go over there and ask him."

## SAUDI HIGH COMMISSION

318.    The Saudi High Commission for Relief of Bosnia and Herzegovian ("SHC") is a Saudi Arabia-based da'awa organization, established by the government of Saudi Arabia and headed by Prince Salman bin Abdul Aziz al Saud, who actively directed the SHC's operations.

319.    The SHC is a controlled agent and alter-ego of the Kingdom of Saudi Arabia. The Kingdom controls and directs SHC operations, appoints and terminates SHC personnel, provides the SHC with virtually all of its funding, determines how funds will be distributed throughout the world, and otherwise stringently controls the SHC's operations.

320.    According to the affidavit testimony of the Minister of State of the Council of Ministers of Saudi Arabia, Dr. Mutlib bin Abdullah al Nafissa, the SHC "is an arm of the Saudi Arabian government.  Actions taken by the SHC properly are viewed as actions of the Government of Saudi Arabia."

321.    Saud bin Mohammad al Roshood, Director of the Executive Office of the SHC, has likewise affirmed in affidavit testimony that the SHC was created by decision of the President of the Council of Ministers of Saudi Arabia, has been continuously headed by Prince Salman bin Abdulaziz al Saud, and that the Executive Committee and Supreme Commission of the SHC include a number of other Saudi Government officials.

322.    As detailed previously, the SHC was established to coordinate the Kingdom of Saudi Arabia's response to the Bosnian War, and served as a primary conduit for the Kingdom's massive sponsorship of al Qaeda's jihad in the Balkans.

323.   According to Bosnian officials, al Qaeda mujahideen fighters began entering Bosnia-Herzegovina in 1992, frequently disguised as relief workers for the SHC.

324.   Throughout the course of the war, the SHC served as a primary front for channeling financial and logistical support for al Qaeda's jihad in Bosnia, as confirmed by the testimony of former al Qaeda member Ali Ahmed Ali Hamad.

325.   Ali Hamad was sent to Bosnia in 1992 to help coordinate al Qaeda's military operations.  Following the war, Ali Hamad was employed by the SHC's Mostar office as the Department Chief for "dawa."  In 1997, Ali Hamad was arrested and convicted for participation in a car bombing in the city of Mostar.  At the time, Ali Hamad was ostensibly employed by the SHC.

326.   Among other things, Ali Hamad has affirmed in sworn testimony that:

> The SHC provided Ali Hamad and other al Qaeda members with false employment papers to allow them to move freely throughout the Balkans in furtherance of al Qaeda's objectives.
>
> Representatives of the SHC provided extensive financial support and food to the mujahideen forces, and also permitted the mujahideen and al Qaeda members in Bosnia to use the SHC's offices and rented houses.  Al Qaeda members planned terrorist plots and attacks from SHC facilities.
>
> The SHC frequently transported mujahideen and al Qaeda members throughout Bosnia-Herzegovina in SHC vehicles bearing the mark of the United Nations High Commission for Refugees ("UNHCR"), thereby allowing those mujahideen and al Qaeda members to pass military and police checkpoints.  The SHC also provided the mujahideen with money for other travel expenses.
>
> The SHC appointed a number of former mujahideen fighters to serve as officers or directors of its branch offices in Bosnia-Herzegovina.  In 1993 the director of the Sarajevo office of the SHC was a Saudi named Abu al-Miqdad al Dusari.  Al Dusari was

among the first mujahideen to arrive in Bosnia-Herzegovina at the
beginning of the Bosnian War.

At the request of the mujahideen in 1994, the Chief Director of the
SHC in Zagreb appointed a man named Hasam al Din to serve as
the director of the Zenica office.  Al Din was also one of the first
mujahideen to arrive in Bosnia-Herzegovina at the beginning of
the Bosnian War, and he engaged in significant military activities
as a member of the mujahideen forces placed in Tesanj, in the
middle of Bosnia.  Al Din was wounded during the course of the
war, and after recovering from his wounds, returned to Bosnia-
Herzegovina as a representative of the Zenica office of the SHC.

SHC directors routinely delivered truckloads of supplies to al
Qaeda members.

After the conclusion of the Bosnian War, the SHC provided
ostensible employment to a number of foreign fighters and al
Qaeda members who had fought in the War, knowing full well that
they were members of al Qaeda.  Moreover, the SHC continued to
provide foreign fighters and al Qaeda members with access to
vehicles with diplomatic car registrations, and vehicles registered
to the UNHCR, which enabled them to move freely throughout
Bosnia-Herzegovina.

327.    Ali Hamad's sworn testimony is independently corroborated by numerous U.S.,

U.N. and NATO investigations.


328.    For instance, wire tap summaries obtained from the International Criminal

Tribunal for the Former Yugoslavia reveal that members of the al Qaeda mujahedeen in Bosnia

were directed to pick up funds for the purchase of weapons from the SHC.  In this regard, a May

25, 1994 entry in from a report of the Republic of Bosnia and Herzegovina's Ministry of the

Interior, detailing intercepted telephone conversations between mujahideen fighters during 1994,

identifies the SHC as having provided money to mujahideen fighters to purchase weapons ("In

the talk between Abu Talib and Abu Meali, Talib asked for money to purchase weapons and said

that he bought an American rifle, three Kalashnikovs and three sniper rifles, and asked Meali for

permission for DEM.  He picked up the money for the purchase of the weapons at the Saudi High Committee in Visoko.").

329.    A U.N. sponsored investigation further determined that Prince Salman bin Abdul Aziz al Saud, the head of the SHC, transferred in excess of $120 million from his personal accounts and SHC accounts under his control to the Third World Relief Agency ("TWRA"), between July of 1992 and July of 1995.  According to the 9/11 Commission, the TWRA was an al Qaeda front and the primary pipeline for illegal arms shipments to al Qaeda fighters in the Balkans.  The U.N. sponsored audit of the TWRA's records suggested that the SHC's lavish funding of TWRA commenced shortly after a personal meeting between Prince Salman and the head of the TWRA.  As the SHC had a robust operational presence of its own in Bosnia, there was no legitimate "humanitarian" reason for it to send any funds to the TWRA.

330.    In 1994, Abdul Hadi al Gahtani, a Saudi who was the Director of the SHC's office in Zenica, was arrested for the murder of the British aid worker, Paul Goodall.  Al Gahtani admitted the gun used in the murder belonged to him, but escaped police custody under mysterious circumstances and a Bosnian court later convicted him in absentia of Goodall's murder.  Al Gahtani was reportedly "martyred" on November 19, 2001, when a U.S. rocket hit a building where he was staying.

331.    The U.S. government has also concluded that an al Qaeda member associated with the SHC murdered U.S. citizen William Jefferson in Bosnia on November 18, 1995.  In a Federal Bureau of Investigation ("FBI") memorandum summarizing an interview of Ali Ahmed Ali Hamad on June 16, 2003 regarding the murder Mr. Jefferson, Ali Hamad discusses his relationship with fellow mujahideen and al Qaeda member, Ahmed Zuhair Handala (who "had a

good relationship with Usama Bin Laden").  The FBI memo states that Handala attempted to recruit Ali Hamad to join his unit to kill American and British citizens, but he refused.  The memo further states that Handala had been arrested in Mostar but had been later released from prison because of a payoff by the SHC ("The Saudi Arabia High Commission gave the Croatians $70,000 or more for his release.").

332.    In October 2001, officials of the U.S. government and NATO raided the Sarajevo offices of the SHC.  During the raid, investigators found computer hard drives with photographs of the World Trade Center before and after its collapse, as well as photographs of the United States embassies in Kenya and Tanzania and the U.S.S. Cole.  Investigators also discovered files on deploying chemical agents with crop dusters, information about how to make fake State Department badges, and photographs and maps of Washington, marking prominent government buildings.

333.    Following the raid, the Financial Police of the Federation of Bosnia Herzegovina Ministry of Finance described the SHC as a front for radical and terrorism-related activities, stating:

> Members of the SFOR (stabilization forces) have on premises on the Saudi high commission relief for Bosnia and Herzegovina confiscated some documentation for which it can be claimed with certainty that it does not belong in the scope of work of a humanitarian organization …

334.    During that same month, officials in Bosnia also arrested six members of the al Qaeda network (known as the "Algerian Six" or "Bosnian Six") who were plotting to conduct terrorist strikes on U.S. targets in Bosnia, including an attack on the U.S. Embassy in Sarajevo: Bensayah Belkacem, Saber Lahmar, Mustafa Ait Idir, Hadj Boudella, Lakhdar Boumediene, and

Mohamed Nechle.  All members of the group were on the SHC's payroll.  According to media reporting on their arrest, intercepted phone conversations between the men spoke of the need to retaliate for U.S. attacks in Afghanistan.  It was reported that one of them said, "Tomorrow, we will start."

335.     The six men were turned over to the U.S. in January 2002 and were incarcerated at Guantanamo Bay Naval Base in Guantanamo Bay, Cuba.  Unclassified evidentiary summaries prepared by the Department of Defense for the Combatant Status Review Tribunal ("CSRT") confirm that the men were closely connected to Osama bin Laden and al Qaeda, were on the SHC's payroll, and that the SHC was providing financial support to mujahideen fighters in Bosnia.

336.     Department of Defense documentation identifies Bensayah Belkacem as a primary al Qaeda facilitator in Bosnia.  According to the unclassified evidentiary summaries: Belkacem possessed numerous phone numbers that linked him to bin Laden's operational network in Afghanistan and the global Sunni extremist group; Belkacem was known for his ties to the Chechen movement during 1999 and reportedly had a connection to a bin Laden operative; and Belkacem planned to join jihadist elements in Afghanistan in September 2001 in anticipation of the U.S. invasion.

337.     The DOD materials relating to Belkacem specifically link the SHC to the members of the Algerian Six:

> An open source reported that the detainee, also known to be the leader of a group in Algeria, had 3.5 million Marks of Bosnian currency deposited in a bank in Sarajevo, Bosnia, and several other members of the group had millions also deposited in banks.  The open source reported that an investigation revealed the High Saudi

Committee had on its payroll almost all of the members of the group from Algeria, which had links to international terrorism.

338.     Bosnian investigators determined that Belkacem was in charge of screening recruits for al Qaeda training camps in Bosnia and that his cell phone contained the telephone number for senior al Qaeda official Abu Zubaydah.  Belkacem worked closely with Zubaydah regarding the procurement of passports.

339.     Saber Lahmar, a member of the al Qaeda network, was also an employee of the SHC for several years.  According to DOD documentation presented in support of Lahmar's continued detention at Guantanamo Bay:  Lahmar is a former Bosnian/Afghan Mujahedin; Lahmar supported the fatwa issued by bin Laden against the U.S.; Lahmar expressed a desire to blow up U.S. soldiers, proposed attacking U.S. troops in Bosnia, and made threats against the international community in Bosnia; Lahmar attempted to assume leadership of the Armed Islamic Group in Bosnia; and finally was known to be a close associate of an al Qaeda member in Bosnia.  DOD unclassified evidentiary summaries further stated:

- The detainee worked for the Saudi High Commission for Relief from 1993 to 1994 and again from 1996 until 2002.

- The Saudi High Commission for Relief and al Haramayn has provided financial support to former Arab Mujahedin in Bosnia.  The types of financial support included family stipends or travel to Chechnya and Afghanistan.

- The detainee worked for El Haramain in Zenica and Sarejevo, Bosnia.  He had close leadership ties to the leadership of El Haramain in Zenica.

- The head organizer for placing a car bomb in Mostar in 1997, who was also close to the Saudi High Commission and El Haramein, frequently visited the detainee.

- Al Haramayn is directly tied to terrorist activities in the Bosnia-Herzegovina area. They provide shelter and support to persons known to have committed terrorist activities.

340.   DOD materials presented to the CSRT in support of the remaining Algerian Six members' further detention at Guantanamo Bay detail their ties to al Qaeda and the Bosnian mujahideen.  Mustafa Ait Idir is identified as a member of the Armed Islamic Group and a former Bosnian Mujahideen and chief martial arts instructor for the Bosnian Muj Brigade who made threats against Stabilization Forces in Bosnia and reportedly exhorted Bosnian mujahideen to kill Stabilization Forces.  Hadj Boudella is a suspected member of the Bosnian Mujahideen and was associated with known al Qaeda elements in the Balkans.  Boudella was in the Tora Bora region with several al Qaeda fighters and operatives, and received training on the Kalashnikov rifle and grenades from an al Qaeda member.  Lakhdar Boumediene was also a former member of the Bosnian Mujahideen, a member of the Algerian Armed Islamic Group, and was one of the closest associates of an al Qaeda member in Bosnia.  Finally, Mohamed Nechle is a member of the Armed Islamic Group with links to bin Laden's al Qaeda terrorist network.  Nechla is further identified as a supporter of terrorist groups in Africa.

341.   Governmental investigations also indicate that the SHC has played a direct role in arms trafficking for al Qaeda.  Of particular note, a Defense Intelligence Agency report indicates that General Mohammad Farah Hassan Aideed, the al Qaeda affiliated Somali warlord responsible for the Black Hawn down massacre, received "weapons' shipment from the Saudi Arabian High Commission for Relief."  The weapons were "usually hidden in false bottom containers."

## SAUDI RED CRESCENT SOCIETY

342.   The Saudi Red Crescent Society ("SRC") is a Saudi Arabia-based da'awa organization, which conducts operations throughout the world.

343.    The SRC is a controlled agent and alter-ego of the Kingdom of Saudi Arabia.  The Kingdom controls and directs SRC operations, appoints and terminates SRC personnel, provides the SRC with virtually all of its funding, determines how funds will be distributed throughout the world, and otherwise stringently controls the SRC's operation.  In many countries, the SRC conducts operations from the local Saudi embassy, under the supervision of the embassy's Islamic Affairs Division.

344.    Senior officials of the SRC have expressly acknowledged that the SRC is an alter-ego of the Saudi Arabia government.  According to the affidavit testimony of Abdulrahman al Swailem, President of the Saudi Arabian Red Crescent Society, al Swailem was appointed by "royal order issued by King Fahd bin Abdulaziz, to serve as president of the Saudi Arabian Red Crescent Society," a position that holds Excellency level status within the Saudi Arabian Government.  The affidavit further asserts that the Government of the Kingdom "sponsors and supervises the Saudi Arabian Red Crescent Society, and the Saudi Government appoints all of its directors."

345.    The SRC's ties to al Qaeda's leadership also date to the 1980s, when it operated within the network established to support the Afghan jihad.

346.    By all accounts, the SRC played a prominent role within that network, providing extensive financial and logistical support to the mujihadeen in Afghanistan.  Indeed, in 1986, Dr. Abu Hazifa, a Director of the SRC, openly acknowledged the organization's direct ties to the *mujihadeen*, and that many of those fighters in fact worked for the Saudi Red Crescent.

347.    The SRC's support for bin Laden's terrorist organization was orchestrated largely by Wa'el Hamza Jelaidan, who in addition to his positions within the MWL, IIRO and SJRC headed the SRC's office in Peshawar, Pakistan during the 1980s.

348.    As discussed previously, documents recovered fromn the Tareekh Osama file document al Qaeda's intent to rely on the SRC to support its global jihad.  A later internal al Qaeda document cautioned that the SRC may no longer represent a safe "umbrella" for al Qaeda members, because Jelaidan was being recalled to Saudi Arabia.  The import of this statement is clear – under Jelaidan's direction the SRC was serving as a front for al Qaeda.

349.    During that same search, investigators found a letter on SRC stationary to Abu Rida, another founding member of al Qaeda, requesting that "weapons be inventoried."  At the bottom of the letter is a note from bin Laden to Jelaidan, then the SRC's director, stating "we have an extreme need for weapons."

350.    Years later, Jelaidan facilitated the SRC's sponsorship of al Qaeda activities in Kosovo and Chechnya.  In 1999, Saudi Arabia formed the Saudi Joint Relief Committee for Kosovo and Chechnya to coordinate the relief efforts of the SRC and other Saudi charities in Kosovo and Chechnya.  The Kingdom designated the SRC to serve as the operational arm for SJRC-coordinated relief efforts.  Although bin Laden had publicly confirmed that Jelaidan was one of al Qaeda's founding members in a 1999 interview, the Kingdom appointed Jelaidan Director of SJRC and SRC operations in Pristina.  In 2000, U.S. officials sent a written alert to the U.N. Peace Keeping Force in Pristina, asserting that SJRC officials Adel Kazam and Jelaidan were "associates of Osama bin Laden" and that Jelaidan was actively involved in helping bin Laden "move money and men" to and from the Balkans.

351.     Separate incidents revealed that members of the SRC staff working under the supervision of the SJRC actively participated in the development and planning of terrorist attacks against American interests.

352.     Employees of the SRC were also implicated in the 1996 al Qaeda bombing attack on the Egyptian Embassy in Islamabad.  Following that attack, investigators arrested Muhammed Ali Sayed and Bashir Barbar Qadim, two Sudanese employees of the SRCt.  The investigation which led to the arrests revealed evidence that Sayed had indirectly funded the attack by channeling SRC funds to Egyptian al Jihad, the terrorist organization run by Ayman al Zawahiri which formally merged with al Qaeda several years before the September 11th Attack.  Egyptian authorities alleged that Zawahiri personally masterminded the Embassy attack.

353.     The SRC continued to serve as a front for al Qaeda through the date of the September 11th Attack.  In fact, just weeks after the September 11th Attack, the Pakistani government deported employees of the SRC, based on evidence that they were involved in al Qaeda related terrorist activities.  In 2002, NATO and Bosnian authorities arrested six Algerian al Qaeda members who were plotting attacks on the U.S. and British embassies in Sarajevo. Two of those men, Boumediene Lakhdar and Nechle Mohammed, were employees of the SRC.

354.     Based in part of the U.S. government's assertion that the SRC is a front for al Qaeda, several persons associated with the SRC were incarcerated at the Guantanamo Bay Naval Base in Guantanamo Bay, Cuba as enemy combatants

355.     Detainee Mohamed Atiq Awayd al Harbi (ISN No. 333) was a member of the mujahideen in Kandahar, Afghanistan and was further identified as being a fighter in the Tora Bora Mountains.  When al Harbi was arrested by Pakistani police, he was in possession of

$8,000 U.S. dollars and 12,000 Saudi Riyals which he was planning to deliver to the SRC. Representatives from the Saudi Embassy and from the SRC visited him and provided him with lawyers. Al Harbi was eventually handed over to the United States and transported to Guantanamo Bay, but was subsequently transferred to Saudi Arabia on November 9, 2007 to participate in the Kingdom's terrorist rehabilitation program. Less than 6 months after returning to Saudi Arabia, al Harbi fled to Yemen with other Saudi al Qaeda members. On January 23, 2009, the al Fajr Media Center – the official online logistical network responsible for disseminating messages from various al Qaeda military factions – released new video footage of joint sermons delivered by a group of Saudi and Yemeni al Qaeda leaders. Al Harbi appeared in the video with the official title of "Field Commander of the al Qaeda Organization in the Arabian Peninsula."

356.    Detainee Said Ali al Shihri (ISN No. 372) traveled from Saudi Arabia to Afghanistan following the September 11th attacks with $1,900 U.S. dollars to distribute to the SRC. Al Shihri trained in urban warfare at the Libyan Camp north of Kabul, and one of his aliases was among 100 names taken from Afghanistan-based military training camp applications. Following his capture, al Shihri was handed over to the United States and transported to Guantanamo Bay, but was subsequently transferred to Saudi Arabia on November 9, 2007 to participate in the Kingdom's terrorist rehabilitation program. Al Shihri eventually escaped from Saudi security forces and fled with other high profile al Qaeda operatives to Yemen. On January 23, 2009, the al Fajr Media Center released new video footage of joint sermons delivered by a group of Saudi and Yemeni al Qaeda leaders. Al Shihri was featured in the video with the official title of "Secretary General of the al Qaeda Organization in Saudi Arabia."

357.    Detainee Muhamed Hussein Abdallah (ISN No. 704) was employed as an Arabic language instructor by the SRC.  According to the unclassified evidentiary summaries submitted in support of Abdallah's continued detention:  "Senior officials of the SRCS [Saudi Red Crescent Society] were involved in money laundering operations aimed at assisting Pakistani-based extremist organizations."  Concerning the allegations lodged by the United States regarding his association with various "humanitarian organizations," Abdallah stated "the only one I was working for the last two years was the Saudi Red Crescent.  If these organizations were terrorist organizations, its contrary to what I knew about them.  They were official government organizations, recognized as I said, by official governments.  So why don't you bring the officials, the Saudi government…?"

**SAUDI JOINT RELIEF COMMITTEE FOR KOSOVO AND CHECHNYA**

358.    The Kingdom of Saudi Arabia established the Saudi Joint Relief Committee ("SJRC") on May 19, 1999 pursuant to High Order 7/B/1863 (the "Albanian High Order").  In accordance with the Albanian High Order, the SJRC was endowed with responsibility for coordinating and carrying out the operations of five constituent charities in Kosovo and Chechnya:  al Haramain al Masjid al Aqsa; IIRO, WAMY, MWL and SRC.  Subsequent to the establishment of the SJRC, those constituent charities continued to solicit funds to support activities in Kosovo and Chechnya throughout the World, including from the United States.

359.    Senior officials of the SJRC have expressly acknowledged that the SJRC is a controlled agent and alter-ego of the the Kingdom of Saudi Arabia.  According to the affidavit testimony of Dr. Abdulrahmann al Swailem, President of the SJRC, the SJRC has "always functioned as a political subdivision, agency, or instrumentality of the Kingdom of Saudi Arabia. The SJRC was established on May 19, 1999 pursuant to High Order… issued by King Fahd upon

the recommendation of the Council of Ministers of the Kingdom of Saudi Arabia."  The affidavit

further reflects that the governing Albanian High Order specified that the SJRC would be

supervised by the Minister of Interior of the Kingdom of Saudi Arabia, and that the SJRC would

include a number of other high-ranking representatives from agencies of the Kingdom and other

"charity" organizations.  Of particular interest, the Order establishing the SJRC required that its

leadership include "the Presidency of General Intelligence."

360.     Between 1998 and 2000, the Kingdom of Saudi Arabia, through SJRC, diverted

more than $74 million dollars to al Qaeda members and loyalists affiliated with SJRC bureaus.

Throughout this time, the committee was under the supervision and control of Saudi Interior

Minister Prince Naif Bin Abdul Aziz.

361.     Each of the constituent charities operating under the SJRC has longstanding ties

to al Qaeda.  For instance, al Haramain al Masjid al Aqsa was designated by the Treasury

Department on May 6, 2004 pursuant to Executive Order 13224.  According to U.S. officials:

>The Al-Haramain & Al Masjed Al-Aqsa Charity Foundation
>(AHAMAA) has significant financial ties to the Bosnia-based
>NGO Al Furqan, and al Qaida financier Wa'el Hamza Julaidan,
>who was designated by the Treasury Department on September 6,
>2002.  Wa'el Hamza Julaidan, a Saudi citizen, is a close associate
>of Usama bin Laden. Julaidan fought with bin Laden in
>Afghanistan in the 1980s. Bin Laden himself acknowledged his
>close ties to Julaidan during a 1999 interview with al-Jazeera TV.
>As a member of the Board of Directors for AHAMAA, Julaidan
>opened three bank accounts on behalf of the NGO between 1997
>and 2001 and continued to have authorization to handle two of
>their accounts as a signatory on two the NGO's Bosnian accounts.

362.     As described above, the MWL, IIRO, WAMY and SRC have similar pervasive

ties to al Qaeda, and like its constituent entities, the SJRC provided critical resources to support

al Qaeda's jihad against the United States.

363.     As al Qaeda was establishing its operations in Kosovo and Chechnya, Wa'el Jelaidan assumed a position as Director of the SJRC's office in Pristina.  As referenced above, Jelaidan is a founding member of al Qaeda and was designated by the United States government on September 6, 2002 pursuant to Executive Order 13224.  The Treasury Department press release issued in conjunction with the designation set forth the following basis for the action:

> The United States' has credible information that Wa'el Julaidan is an associate of Osama bin Laden and several of bin Laden's top lieutenants.  Julaidan has directed organizations that have provided financial and logistical support to al Qaida.  Accordingly, the United States is designating Julaidan under Executive Order 13224 as a person who supports terror.

364.     The United Nation's mission in Kosovo has declared that the SJRC office in Pristina, Kosovo, served as a cover for several al Qaeda operatives, including Adel Muhammad Sadi Bin Kazarn and Wa'el Hamza Julaidan, both of whom served as Directors of SJRC.

365.     More than a year before the September 11th Attacks, U.S. officials sent a written request to the U.N. Peace Keeping Force in Pristina, requesting that U.N. police undertake surveillance of the SJRC.  In that document, Marked "Secret: U.S. Office Only – Release to UNMIK," the U.S. government asserted that SJRC officials Adel Muhammad Sadi Bin Kazam and Julaidan were "associates of Osama bin Laden" and that Julaidan was actively involved in helping bin Laden "move money and men to and from the Balkans."

366.     Acting on that information, the United Nations Mission in Kosovo ("UNMIK") raided a house rented by the SJRC in Pristina, and declared that the organization served as a cover for several Usama bin Laden operatives, including Kazem and Jelaidan.

367.    A year earlier, in June 1998, the CIA and Albanian authorities raided several houses and offices of members of an associate of the SJRC in Tirana.  In July 1998, its Director Muhamed Hasan Mahmud, an Egyptian national, was arrested on charges of making false documents and arms possession.  He was connected to a 1992 terrorist attack against the Egyptian Parliament.  Several of its members and directors were later arrested in connection with the U.S. Embassy bombings in Kenya and Tanzania of August 1998.

368.    Prominent media outlets have also documented the SJRC's role in facilitating the movement of "money and men to and from the Balkans" for Osama bin Laden.

369.    Despite his joint designation by the United States and Saudi Arabia on September 6, 2002 for being "an associate of Usama bin Laden and a supporter of al-Qa'ida terror," Jelaidan continued to work on behalf of the SJRC as late as December 2003.  According to the United Nations Security Council Committee's December 2, 2003 *Second Report of the Monitoring Group on Al-Qaida*:

> The Rabita Trust was added to the list in October 2001. Its Saudi Chairman, Wa'el Hamza Julaidan (also spelled Jalaidan) was designated at the request of the United States and Saudi Arabia on 6 September 2002. There are nevertheless reports that Julaidan remains actively engaged in "charitable activities" and financial transactions. Julaidan currently lives in Saudi Arabia and is reportedly still working with the Saudi Joint Relief Committee for Kosovo and Chechnya, and serves as one of the directors of the Al-Haramain al-Masjid al-Aqsa Foundation in Bosnia and Herzegovina.

370.    SJRC's Saudi bank accounts at National Commercial Bank ("NCB") were managed by Suleiman Abdel Aziz al Rajhi, Chairman, Managing Director and the largest shareholder of Al Rajhi Banking & Investment Corporation.  Historically, Suleiman al Rajhi himself has been an active sponsor of al Qaeda frequently through his own banks.  Al Rajhi Bank

has been used by the MWL, IIRO and al Haramain to funnel funds to support terrorism.

According to a 2003 CIA report:

> Al-Rajhi Bank: Conduit for Extremist Finance (S//NF)
>
> Islamic extremists have used Al-Rajhi Banking & Investment Corporation (ARABIC) since at least the mid-1990s as a conduit for terrorist transactions, probably because they find the bank's vast network and adherence to Islamic principles both convenient and ideologically sound.  Senior al-Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank.  Reporting indicates that senior al-Rajhi family members control the bank's most important decisions and that ARABIC's principle [sic] managers answer directly to Suleiman.  The al-Rajhis know they are under scrutiny and have moved to conceal their activities from financial regulatory authorities.

371.    NCB actively sponsored al Qaeda through Muwafaq, IIRO and SJRC.  SJRC also received valuable financial services from NCB which allowed the organization to provide direct financial and logistical support to al Qaeda for several years leading up to the 9/11 attack.

372.    In addition to maintaining the SJRC's bank accounts, NCB actively promoted those accounts on behalf of the organization.  Advertisements running in multiple issues of the MWL Journal in 2000 and 2001 openly solicited funds and directed donors to SJRC accounts managed by the National Commercial Bank and Al Rajhi Banking & Investment Corporation.

373.    NCB opened two "shared accounts" with Al Rajhi Banking & Investment Corporation (Special Joint account #22 and #33) for the IIRO as a member of the SJRC, thereby allowing the SJRC to serve as a conduit for funneling donations to al Qaeda fighters in Kosovo and Chechnya.

**RABITA TRUST**

374.     Defendant Rabita Trust is a subsidiary body of the Muslim World League ("MWL"), with headquarters in Lahore, Pakistan and offices throughout the world.

375.     Rabita Trust is an agency, instrumentality and organ of the Kingdom of Saudi Arabia. The Kingdom controls and directs Rabita Trust operations, appoints and terminates Rabita Trust personnel, provides Rabita Trust with virtual all of its funding, determines how funds will be distributed throughout the world, and otherwise stringently controls Rabita Trust operations.  In many countries, Rabita Trust conducts operations from the local Saudi embassy, under the supervision of the embassy's Islamic Affairs Division.

376.     As set forth previously, senior officials of the MWL have expressly acknowledged that the MWL and its subsidiary bodies are agencies, instrumentalities and organs of the Kingdom of Saudi Arabia.

377.     Rabita Trust's material sponsorship of al Qaeda has been facilitated by the direct participation of senior at Qaeda officials in the management and operation of Rabita Trust.  In fact, Rabita Trust was, for several years prior to September 11, 2001, headed by al Qaeda founding member Wa'el Hamza Jelaidan.

378.     In addition, Rabita Trust has shared common officers and directors with several other charities operating within al Qaeda's infrastructure, including the MWL and the SAAR Network of charities and businesses.  Abdullah Omar Naseef served as a Chairman of Rabita Trust and as Secretary General of the MWL.  Naseef is also an officer of Makkahl-Mukarramah, Inc., a Virginia based charity operating within the SAAR network.  The Co-Chairman of the Board of Trustees of Rabita Trust, Abdullah al Obaid, also served as an officer of the MWL and Sanabel al Kheer organizations within the SAAR network. Al Obaid also serves as a senior

executive of al Watania Poultry in Saudi Arabia, one of the many businesses owned by Suleiman

Abdel Aziz al Rajhi, the founder of the SAAR Network, member of the Board of Directors of the

IIRO, and CEO of al Rajhi Banking and Investment.  Adnan Basha, a member of the Rabita

Trust Board of Directors, is also the Secretary General of the International Islamic Relief

Organization ("IIRO").

379.    Given its pervasive and ongoing involvement in al Qaeda's operations, and the

direct participation of senior al Qaeda officials in its management, the United States government

designated Rabita Trust as a Specially Designated Global Terrorist on October 12, 2001 pursuant

to Executive Order 13224.  According to the U.S. Treasury Department:

> Rabita Trust is a Pakistani non-governmental organization (NGO)
> designated for its close ties to senior al Qaida leadership and for
> providing logistical and financial support to al Qaida.  In February
> 2000, Wa'el Hamza Julaidan was appointed to the Board of
> Trustees of the Rabita Trust and served as its Director General.
> Julaidan was jointly designated on September 6th, 2002 by Saudi
> Arabia and by the United States under Executive Order 13224.

## G.    THE HOUSE OF SAUD'S KNOWLEDGE CONCERNING ITS CHARITIES' TERRORIST ACTIVITIES PRIOR TO 9/11

380.    The pervasive sponsorship of al Qaeda's global jihad by the Saudi government

controlled da'awa organizations, as reflected by the facts and evidenced set forth above, was

carried out with the full knowledge of the Saudi regime.

381.    As discussed previously, the House of Saud made a conscious decision to deploy

the Saudi da'awa infrastructure to support Islamist movements throughout the World in response

to the demands of the Saudi Ulema, and was expressly aware when it did so of the longstanding

ties between those organizations and the al Qaeda leadership.  The Kingdom also knew, from the

earliest date, of bin Laden's organizational activities as the head of a global jihad organization,

and the continuing involvement of bin Laden associates as officials of Saudi da'awa organizations.  Moreover, by virtue of its own promotion of the Western Cultural Attack paradigm, the regime also understood that members of the Ulema appointed to direct the activities of the Saudi da'awa organizations shared al Qaeda's belief that conducting jihad against the United States was a religious obligation.

382.    Although these facts render any claim that the Saudi government was unaware of the terrorist activites of its da'awa organizations implausible, it is worth noting that the Kingdom received continuous warnings concerning their pervasive ties to al Qaeda, through media reports and engaements with other governments, as well as its own monitoring of those organizations.

383.    Indeed, from the early 1990's through September 11, 2001, the involvement of the Saudi da'awa organizations in terrorist plots and operations was the subject of intense media scrutiny and reporting.   As the regime closely monitors all media reporting referencing its state controlled da'awa organizations, both through its embassies and via a media surveying program carried out by the Saudi Ministry of Foreign Affairs, this reporting was well known to the House of Saud.

384.    Furthermore, the international community repeatedly cautioned Saudi Arabia about the imminent threat posed by the activities of its da'awa organizations during the years preceeding the September 11th Attacks.  For instance, during a 1994 meeting with senior officials of the Kingdom, French Interior Minister Charles Pasqua expressed the French government's deep concerns regarding the pervasive involvement of the Saudi charities in the sponsorship and funding of terrorist organizations.  Pasqua specifically mentioned the MWL during that meeting. At a conference of  Arab interior ministers in 1998, the Egyptian Minister of Interior similarly

expressed specific concerns about the involvement of Saudi charities in the sponsorship of terrorist activities to Saudi Prince Naif. In 1999 and 2000, senior delegations from the U.S. government met with senior officials of the Kingdom, to address the U.S. government's concerns regarding the extensive involvement of Saudi charities in the sponsorship of terrorism. As the U.S. and Saudi governments had an intelligence sharing program concerning terrorism in place beginning in 1997, these concerns had no doubt been conveyed to the Saudis earlier.

385. Despite these repeated warnings about the terrorist agenda being pursued by its da'awa organizations in partnership with al Qaeda, the Kingdom continued to channel massive support to those organizations, in the hopes of directing the jihadist fervor of Saudi Arabia's most radical elements at targets other than the House of Saud. This calculated decision by the Saudi regime fueled al Qaeda's growth and development, culminating in the September 11th Attacks.

386. Nearly a decade since those Attacks, the Saudi da'awa apparatus continues to channel material support to al Qaeda and affiliated terrorists, and State Department officials have recently lamented that the United States has had little success in convincing the Saudi regime to treat the matter as a priority.

## THE SPONSORSHIP OF AL QAEDA BY FINANCIAL INSTITUTIONS

387. Although al Qaeda's charity partners served as the primary mechanism for raising and moving funds on behalf the organization, the scope of its global operations and the extent of its funding required that al Qaeda also obtain access to the international banking system to facilitate the distribution and laundering of its funds. At the same time, al Qaeda needed to avoid

triggering any of the regulatory devices developed by the international banking system to identify money laundering and illicit financial transactions.

388.    Al Qaeda gained access to the international financial system, and concealed the illicit nature of the transactions it conducted through that system, in limited instances by establishing its own financial institutions, and more commonly by establishing cooperative relationships with financial institutions which shared and supported al Qaeda's worldview, and were knowing and willing collaborators in its global jihad.  As the Council on Foreign Relations explained, because of its "Islamic" agenda, al Qaeda found "willing collaborators within the Islamic banking system."

389.    As is the case with al Qaeda's charity sponsors, the material support provided to al Qaeda by its financial institution collaborators took many forms.  In certain cases, al Qaeda openly maintained its own accounts with the knowledge of the financial institution, particularly during the period when al Qaeda resided in Sudan with the approval and support of the ruling National Islamic Front Regime.  More typically, financial institutions maintained accounts for al Qaeda's ostensible charity fronts, with full knowledge that those accounts were being used to support al Qaeda's global infrastructure.  In cooperation with those ostensible charities, these financial institutions advertised the existence and numerical designations for "jihad" accounts, and provided mechanisms for al Qaeda's supporters to deposit funds directly into those accounts. In addition, several financial institutions channeled their own *zakat* funds to al Qaeda.

390.    The support provided to al Qaeda by these financial institutions was in many cases orchestrated by the founders and most senior officials of the financial institutions, and the members of the Shariah Committees of the Islamic banking divisions of such institutions.  Senior

officials of these financial institutions often served as officials of al Qaeda affiliated charities, and used their positions in those organizations to facilitate their collaborative fund-raising and money laundering efforts on behalf of al Qaeda.

391.    As documented below, al Qaeda's supporters in the financial industry included National Commercial Bank and al Rajhi Bank.

## NATIONAL COMMERCIAL BANK

392.    The National Commercial Bank ("NCB") was established in 1950 by Salim bin Mahfouz, father of Khalid bin Mahfouz.

393.    With his father's death in 1996, Khalid bin Mahfouz became President and CEO of NCB, and its principal shareholder with control over more than 50% of the bank's capital. Khalid bin Mahfouz served as President and CEO of NCB until 1999.

394.    Throughout the 1980s and early 1990s, NCB was closely related to, and often worked in collaboration with, the Bank of Credit and Commerce International ("BCCI"), a banking institution in which Khalid bin Mahfouz held a substantial equitable interest and served as the CEO. After several fraudulent practices were discovered, Khalid bin Mahfouz was indicted on July 1, 1992 on charges of participation in a Scheme to Defraud in the First Degree in violation of New York Penal Law § 190.65, in connection with certain of defendant's acts and omissions relative to BCCI Holdings and certain related entities. The indictment alleges a series of misrepresentations, sham loans, and fraudulent conduct in failing to disclose the status of defendant's interest in BCCI.

395.    Under Khalid bin Mahfouz, BCCI was also implicated in supporting terrorism, as reported by the United States Senate.  In the course of targeting BCCI for laundering drug money, the CIA learned of BCCI's extensive involvement in manipulating certain financial markets, in arms trafficking, and in supporting international terrorism.  A federal investigation into BCCI's operations further revealed extensive involvement in corrupt practices, including money laundering, hiding assets, the obstruction of a Senate investigation.

396.    The 1992 U.S. Senate Investigative Report on the BCCI affair linked the bank to financial funding of the Afghan war.  According to the Report:

> BCCI may have been moving money through the National Bank of Oman to fund the war in Afghanistan.  The bank's role began to surface in the mid-1980's (…).  This was confirmed in the Wall Street Journal of 23 October 1991 which quotes a member of the late General Zia's cabinet as saying 'It was Arab money that was pouring through BCCI.'  The Bank which carried the money on from Oman to Pakistan and into Afghanistan was National Bank of Oman, where BCCI owned 29%.

Under Khalid bin Mahfouz, BCCI was also implicated in supporting terrorism, as reported by the U.S. Senate:

> In the course of targeting BCCI for laundering drug money, the CIA learned of BCCI's involvement in manipulating certain financial markets, in arms trafficking, and in supporting international terrorism, including handling the finances of Sabri Al-Bannah or Abu Nidal, and his terrorist organization.

Moreover, the U.S. Senate Investigative Report detailed the initial involvement of the BCCI in terrorism financial support.

> BCCI's support of terrorism and arms trafficking developed out of several factors.  First, as a principal financial institution for a number of Gulf sheikhdoms, with branches all over the world, it was a logical choice for terrorist organizations, who received payment at BCCI-London and other branches directly from Gulf-state patrons, and then transferred those funds wherever they wished without apparent scrutiny.  Secondly, BCCI's flexibility regarding the falsification of documentation was helpful for such activities.

> Finally, to the extent that pragmatic considerations were not suffi-
> cient of themselves to recommend BCCI, the bank's pan-third
> world and pro-Islam ideology would have recommended it to Arab
> terrorist groups.

397.    The U.S. Senate Report regarding BCCI's fraudulent activities directly implicated

NCB in BCCI's corrupt practices, including the manipulation of financial markets, arms

trafficking and sponsorship of international terrorism, including handling the finances of Abu

Nidal and his terrorist organization.  Bin Mahfouz paid over $200 million in fines in 1991 for

misdeeds when he was COO of BCCI.

398.    Consistent with the findings of the 1992 U.S. Senate Investigative Report, NCB

has served as one of al Qaeda's preferred banks for many years, providing financial serives for

for many of al Qaeda's "charity" patrons, including the MWL, IIRO, WAMY, Muwafaq

Foundation, and al Haramain Islamic Foundation, among others.

399.    NCB actively provided material support and resources to al Qaeda via the charity

defendants, particularly through the Muwafaq Foundation, IIRO and SJRC.

400.    From the date of Muwafaq's creation, NCB provided financial services and other

support to facilitate Muwafaq's direct participation in al Qaeda's jihad against the United States,

serving as an efficient conduit for wealthy Saudi businessmen to transfer funds to al Qaeda, via

Muwafaq.

401.    NCB's role in this process was confirmed by a German Internal Intelligence

Service investigation of Muwafaq, which found that "one route [for the sponsorship of al Qaeda]

was the transfer of large sums from the National Commercial Bank to Islamic (charities).  These

included Muwafaq el Kheiriya and Islamic Relief [IIRO].  There are institutional links between

Muwafaq and Usama bin Laden's network."

402.    Vincent Cannistraro, the former Central Intelligence Agency Chief of

Counterterrorism Operations, echoed the findings of the German Intelligence investigations in

testimony before Congress in the wake of the September 11th Attacks, testifying as follows:

> How does the al-Qaeda organization fund its worldwide network
> of cells and affiliated groups?  Several businessmen in Saudi
> Arabia and in the Gulf contribute monies.  Many of these
> contributions are given out of a sense of Islamic solidarity.  But
> much of the money is paid as "protection" to avoid having the
> enterprises run by these men attacked.  There is little doubt that a
> financial conduit to bin Laden was handled through the National
> Commercial Bank, until the Saudi government finally arrested a
> number of persons and closed down the channel.  It was evident
> that several wealthy Saudis were funneling contributions to bin
> Laden through this mechanism.

403.    The "wealthy Saudi businessmen" who transferred "large sums" of money to al

Qaeda via Muwafaq included NCB senior executives and agents Khalid bin Mahfouz and Yassin

al Kadi.  Abdulrahmann Khalid bin Mahfouz, Khalid bin Mahfouz's son, has publicly stated that

Khalid bin Mahfouz provided up to $30 million for Muwafaq's operations.  Al Kadi also made

significant contributions to Muwafaq, from his personal fortune.

404.    INTERPOL intelligence reports filed of record by the U.S. government in legal

proceedings pending in the United States District Court for the District of Columbia, in support

of al Kadi's continued designation, include details of a single transaction in which NCB

transferred $2 million to Dr. Salim Bin Mahfouz, an official of Muwafaq in Europe.  Dr. bin

Mahfouz then transferred $500,000 to Chafiq Ayadi, the Specially Designated Global Terrorist al

Kadi appointed to head Muwafaq's European Operations at the suggestion of Wa'el

Jelaidan.  Dr. bin Mahfouz transferred an additional $1.4 million to an apparent shell company in

Florida, which he had formed with a senior official of Taibah International, another designated al

Qaeda front.

405.    NCB similarly provided funds and financial support to IIRO over a period of

many years.  NCB maintained numerous accounts for IIRO, and also donated its own funds to

the organization.

406.    A bank audit conducted in 1998 revealed that over a 10 year period $74 million

was funneled by NCB's Zakat Committee to the IIRO.  According to the audit:

> Bin Laden used his personal fortune and continuing contributions
> from wealthy Islamic businessmen in Saudi and the Gulf to
> organize training camps in the Sudan for Islamic activists from
> every major Islamic country.  These contributions, plus revenues
> from Islamic Charity fronts, such as the International Islamic
> Relief Organization, headed by Bin Laden's brother-in-law, as well
> as numerous other charitable fronts, continue to fuel his group
> today.

407.    The NCB audit report also stated that direct donations were "received through

those [NCB] facilities to the Red Crescent Saudi Committee, International Islamic Relief

Organization and Muwafaq Foundation."

408.    SJRC also received valuable financial services from NCB which allowed the

organization to provide direct financial and logistical support to al Qaeda for several years

leading up to the 9/11 attack.  Under the supervision of Suleiman Abdul Aziz al Rajhi, NCB also

managed the budget of the SJRC.

409.    In addition to maintaining the SJRC's bank accounts, NCB actively promoted

those accounts on behalf of the organization.  Advertisements running in multiple issues of the

Muslim World League Journal in 2000 and 2001 openly solicited funds and directed donors to SJRC accounts managed by the National Commercial Bank and Al Rajhi Banking & Investment Corporation.

410.   NCB opened two "shared accounts" with Al Rajhi Banking & Investment Corporation (Special Joint account #22 and #33) for the IIRO as a member of the SJRC, thereby allowing the SJRC to serve as a conduit for funneling donations to al Qaeda fighters in Kosovo and Chechnya.  The bank's audit report shows that:

411.   NCB established special relations with the SJRC and maintained two shared accounts with Al-Rajhi Banking & Investment Corp for IIRO and SJRC donations in Kosovo and Chechnya.  These special accounts were not reviewed by the Audit Division nor by the Zakat Committee in 1998.

412.   According to a November 22, 1999 British intelligence report, the Saudi Arabian Royal family used NCB to channel funds to Osama Bin Laden.  Similar reports surfaced in the fall of 1999 in Reuters and USA Today, quoting U.S. intelligence sources stating an NCB audit conducted by Saudi government officials uncovered that $3 million of protection money from five of Saudi Arabia's prominent business leaders' accounts was transferred to Blessed Relief (a/k/a Muwafaq Foundation), an al Qaeda charity front.

413.   NCB was specifically aware of the terrorist activities of Muwafaq, IIRO and SJRC at all relevant times.  This knowledge derives from the direct involvement of senior NCB officials in the sponsorship of al Qaeda, their longstanding personal ties to senior al Qaeda leadership, as well as information publicly available to NCB.

414.     From the date of Muwafaq's establishment until its merger into al Qaeda, NCB maintained close and intimate organizational connections with Muwfaq.

415.     Muwafaq was established by NCB's then chairman, Khalid bin Mahfouz, and the architect of NCB's Islamic banking division, Yassin al Kadi.

416.     In his Statement to the U.S. Treasury Department's Office of Foreign Assets Control, al Kadi himself confirmed that he and bin Mahfouz jointly conceived Muwafaq when al Kadi was working "with KBM for NCB."   Further explaining his role in NCB, al Kadi has stated that "KBM [bin Mahfouz] turned to me to help in realizing this ambition ['to convert NCB from a bank which offered purely conventional banking services to one that could also offer Islamic banking products'].   To do this, we established a new department within NCB called the "Islamic Banking Department."   Kadi has further explained that he was "a member of the Islamic Banking Services Committee, which was formed by the National Commercial Bank in July 1997 and on which I served until December 8, 2009.   This is a committee responsible for the strategic development of Islamic banking services which was chaired by the CEO of the NCB.   I served on this committee with other senior bank officials."

417.     By his own design, Khalid bin Mahfouz hand-picked designated terrorist sponsor Yassin al Kadi, with whom he maintained a "close personal relationship," to oversee the establishment and operation the Muwafaq Foundation and NCB's Islamic Banking division.   Al Kadi acknowledges meeting with Osama Bin Laden around the time the Muwafaq Foundation was being funded and established.

418.     Khalid bin Mahfouz similarly appointed several other senior NCB personnel to positions in the management structure of Muwafaq Foundation.   Abdulrahman bin Mahfouz

served as a Board member and Trustee of Muwafaq, and simultaneously held numerous senior positions in NCB, including:  Vice President; Deputy General Manager; Member of the Board of Directors; and Chairman of the Management Committee of NCB.

419.    Mohamed al Ali al Qari bin Eid ("al Gari") was a founding Board member of Muwafaq in the United States, and in collaboration with Yassin al Kadi, developed Islamic Finance at NCB.  Al Gari was also appointed as NCB's Sharia Board Advisor, giving him authority over the use and attribution of NCB's zakat funds.

420.    Throughout the time he was working for "NCB," al Kadi was also responsible for the management and operations of Muwafaq, along with Khalid bin Mahfouz, who also played an active role in directing Muwafaq's operations.

421.    Throughout the time he and bin Mahfouz were directing Muwafaq's operations, al Kadi admits having close relationships with senior al Qaeda officials, including Wa'el Jelaidan, who as noted above held senior positions in the IIRO and SJRC and played a central role in the terrorist activates of those organizations.

422.    During the period that Jelaidan served as Director of the SJRC, al Kadi acknowledges providing support to the SJRC through an Albanian company al Kadi owned.  Al Kadi has stated that he has known Jelaidan as a family friend since the 1980's.

423.    In relation to the management and operation of Muwafaq, al Kadi acknowledges having consulted with Jelaidan, and appointed terrorist operatives to run Muwafaq offices on the basis of Jelaidan's recommendation.  In fact, al Kadi has stated that he "was first introduced to [Specially Designated Global Terrorist] Chafiq Ayadi in Zagreb, Croatia, by Waa'el Juladain in

or around 1992" and further "recommended Chafiq Ayadi for the management" of the Muwafaq

Foundation.  Al Kadi would hire Ayadi to head Muwafaq's European operations upon the

recommendation of Jelaidan in 1992.

424.    Al Kadi has longstanding ties to many other senior terrorist operatives including

Muhammad Salah, a high-level HAMAS operative and Specially Designated Terrorist under

Executive Order 12947, and Dr. Abdul Latif Saleh, founder of the Albanian Islamic Jihad.

425.    As a result of its intensive investigation of al Kadi, the United States concluded

that his ties to senior members of al Qaeda and several affiliated terrorist organizations could not

be viewed as a coincidence, but rather reflected al Kadi's own central role in al Qaeda's financial

network.  According to the U.S. Treasury Department's Evidentiary Memorandum in Support of

the Continued Designation of Yassin al Kadi Pursuant to Executive Order 13224:

> Yassin Al Qadi is an experienced and sophisticated businessman
> and financier.  He has operated companies, including investment
> vehicles and banks, in many corners of the world.  He is presumed
> to be capable of understanding his investments, his companies, and
> his charities, and of being responsible for the actions of those
> entities which he founds, funds and/or controls.
>
> Al Qadi's defense, however, to all the charges that he has
> supported terrorist through his provision of funds to Muwafaq and
> other entities he controls and the persons with ties to terrorists is
> that either there is no evidence that these entities and individuals
> have been involved in terrorism, or that to the extent that they
> were, this involvement was beyond his knowledge.
>
> There is, however, substantial and credible evidence that both
> Muwafaq as an entity, and many of the individuals charged with
> operating it and distributing its funds, were engaged in a
> longstanding pattern of supporting terrorist and extremist causes.
> This evidence comes from both classified and unclassified sources.
>
> Al Qadi admits his longstanding and intimate association with
> SDGT Julaidan, SDGT Chafiq Ayadi, Dr. Abdul Latif Saleh, and

Amir Mehdi.  The latter three individuals have been, according to the information available to OFAC arrested and/or deported from their countries of operation because of associations with terrorists, and Julaidan is a known close associate of Usama Bin Ladin.  Each one of these individuals handled significant sums of money provided to him by Al Qadi.

It strains credulity that Al Qadi could have unintentionally found himself in a repeating cycle of hiring individuals based on his assessment of their character and that these individuals kept deceiving him about their intents on providing his funds  to terrorists and extremists.  These are individuals who Al Qadi had opportunity to personally observe over a period of years, and he gave them significant sums of money to handle on his behalf. Indeed, Al Qadi continues to refer to Julaidan and others as trustworthy and does not question their motives.

In making this determination no one element, no one contact, no one accusation of funding is taken as being determinative of the assessment that Al Qadi has been providing support to terrorists through his actions.  [Redacted text] associated with Al Qadi that have connections with terrorism and dating over too long a time period, to give credence to a defense that all of the reports are in error.  OFAC concludes that when considering the number of sources, the number of activities and length of time, the totality of the evidence, both classified and unclassified provides a reason to believe Yaseen Al Qadi has funded terrorist and extremist individuals and operations.

426.     Consistent with the foregoing findings, the United States listed al Kadi as a "Specially Designated Global Terrorist" on October 12, 2001, describing him as "a Saudi businessman whose companies span the Middle East, Europe, North America and South Asia, [who] has been consistently identified as a financial supporter of Usama bin Laden and other known extremists for more than a decade."

427.     Khalid bin Mahfouz is also a primary financier of al Qaeda and has acknowledged making a $270,000 contribution to Osama bin Laden in 1988, contemporaneous with the establishment of al Qaeda.

428.   An internal al Qaeda document dating from this period, referred to within al Qaeda as the "Golden Chain," includes the name bin Mahfouz, a reference to Khalid bin Mahfouz.

429.   The Golden Chain document was discovered during a raid of the Bosnian offices of the Benevolence International Foundation ("BIF"), conducted jointly by the Federal Bureau of Investigation and Bosnian Police.  During the course of that raid, the authorities seized several computer hard drives, one of which included a file named "Tareekh Osama" ("Osama's History"), containing scanned images of documents chronicling the formation of al Qaeda.  The "Golden Chain" document was among several hundred documents contained in this computer file.  Based on their analysis of all the documents within that file, and intelligence gathered from other sources during the war on terror, officials of the US government concluded that the document is "a list of people referred to within al Qaeda" as wealthy donors to the movement. *See* Government's Evidentiary Proffer supporting the Admissibility of Co-Conspirator Statements, United States of America v.  Enaam Arnaout, No.  02-CR-892 (N.D.  Ill.  filed Jan.6, 2003).

430.   U.S. intelligence and enforcement agencies have concluded that the Golden Chain is an authentic al Qaeda document, identifying al Qaeda's most important financial benefactors, and the individuals responsible for coordinating their contributions to al Qaeda.  Indeed, the 9-11 Commission's Final Report refers to the Golden chain as the al Qaeda organization's "financial supply network …  put together mainly by financiers in Saudi Arabia and the Persian Gulf states."

431.     Jamal al Fadl, the senior al Qaeda official who defected and became a cooperating witness for the United States, has authenticated the Golden Chain.

432.     On the basis of the United States' finding that the Golden Chain is an authentic list of al Qaeda's principal individual financiers, the Treasury Department has used inclusion on that list as a basis for designating individuals as terrorist sponsors and freezing their assets under Executive Order 13224.  For instance, on December 21, 2004 the U.S. Treasury Department issued a press release announcing the designation of Adel Abdul Jalil Batterjee for providing financial and material support to al Qaeda and Osama bin Laden.  The identification of Batterjee's name on the Golden Chain served as a factor for his designation.

433.     Following his $270,000 contribution to Osama bin Laden, Khalid bin Mahfouz founded Muwafaq Foundation, personally choosing Specially Designated Global Terrorist al Kadi to manage its operations.

434.     Given their prominent roles within al Qaeda's financial infrastructure and active participation in facilitating the sponsorship of al Qaeda, NCB officials Yassin al Kadi and Khalid necessarily were aware through a variety of channels of the terrorist activities of Muwafaq Foundation, IIRO, and SJRC.

435.     NCB was also placed on notice of the terrorist activities of Muwafaq Foundation, IIRO and SJRC through media reports and widely publicized governmental investigations.

436.     As the Treasury Department's Evidentiary Memorandum in Support of the Continued Designation of Yassin al Kadi Pursuant to Executive Order 13224 makes clear, the terrorist activities of Muwafaq Foundation were the subject of numerous public reports prior to

September 11, 2001, and several of Muwafaq's offices were closed by foreign governments between 1995 and 1999.

437.     Forced closures of the IIRO and al Haramain offices in Kenya in 1998 were similarly reported by a number of media outlets when Kenyan officials banned those organizations for supporting terrorism.

438.     The IIRO's support for Abu Sayyaf Group, al Qaeda's affiliate in the Philippines, was widely reported upon by the press during this same time frame.

439.     Prominent media reports also documented the SJRC's role in facilitating the movement of "money and men to and from the Balkans" for Osama bin Laden.

440.     Given the public nature of the charity office closings during the mid-1990's, the public reporting concerning the charities' role in supporting al Qaeda, NCB was necessarily aware of the terrorist activities of Muwafaq Foundation, IIRO, and SJRC.

441.     As the forgoing demonstrates, NCB has, for a period of many years, provided critical financial and logistical support to al Qaeda in relation to that terrorist organization's global jihad.

## AL RAJHI BANKING AND INVESTMENT GROUP

442.     Al Rajhi Banking and Investment Corporation ("Al Rajhi Bank") is a Saudi Arabia based bank with four hundred (400) branch offices within the Kingdom, and seventeen (17) subsidiaries across the world.

443.     Al Rajhi Bank is a family owned enterprise, in which Suleiman Abdel Aziz Al Rajhi is Chairman, Managing Director, and the largest shareholder.  Abdullah Suleiman al Rajhi

is General Manager of Al Rajhi Bank and is a member of its Executive Committee.  Saleh

Abdulaziz al Rajhi is the eldest brother of Suleiman and has been Chairman of Al Rajhi Bank.

Through their control of Al Rajhi Bank, the al Rajhis actively participated in that financial

institution's support and sponsorship of al Qaeda.  For example, with Suleiman's support and

authorization, Al Rajhi Bank maintained accounts for many of al Qaeda's charity fronts,

including the IIRO, MWL, WAMY, BIF and Al Haramain, among others.

444.     In cooperation with these charitable organizations, Al Rajhi Bank advertised the

existence and numerical designation of the accounts it maintained for those charities throughout

the Muslim world, thereby providing a mechanism to allow al Qaeda's supporters to deposit

funds directly into those accounts.  At all times relevant, Al Rajhi Bank and the al Rajhi family

members, including Suleiman, were expressly aware that many of the charities for which Al

Rajhi Bank provided financial services were conduits for financing al Qaeda, and that the Bank

was being used as a vehicle for laundering funds on behalf of, and transferring funds to, that

terrorist organization.  Nevertheless, Al Rajhi Bank has continued to maintain those accounts and

to directly fund the charities.

445.     As an example, the IIRO is one of the chief Saudi charities definitively linked to

financing a variety of international terrorist groups and has accounts in Al Rajhi Bank, where

donors deposit their donations.  The IIRO places advertisements for donations in their own

publications, specifically identifying the IIRO bank account number at the bank (i.e., IIRO

account no. 77700), and Al Rajhi Bank collects and deposits these so-called "charitable"

donations into joint accounts according to the account numbers.

446.    In addition, Al Rajhi Bank collected charitable donations on behalf of Sanabel al Kheer ("Seeds of Charity"), the financial/investment arm of the IIRO, depositing the donations into Sanabel's Al Rajhi Bank account no. 77707. Sanabel al Kheer, which the IIRO "owns or controls," was established as a separate branch of the IIRO in 1987 to make investments designed to support the IIRO's charitable operations. Al Rajhi Bank collects Sanabel's donations, while organizations like Sanabel, the IIRO, and the Jeddah al Birr Society ensure their donors a reward of religious fulfillment. Under the guise of IIRO funds labeled and designated for purposes such as "war and disaster" (Account number for Immigrants, Refugees, and Victims of Disasters: 77702) or "sponsor a child" (IIRO Account Number of Deprived Children: 77704), charitable organizations such as the IIRO use banks like Al Rajhi Bank to gather donations that fund terrorism and terrorist activities.

447.    Al Rajhi Bank also handled IIRO "charitable" contributions intended to benefit suicide bombers by directing Al Igatha Journal advertisements toward humanitarian needs in Somalia, Sri Lanka, India, and the Philippines under IIRO Account number 77709 for "the action most loved by Allah."

448.    On February 17, 1994, Al Rajhi Bank made a $533,333 donation to the Saudi High Commission ("SHC") in response to a call for donations for Bosnia and Somalia. In August 1995, Al Rajhi Bank contributed $400,000 to the SHC which was collecting donations for Bosnia during a 12-hour telethon. The donation was identified by the Arabic newspaper Asharq al Awsat. In January 1996, al Rajhi personally donated $80,000 to the SHC while collecting donations for Bosnia.

449.    Moreover, Al Rajhi Bank knowingly and intentionally supplied funds to persons who committed violent terrorist acts.  For example, money was funneled to the Hamburg, Germany al Qaeda cell through the Al Rajhi Bank to businessmen Mahmoud Darkazanli and Abdul Fattah Zammar, who in turn provided the al Qaeda cell of September 11th hijackers with financial and logistical support.  Through Al Rajhi Bank, September 11th hijacker Abdulaziz al Omari received funds into his Al Rajhi Bank Account Number: 162608010366080, 39800061, and Visa  Debit Card No. 4909-8016-2002-5747.  Al Omari frequently utilized a credit card drawn on Al Rajhi Bank in the planning of the attacks.  On September 7, 2001, four days before the 9/11 attacks, al Omari received a wire transfer from Al Rajhi Bank, Buraidah Branch, Jeddah, Saudi Arabia on SunTrust bank account 265D-NY-280350.

450.    Suleiman al Rajhi's active sponsorship of al Qaeda through his family owned bank was specifically detailed in a 2003 Central Intelligence Agency Report.  According to an excerpt from the 2003 Report regarding Al Rajhi Bank:

> Al-Rajhi Bank: Conduit for Extremist Finance (S/NF)
>
> Islamic extremists have used Al-Rajhi Banking & Investment Corporation (ARABIC) since at least the mid-1990s as a conduit for terrorist transactions, probably because they find the bank's vast network and adherence to Islamic principles both convenient and ideologically sound.  Senior al-Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank.  Reporting indicates that senior al-Rajhi family members control the bank's most important decisions and that ARABIC's principle managers answer directly to Sulayman. The al-Rajhis know they are under scrutiny and have moved to conceal their activities from financial regulatory authorities.

451.    The Wall Street Journal was permitted to review the confidential reports authored by the CIA and other U.S. agencies which detailed the use of Al Rajhi Bank by alleged extremists.  *See* July 26, 2007 Report by Glenn Simpson of the Wall Street Journal, titled *U.S.*

*Tracks Saudi Bank Favored By Extremists*.  According to the WSJ, the U.S. intelligence reports

"describe how Al Rajhi Bank has maintained accounts and accepted donations for Saudi charities

and the U.S. and other nations have formally designated as fronts for al Qaeda or other terrorist

groups."  The article further states that "Mr. Al Rajhi and family members have been major

donors to Islamic charities that are suspected by Western intelligence agencies of funding

terrorism, according to CIA reports and federal-court filings by the Justice Department."

452.    The WSJ reported on the following additional findings relative to its review of the

CIA Report.  According to the WSJ, the 2003 CIA Report claims that a year after September

11th, with a spotlight on Islamic charities, Mr. Al Rajhi ordered Al Rajhi Bank's board "to

explore financial instruments that would allow the bank's charitable contributions to avoid

official Saudi scrutiny."  A few weeks earlier, Mr. Al Rajhi reportedly "transferred $1.1 billion

to offshore accounts – using commodity swaps and two Lebanese banks – citing a concern that

U.S. and Saudi authorities might freeze his assets."

453.    The 2003 CIA Report further discusses efforts by two al Rajhi brothers to keep

some charitable contributions secret.  The report says that Sulaiman and Saleh transferred $4

million to parties in Germany and Pakistan in December 1998 using "a unique computer to

decode to send funds at regular intervals to unspecified recipients, suggesting that they were

trying to conceal the transactions and that the money may have been intended for illegitimate

ends."

454.    The 2003 CIA Report states that extremists "ordered operatives in Afghanistan,

Indonesia, Pakistan, Saudi Arabia, Turkey, and Yemen" to use Al Rajhi Bank.  Mamduh

Mahmud Salim, convicted mastermind of the 1998 embassy bombings in Kenya and Tanzania,

was carrying records of an Al Rajhi account (number 001424/4) when arrested in Germany in 1998.

455.    The 2003 CIA Report further says that al Rajhi Bank couriers "delivered money to the Indonesian insurgent group Kompak to fund weapons purchases and bomb-making activities.

456.    A 2003 German police report states that Sulaiman al Rajhi and other family members had contributed more than $200,000 in 1993 to a charity that finances weapons for Islamic militants in Bosnia, in addition to providing humanitarian aid.

457.    A November 16, 2001 U.S. intelligence memo says that a money courier for Osama bin Laden's second-in-command, Ayman al Zawahiri, traveled on a visa that al Rajhi Bank had obtained for him.

458.    Finally, the WSJ reported that Al Rajhi Bank maintained at least twenty-four (24) accounts and handled unusual transactions for the Al Haramain Islamic Foundation, "a charity that Treasury officials say has acted as a front for al Qaeda in 13 countries."  The U.S. Treasury Department has designated Al Haramain headquarters in Saudi Arabia, including thirteen (13) of branch offices between 2002-2004: Afghanistan, Albania, Bangladesh, Bosnia-Herzegovina, Comoros Islands, Ethiopia, Indonesia, Kenya, Netherlands, Pakistan, Somalia, Tanzania, and the United States.

459.    Suleiman Abdel Aziz Al Rajhi's financial and material support for al Qaeda is not limited to his control and chairmanship of the Al Rajhi Bank.  Suleiman was also on the board of directors of Akida Bank in the Bahamas, a Specially Designated Global Terrorist ("SDGT")

entity pursuant to E.O. 13224.  Akida Bank was run by Youssef Nada, a noted terrorist financier.
Suleiman also funneled money through Bank al Taqwa, another SDGT entity operating in the
Bahamas.

460.     Sulaiman similarly enjoyed a long and ongoing relationship with SDGT Ahmed
Idris Nasreddin.  Nasreddin and Nada are both founders and directors of Bank Al Taqwa.
According to the U.S. Treasury Department, "Usama bin Laden and his al-Qaida organization
received financial assistance from Youssef Nada.  Al Taqwa provides investment advice and
cash transfer mechanisms for al Qaida and other radical Islamic groups."

461.     Suleiman has served on the board of directors of the IIRO as well.  Significantly,
numerous branches of the IIRO were publicly implicated in al Qaeda plots throughout the
1990's, during the time that Suleiman was serving as an officer of the IIRO, and at which time
Al Rajhi Bank maintained accounts for that ostensible charity.  Suleiman served on the executive
council of IIRO with Ibrahim Afandi.  Ibrahim Afandi is listed on the "Golden Chain."

462.     Suleiman also managed the National Commercial Bank budget of defendant
SJRC.  In addition, Suleiman has long been involved with the Muslim Brotherhood, a 74-year-
old group which is under investigation by European and Middle Eastern governments for its
alleged support of radical Islamic and terrorist groups.  For decades the Brotherhood has been a
wellspring of radical Islamic activity.  Hamas, the militant Palestinian group, is itself an offshoot
of the Muslim Brotherhood.

463.     Suleiman also materially supported SDGTs and al Qaeda fronts al Haramain
Islamic Foundation and Benevolence International Foundation.  Branch offices of al Haramain
were implicated in al Qaeda plots throughout the 1990's.

464.     Suleiman is also identified on the Golden Chain as one of al Qaida's principal financiers.  The "Golden Chain" document was discovered during a raid of the Bosnian offices of the Benevolence International Foundation, conducted jointly by the Federal Bureau of Investigation and Bosnian Police.  During the course of that raid, the authorities seized several computer hard drives, one of which included a file named "Tareekh Osama" ("Osama's History"), containing scanned images of documents chronicling the formation of al Qaida.  The "Golden Chain" document was among several hundred documents contained in this computer file.  Based on their analysis of all the documents within that file, and intelligence gathered from other sources during the war on terror, officials of the U.S. government concluded that the Golden Chain is an authentic al Qaeda document, identifying al Qaeda's most important financial benefactors, and the individuals responsible for coordinating their contributions to al Qaeda.  Indeed, the 9-11 Commission's Final Report refers to the Golden chain as the al Qaeda organization's "financial supply network …  put together mainly by financiers in Saudi Arabia and the Persian Gulf states.

465.     Among the individuals identified in the Golden Chain as al Qaida's principal sponsors are Suleiman al-Rashid, Abdulkader al Bakri a/k/a Abdel Qader Bakri, Bakr Bin Laden, Youseff Jameel, Ibrahim Muhammad Afandi, Saleh Abdullah Kamel, Suleiman Abdulaziz al Rajhi, Mohammad bin Abdullah al-Jomaih, Abulrahman Hassan Sharbalty, Ahmed Mohamed Naghi, Khalid Bin Mahfouz Adel Faqih a.k.a Abdel Qader Faqeeh, Salahuddin Abduljawad a/k/a Salah al-Din Abdel Jawad, Ahmad Turki Yamani a/k/a Ahmed Zaki Yamani, Abdul Hadi Taher, Ahmad al Harbi Mohammed al-Issai, Hamad al Hussaini, Mohamed Omar and al Kuwait.

466.     Suleiman al Rajhi also established, founded, financed, and is the namesake of the SAAR Network of "charities" and front groups organized at 555 Grove Street in Herndon,

Virginia.  The SAAR Network is comprised of over 100 entities at this single address, with overlapping officers and directors set up to launder money to al Qaeda and international terrorism.

467.    The organizations which operated within the SAAR Network of charities and businesses include but are not limited to defendants African Muslim Agency, Grove Corporate, Inc., Heritage Education Trust, International Institute of Islamic Thought, Mar-Jac Investments, Inc., Mena Corporation, Reston Investments, Safa Trust, Sana-Bell, Inc., Sterling Charitable Gift Fund, Sterling Management Group, Inc., and York Foundation.  These entities funneled millions of dollars of financial sponsorship as well as logistical assistance to al Qaeda through a web of interrelated entities, activities and transactions of deliberate complexity, overseen by the leaders of the SAAR Network.

468.    In March 2002, the entities located at the 555 Grove Street address in Herndon, Virginia were raided under a federal search warrant by the U.S. Treasury Department.  Known as Operation Green Quest, federal authorities were looking for "potential money laundering and tax evasion activities and their ties to terrorist groups such as . . . al Qaeda as well as individual terrorists . . . (including Osama bin Laden)."  It was said by authorities that the probe of the Herndon groups is the largest federal investigation of terrorism financing in the world.  An affidavit from Homeland Security agent David Kane said that the SAAR Network in Herndon has sent more than $26 million in untraceable money overseas and that the leaders of the organization "have committed and conspired to . . . provide material support to foreign terrorist organizations."

469.    Beginning n 1989, Suleiman al Rajhi served as an original member of the Board of Directors for Sana-Bell, Inc. with Ibrahim Afandi and Saleh Kamel, both of whom are identified on the Golden Chain.

470.    Suleiman has close ties to the Saudi Royal family.  Indeed, several members of the Saudi Royal Family are employed by or serve as officers of businesses owned or controlled by al Rajhi.  For example, Prince Mohammad bin Nayef bin Abdel Aziz al Saud, the Assistant Deputy Minister of the Interior of Saudi Arabia, serves as the Chairman of Al Rajhi Commercial Foreign Exchange.  Abdallah bin Yahya al Muallimi, the Secretary General of the Jeddah Province, serves as board member in the same company.  Prince Faisal Ibn Muhamad Ibn Saud is the Chairman of al Rajhi Yamama Cement Company.  Prince Turki Ibn Muhamad Ibn Abdul Aziz Ibn Turki is a board member of al Rajhi Yamama Cement Company.  Suleiman Abdel Aziz Al Rajhi also serves on the Board of Directors of the IIRO, and as a member of the Ibn Baz Foundation, which is chaired by Prince Salman.

471.    Members of the al Rajhi family also used the bank to transfer large sums to the TWRA.  In particular, the U.N. sponsored audit of the TWRA's records two (2) transfers of money totaling $53,287.70 sent by "Sulaiman Al Rajhi" to the TWRA account in June and July of 1993, and three (3) transfers totaling $155,894.28 to the TWRA by "Saleh Alabdulaziz Alrajhi and Brothers" in 1993 and 1994.

472.    As the forgoing demonstrates, Al Rajhi Bank has, for a period of many years, provided critical financial and logistical support to al Qaeda in relation to that terrorist organization's global jihad.

### AL QAEDA'S INDIVIDUAL FINANCIERS AND SUPPORTERS

473.     Wealthy and powerful individuals sympathetic to al Qaeda's cause also provided essential support for al Qaeda's growth and development, both by financing al Qaeda and assisting the organization in developing efficient channels to covertly move resources throughout the World in support of al Qaeda's mission.  Al Qaeda's ties to many of these wealthy individual sponsors dates to the period of the Afghan jihad, when a group of financiers from Saudi Arabia and the Persian Gulf States formed a financial support network for the mujahideen.

474.     When Osama bin Laden formed al Qaeda at the conclusion of the Afghan jihad, many of these financiers became champions of bin Laden's new mission to wage jihad globally. As discussed above, these wealthy financiers became known as the "Golden Chain."

475.     As further detailed above, al Qaeda's individual patrons include Prince Salman bin Abdul Aziz al Saud, Yassin al Qadi, and Suleiman al Rajhi.

476.     In 1980, Prince Salman was named Chairman of the General Donation Committee for Afghanistan (a/k/a "Afghan Jihad Support Committee") which has a history of funding Islamic extremism.  In 1981, the General Donation Committee for Afghanistan gave $39 million to aid the Afghan Mujahideen.  Prince Salman stated the donation was made to "our Afghan brothers."  In a 1989 interview, Sheikh Abdullah Azzam, co-founder of al Qaeda, was asked, "Who donated to the Mujahedeen?" Azzam replied:  "The Saudi Red Crescent and the Saudi Relief Agency headed by Salman Abdel Aziz…"

477.     In 1992, Prince Salman was appointed to head the newly established SHC by the President of the Council of Ministers.  As President of the SHC, Prince Salman is the head of the Executive Committee and Supreme Commission of the SHC.  The Executive Committee and the Supreme Commission include several other Saudi government officials, each of whom Prince

Salman has selected.  Decisions regarding which causes to support and recipients for SHC funds are left to the discretion of the Executive Committee, Supreme Commission, and Prince Salman.

478.    Under Prince Salman's leadership, the SHC served as a primary front for supporting al Qaeda's operations in the Balkans, as detailed above.  Prince Salman was instrumental in facilitating this support, as reflected by his role in transferring more than $120 million from his personal accounts and SHC accounts under his control to the TWRA.

479.    In addition, when he founded the SHC, Prince Salman fully intended that the organization would serve as a vehicle for funding and supporting Islamic militants in Bosnia, including elements of the al Qaeda movement.  Indeed, Prince Salman knew that the SHC was, in fact, supporting al Qaeda's efforts in Bosnia.

480.    Prince Salman has been instrumental in raising funds for several other charities that operate within al Qaeda's infrastructure, including the IIRO, WAMY, and al Haramain, and has made significant personal donations to those organizations as well.

481.    In February 1994, Prince Salman provided the traditional opening speech for a Sanabel al Kheer fundraising convention in Riyadh organized by the IIRO.  Prince Salman told the convention members how he had personally solicited "donations from a number of benevolent Saudi people" for Sanabel and IIRO totaling SR 6,979,462.

482.    On February 23, 1995, the IIRO held its 8th annual charity festival in Riyadh in conjunction with Sanabel al Kheer.  Donations totaling SR 8 million included a SR 1 million personal donation from Prince Salman.

483.    On February 5, 1996, the IIRO and Sanabel al Kheer annual fundraising drive raised more than SR 6 million at the Cultural Palace in Riyadh.  Significant donations included a SR 1 million contribution from Prince Salman.

484.    In December 1998, at the 11th annual IIRO and Sanabel al Kheer fundraising drive, IIRO netted over SR 6 million, including a SR 1 million donation from Prince Salman.

485.    In 1999, Prince Salman donated approximately $400,000 during a joint fundraising event of the IIRO, WAMY, and al Haramain.

486.    During a 1999 televised fundraising event organized by the SJRC, Dr. Abd al Rahman al Swailem, head of the Saudi Red Crescent, announced that Prince Salman personally donated SR 1 million.  In the same event, the total amount of donations by senior Saudi officials totaled SR 47 million.  Dr. al Swailem thanked the members of the Saudi Royal family and the citizens who donated, as well as, the Minister of Communication who helped organize the event.

487.    During a donation campaign in December 2000, Prince Salman donated SR 1.5 million to the IIRO, WAMY, and al Haramain.

488.    At a November 2001 joint fundraiser for the IIRO, WAMY, and al Haramain, Prince Salman contributed SR 1.5 million, while his deputy Prince Sattam donated SR1 million.

489.    As a senior member of the Saudi regime, Prince Salman was expressly aware, at the time of the contributions identified above, that the IIRO, WAMY, SJRC and al Haramain were material sponsors of al Qaeda's global jihad, and that contributions to those organizations would benefit al Qaeda.

490.     Prince Salman also serves as the chairman of the Popular Committees for Support of the Palestinian Jihadis, a Saudi government entity that supports terrorism by donating money to the families of Palestinian suicide bombers.  A letter seized by the Israeli Defense Forces during Operation Defensive Shield, evidences the involvement of Prince Salman in financing Palestinian terrorist organizations. The letter dated December 30, 2000, was issued by the Embassy of the State of Palestine in Riyadh to Prince Salman.  The Palestinian ambassador, Abu Mazen, expresses the concern of Yasser Arafat regarding funding of radical organizations. The letter, translated into English, reads in part as follows:

> *I wish to inform you that [Yasser Arafat] called me and asked to convey his request to mediate and intervene and express his opinion about what is happening in our homeland. The Saudi committee responsible for transferring contributions to beneficiaries is sending large sums to radical committees and associations, including the Islamic Association which belongs to Hamas, the Al-Salah Association, and brothers belonging to the Jihad in all areas. This has a bad affect on the domestic situation and also strengthens these brothers and thus has a bad impact on everybody.*

491.     The excerpted section of the letter to Prince Salman confirms the reality of Saudi support for Palestinian terror organizations, and in particular, Prince Salman's direct role in the funding.

492.     Through his official and personal acts, as described herein, Prince Salman has provided critical financial and logistical support to al Qaeda for a period of many years.

## COUNT I

## PLAINTIFF V. ALL DEFENDANTS

## COMMON LAW INDEMNITY

493.     Plaintiff incorporates all pervious allegations by reference.

494.    As set forth above, the September 11th Attacks were a direct, intended, and foreseeable product of al Qaeda's global jihad.

495.    Through the conduct described in detail above, each of the defendants knowingly conspired with, adied and abetted, and provided material support and resources to al Qaeda, in furtherance of al Qaeda's global jihadist campaign.

496.    By knowingly conspiring with, aiding and abetting, and providing material support and resources to al Qaeda, the defendants engaged in intentional tortious acts under applicable state law, federal common law, and the statutory standards of the Anti-terrorsim Act.

497.    Given the intentional character of their tortious conduct, the defendants bear primary responsibility for the injuries resulting from the September 11th Attacks, and are obligated under principles of common law indemnity, arising under both state law and federal law, to reimburse plaintiff for all losses incurred in defending and settling the unintentional tort claims advanced against their insureds in the 9/11 Aviation Litigation.

WHEREFORE, plaintiff demands judgment against the defendants, jointly and severally, for an amount in excess of $215,000,000, together with punitive damages, pre and post-judgment interest, attorney's fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT II

## PLAINTIFF V. ALL DEFENDANTS

## COMMON LAW CONTRIBUTION

498.    Plaintiff incorporates all pervious allegations by reference.

499.     As set forth above, the September 11th Attacks were a direct, intended, and foreseeable product of al Qaeda's global jihad.

500.     Through the conduct described in detail above, each of the defendants knowingly conspired with, adied and abetted, and provided material support and resources to al Qaeda, in furtherance of al Qaeda's global jihadist campaign.

501.     Through their conduct in knowingly conspiring with, aiding and abetting, and providing material support and resources to al Qaeda, the defendants engaged in tortious acts under relevant principles of applicable state law, federal common law, and the statutory standards of the Anti-terrorsim Act.

502.     By virtue of their knowing and intentional sponsorship of al Qaeda's global jihad, as described above, the defendants bear primary responsibility for the injuries resulting from the September 11th Attacks.

503.     In settling the claims brought against their insureds in the 9/11 Aviation Litigation, plaintiff was compelled to pay greater than its insureds' equitable share of the liability for the 9/11 Aviation Litigation plaintiffs' injuries.

504.     Plaintiff is accordingly entitled to recover from the defendants all amounts expended in relation to the defense of its insureds from the claims asserted in the 9/11 Aviation Litigation, as well as all amounts paid in settlement of those claims, under principles of common law contribution arising under both state law and federal law.

WHEREFORE, plaintiff demands judgment against the defendants, jointly and severally, for an amount in excess of $215,000,000, together with punitive damages, pre and post-judgment

interest, attorney's fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT III

## PLAINTIFF V. ALL DEFENDANTS

## INDEMNITY UNDER THE AIR TRANSPORTATION SAFETY AND SYSTEM STABILIZATION ACT OF 2001

505.     Plaintiff incorporates all pervious allegations by reference.

506.     As set forth above, the September 11th Attacks were a direct, intended, and foreseeable product of al Qaeda's global jihad.

507.     By virtue of their knowing and intentional sponsorship of al Qaeda's global jihad, as described above, the defendants bear primary responsibility for the injuries resulting from the September 11th Attacks.

508.     Pursuant to the Air Transportation Safety and System Stabilization Act of 2001 (ATSSSA), 49 U.S.C. § 40101 *et seq*., Congress established a federal cause of action "for damages arising out of the hijacking and subsequent crashes of American Airlines flights 11 and 77, and United Airlines flights 93 and 175, on September 11, 2001."

509.     ATSSSA was passed in order to preserve the air transportation system, and in furtherance of that objective provided various protections to airlines, security companies, airplane manufacturers and other parties likely to be targeted through civil claims for alleged negligence in relation to the September 11th Attacks.

510.     Consistent with these goals, Congress through ATSSSA created an implied right of indemnity for the benefit of aviation industry members sued for negligence in relation to the September 11th Attacks against responsible terrorists and their supporters.

511.     Plaintiff is accordingly entitled to recover from the defendants all amounts expended in relation to the defense of its insureds from the claims asserted in the 9/11 Aviation Litigation, as well as all amounts paid in settlement of those claims, pursuant to ATSSSA.

WHEREFORE, plaintiff demands judgment against the defendants, jointly and severally, for an amount in excess of $215,000,000, together with punitive damages, pre and post-judgment interest, attorney's fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT IV

## PLAINTIFF V. ALL DEFENDANTS

## CONTRIBUTION UNDER THE AIR TRANSPORTATION SAFETY AND SYSTEM STABILIZATION ACT OF 2001

512.     Plaintiff incorporates all pervious allegations by reference.

513.     As set forth above, the September 11th Attacks were a direct, intended, and foreseeable product of al Qaeda's global jihad.

514.     By virtue of their knowing and intentional sponsorship of al Qaeda's global jihad, as described above, the defendants bear primary responsibility for the injuries resulting from the September 11th Attacks.

515.     Pursuant to the Air Transportation Safety and System Stabilization Act of 2001 (ATSSSA), 49 U.S.C. § 40101 *et seq.*, Congress established a federal cause of action "for

damages arising out of the hijacking and subsequent crashes of American Airlines flights 11 and 77, and United Airlines flights 93 and 175, on September 11, 2001."

516.    ATSSSA was passed in order to preserve the air transportation system, and in furtherance of that objective provided various protections to airlines, security companies, airplane manufacturers and other parties likely to be targeted through civil claims for alleged negligence in relation to the September 11th Attacks.

517.    Consistent with these goals, Congress through ATSSSA created an implied right of contribution for the benefit of aviation industry members sued for negligence in relation to the September 11th Attacks against responsible terrorists and their supporters.

518.    In settling the claims brought against its insureds in the 9/11 Aviation Litigation, plaintiff was compelled to pay greater than its insureds' equitable share of the liability for the 9/11 Aviation Litigation plaintiffs' injuries.

519.    Plaintiff is accordingly entitled to recover from the defendants all amounts expended in relation to the defense of its insureds from the claims asserted in the 9/11 Aviation Litigation, as well as all amounts paid in settlement of those claims, pursuant to ATSSSA.

WHEREFORE, plaintiff demands judgment against the defendants, jointly and severally, for an amount in excess of $215,000,000, together with punitive damages, pre and post-judgment interest, attorney's fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

## COUNT V

## PLAINTIFF V. ALL NON-FOREIGN STATE DEFENDANTS

## ANTI-TERRORISM ACT, 18 U.S.C. § 2333

520.    Plaintiff incorporates all previous allegations by reference.

521.    Through their conduct in knowingly and intentionally conspiring with, aiding and abetting, and providing material support and resources to al Qaeda, as described in detail above, each of the defendants committed multiple violations of the criminal provisions of the Anti-terrorism Act, including the provsions set forth at 18 U.S.C. §§ 2332a, 2332b, 2332f, 2339, 2339A, and 2339B.

522.    The actions of the defendants in knowingly and intentionally conspiring with, aiding and abetting, and providing material support and resources to al Qaeda, as described in detail above, constitute acts of international terrorism within the meaning of 18 U.S.C. § 2331.

523.    As described in detail above, the defendants' acts of international terrorism, to include their knowing and intentional provision of material support and resources ot al Qaeda, were carried out with express awareness that al Qaeda engaged in acts of international terrorism, and that their contributions of support would advance al Qaeda's jihadist campaign and goal of carrying out terrorist attacks against the United States and its citizens.

524.    Plaintiff suffered an injury to its property, to include moetary losses incurred in the defense and settlement of the claims advanced against its insureds in the 9/11 Aviation Litigation, as a result of the defendants' acts of international terrorism, and the defendants are therefore liable to plaintiff pursuant to 18 U.S.C. § 2333 for those financial losses, together with treble damages, attorney's fees and costs of this action.

WHEREFORE, plaintiff demands judgment against the defendants, jointly and severally, for an amount in excess of $215,000,000, together with treble damages, punitive damages, pre

and post-judgment interest, attorney's fees, costs of this action and such other and further relief as the Court may deem appropriate under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury as to all claims so triable.

COZEN O'CONNOR

Attorneys for Plaintiffs

BY:     /s/ Stephen A. Cozen_____
        STEPHEN A. COZEN, ESQUIRE
        PA Bar ID # 03492
        COZEN O'CONNOR
        1900 Market Street
        Philadelphia, PA 19103
        Direct:  (215) 665-2020
        Fax:      (215) 665-3701
        Email:  scozen@cozen.com

Of Counsel:

Elliott R. Feldman, Esquire
PA Bar ID # 32115
Sean P. Carter, Esquire
PA Bar ID # 78886
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103

Carter G. Phillips, Esquire
Richard D. Klingler, Esquire
SIDLEY AUSTIN, LLP
1501 K. Street, N.W.
Washington, DC 20005

PHILADELPHIA\6177937\1  117430.000